**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HEYWOOD HEALTHCARE, INC., | ) | Case No. 23-40817 |
| *et al.*[1] | ) | |
| | ) | Honorable |
| Debtors-in-Possession. | ) | |
| | ) | (Joint Administration Requested) |

## DECLARATION OF THOMAS J. SULLIVAN, CO-CHIEF EXECUTIVE OFFICER OF THE DEBTORS, IN SUPPORT OF FIRST DAY MOTIONS

I, Thomas J. Sullivan, being duly sworn, declare that the following is true to the best of my knowledge, information and belief:

1.      I am the Co-Chief Executive Officer ("CEO") of Debtor Heywood Healthcare, Inc. ("Heywood Healthcare"), a Massachusetts not-for-profit corporation, which is the parent and sole member of The Henry Heywood Memorial Hospital ("Heywood Hospital"), Athol Memorial Hospital ("Athol Hospital"), Heywood Medical Group, Inc. ("Heywood Medical Group"), Athol Memorial Hospital NMTC Holdings, Inc. ("Athol NMTC"), Quabbin Healthcare, Inc. ("Quabbin"), and Heywood Realty Corporation ("Heywood Realty" and together with Heywood Parent, Heywood Hospital, Athol Hospital, Heywood Medical Group, Athol NMTC and Quabbin, collectively, the "Debtors" or "Heywood").

---

[1]      The Debtors in these Chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal identification number are: Heywood Healthcare, Inc. (0658); The Henry Heywood Memorial Hospital (3581); Athol Memorial Hospital (6583), Heywood Medical Group, Inc. (3589), Athol Memorial Hospital NMTC Holdings, Inc. (2189), Quabbin Healthcare, Inc. (7153) and Heywood Realty Corporation (7447). The Debtors have filed a motion for joint administration of these cases contemporaneously herewith.

4893-8219-1219

2.    I serve as co-CEO of Heywood Healthcare with Rozanna Penney.  Ms. Penney oversees Patient Care Services and Operations for the Debtors, and I oversee Administration & Finance.

3.    I have served in this role since June 6, 2023.  Prior to my appointment as CEO, I served as Interim CFO of the Debtors from July 25, 2022, until my appointment as CEO.  I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.

4.    I submit this declaration (the "Declaration") in support of the Debtors' Chapter 11 petitions and the first-day motions in the above-captioned case (collectively, the "First Day Motions").  Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion, relying on my experience with and knowledge of the Debtors' operations and financial condition.  If I were called to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration.

5.    Part I of this Declaration describes the Debtors' business and the circumstances surrounding the commencement of their Chapter 11 Cases.  Part II of this Declaration describes the relief requested in each of the Debtors' First Day Motions.  I attest to the truth and accuracy of the relevant facts set forth in the First Day Motions filed concurrently herewith.

## PART I

## BACKGROUND

**A.    Introduction**

6.    Heywood has stood independently for 116 years, providing essential healthcare services to the "Greater Gardner Area", which includes the communities identified in the graphic

4893-8219-1219

below.  Heywood values providing high quality, affordable, patient-centered local care, enabling

patients to stay close to family and their support system.

7.      Heywood's primary service area includes 15 communities in the North Central and

North Quabbin regions of Massachusetts encompassing a total population of slightly over 80,000.



8.      *Heywood is the largest economic contributor to the region, employing*

*approximately 1,650 residents of North Central Massachusetts, including a medical staff of 200.*

9.      Heywood's dedicated medical staff and employees are the impetus that has driven

the healthcare system's independence and success thus far.  The Debtors are proud of their

achievements and have been bold in their leadership of innovative programs and services,

including deep investments to meet community needs and to address increasing regional social

4893-8219-1219

and health determinants, which are largely supported through the acquisition of competitive grant and philanthropic dollars, securing more than $26,000,000 over the past ten years.

10.    The Debtors have endured their share of challenges as well. Historic operating margins average less than 1%, in large part due to Heywood being one of the lowest commercially reimbursed health care systems in the Commonwealth of Massachusetts (according to CHIA data). Despite these odds, Heywood has recognized growth and a significant number of accomplishments over the years, withstanding the test of time and overcoming many challenges along the way.

11.    However, as described in detail below, over the past three years, a series of events have strained the Heywood healthcare system (and the U.S. healthcare system at large), including:

- EMR Conversion. An electronic medical record ("EMR") conversion in 2021 was lengthy and costly, and led to problematic billing and collection delays and revenue cycle issues.

- Revenue cycle and collection issues.  Heywood's billing infrastructure was tied to the new EMR, resulting in the inability to bill and collect accounts receivable for a significant period of time, which frustrated the billing staff resulting in an exodus of 11 billers, further exacerbating the collections and accounts receivable issues.

- Covid Impacts to Costs. The pandemic impact of workforce shortages resulted in escalating costs to fill needed positions, as well as supply chain interruptions and increased costs.  These increased expenses, coupled with Heywood's high public payor mix and low commercial payor reimbursement rates led to revenue shortfalls.

- Aging Infrastructure.  Heywood and Athol Hospitals continue to require the investment of capital dollars to ensure the delivery of patient care.

- Waterstone Surgical Pavilion. In 2021, Heywood Hospital embarked on the development of a new surgical pavilion, which was to be built by a developer and then leased to Heywood Hospital. The rental rates were based on the costs of construction as projected at the time of lease signing. Shortly after construction commenced in the summer of 2022, the projected costs of construction escalated, resulting in significant increases in projected rent and Heywood Healthcare's capital contribution.

- Repayment of Covid Relief Funds.  Beginning in 2022, Heywood was required to repay Centers for Medicare & Medicaid Services ("CMS") for funding provided to address some of the increased costs associated with the pandemic. The structure of the payback period and amounts were dictated by CMS and were recouped through

4

significant reimbursement reductions over a 12-month period, impacting the system's ability to remain current with accounts payables which resulted in chronic aged payables.

12.     In response to these challenges, earlier this year, the Debtors transitioned to a new executive management team, which transition included the departure of the former Vice President of Operations and Chief Information Officer, Chief Nursing Officer, and President and Chief Executive Officer.  A newly formed co-CEO structure—of Ms. Penney and myself—is in place, which includes strong executive knowledge of both finance and operations.  Further, the Debtors have made significant financial improvements by consolidating services, reducing expenses, productivity management, and revenue cycle optimization.

13.     However, overcoming these challenges is difficult for any health system, let alone one with less than 1% operating margins; overcoming all of them simultaneously has proven to be more than the Debtors can handle.  Despite their best efforts, the Debtors require Chapter 11 relief to facilitate a reorganization and allow the Heywood healthcare system to continue to provide exceptional healthcare to the community.

14.     Most importantly, the Commonwealth of Massachusetts has remained supportive of Heywood, recognizing the value of the Debtors and the detrimental impact to residents' ability to access healthcare should there be an interruption in hospital services. To that end, the Commonwealth is providing certain funds to help ensure the Debtors can continue to provide core essential healthcare services to the community during this Chapter 11 process.

**B.     The Chapter 11 Filings**

15.     On October 1, 2023 (the "Petition Date"), the Debtors commenced with this Court voluntary cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in an effort to preserve and maximize the value of their Chapter 11 estates.

5

16.     The Debtors intend to operate their businesses and to manage their property as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

17.     I am advised by counsel that this Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in the United States Bankruptcy Court for the District of Massachusetts pursuant to 28 U.S.C. §§ 1408 and 1409.

18.     No request for appointment of a Chapter 11 trustee or examiner has been made and, as of the date hereof, no official committee has been appointed.

## C.    Description of the Debtors

19.     Heywood offers a full range of medical services including medical-surgical, telemetry and intensive care, emergency care, maternity and pediatrics, geriatric and adult inpatient care, inpatient mental health for ages sixteen and up, geriatric psychiatric care, outpatient mental health, outpatient oncology and hematology, advanced imaging, special procedures, diabetes care, sleep medicine and interventional pain care, as well as, rehabilitation services and a variety of other services on an inpatient and outpatient basis. In partnership with UMASS Memorial Massachusetts ("UMass") Health System, Heywood Hospital operates an e-ICU in addition to tele-neurology in the Emergency Department.

20.     Heywood Healthcare, Inc.  Debtor Heywood Healthcare, a Massachusetts not-for-profit corporation, was established as the parent company of Heywood Hospital, Athol Hospital, Heywood Medical Group, Heywood Realty and the Heywood Charitable Foundation (a non-debtor affiliate), on December 31, 2012, and is the sole member of each of the six other Debtor entities.

21.     The Henry Heywood Memorial Hospital. Debtor Heywood Hospital, a Massachusetts not-for-profit corporation, is a community-owned acute-care hospital licensed for 134 beds, located in Gardner, Massachusetts.  *Heywood Hospital is the largest employer and economic contributor to the Greater Gardner region.*

6

22.      Heywood Hospital was established in 1907 with money donated by Martha Heywood, the widow of Gardner furniture manufacturer Henry Heywood. Henry was president of the Heywood-Wakefield Furniture Co. and had long envisioned a hospital for Gardner, concerned that injured workers would have to travel to Boston for top-notch care.  In 1907, the Heywood family donated land and a building with 20 beds to the city of Gardner.

23.      Today, the Medical Staff of Heywood Hospital includes 200 active, courtesy and consulting physicians in primary care and a multitude of specialties. Heywood Hospital offers medical-surgical, telemetry and intensive care, emergency care, maternity, geriatrics and adult inpatient care, inpatient adult mental health, outpatient oncology and hematology, advanced imaging, special procedures, rehabilitation services and many other services on an inpatient and outpatient basis.

24.      Athol Memorial Hospital. Debtor Athol Hospital, a Massachusetts not-for-profit corporation, is a 25-bed, critical access hospital in Athol, MA, with a long and rich history of serving the residents of Massachusetts' North Quabbin region, encompassing parts of Worcester and Franklin Counties. Athol Hospital was founded in 1950 by inventor Addison Sawyer, in honor of Athol soldiers who died in World War II.

25.      Athol Hospital employs or contracts nearly 50 doctors who cover a range of medical specialties, including orthopedic surgery, cataract surgery, emergency surgeries and more. Athol Hospital offers a pain clinic, radiology services, an oncology clinic, and 25 inpatient beds.

26.      Heywood Medical Group, Inc. Debtor Heywood Medical Group, a Massachusetts not-for-profit corporation, is a physician organization affiliated with Heywood Healthcare. Heywood Medical Group has over 75 primary care physicians, specialists, and advanced practice providers located throughout the region, and four satellite facilities in Massachusetts: Heywood

7

Rehabilitation Center in Gardner, the Winchendon Health Center, the Murdock School-based Health Center, and ACES School-Based Health Center, located in Winchendon and Athol respectively. Heywood Medical Group serves individuals and families in need of health care and works in coordination with Heywood Hospital and Athol Hospital to provide high quality comprehensive care to the entire community.

27.     Heywood Medical Group's primary care physicians focus on pediatrics and family practice, while the specialty care physicians focus on the areas of addiction medicine, cardiology, endocrinology, gastroenterology, obstetrics & gynecology, occupational health, orthopedics, pediatrics, pulmonology/sleep medicine, rheumatology, surgery, pain/spine, and urology.

28.     Quabbin Healthcare, Inc. Debtor Quabbin, a Massachusetts not-for-profit corporation, historically owned property located in Petersham, MA, known as the "Quabbin Retreat" which houses behavioral health and addiction recovery providers.

29.     On August 19, 2022, Quabbin sold the building that houses the Quabbin Retreat to Waterstone Petersham Medical, LLC, in order to provide working capital to facilitate improvements to the Heywood Hospital campus required for the Surgical Pavilion (as discussed below).  Quabbin currently has no operations or employees.

30.     Heywood Healthcare is the managing lessee of the Quabbin Retreat under that certain Lease and Property Management and Services Agreement (collectively, the "Waterstone Quabbin Lease") by and between Heywood Healthcare, Inc. as managing lessee and Waterstone Petersham Medical, LLC as lessor. Heywood Healthcare sublets a portion of the Quabbin Retreat to GAAMHA, Inc., which operates a residential substance use disorder treatment program for single mothers.

31.     As managing lessee, Heywood Healthcare is responsible for building maintenance, and provides cafeteria services for other programs at the Quabbin Retreat; the maintenance, security, and food service workers are employees of Athol Hospital.

32.     <u>Athol Memorial Hospital NMTC Holdings, Inc</u>. Debtor Athol NMTC, a Massachusetts not-for-profit corporation, was formed to act as a "qualified active low-income business" under the new markets tax credit program ("<u>NMTC Program</u>") in connection with the issuance of a new markets tax credit to finance the construction of a new Emergency Department and Medical Office Building at Athol Hospital.

33.     The NMTC Program is a federal program administered by the U.S. Department of the Treasury's Community Development Financial Institutions Fund, which incentivizes private-sector investment in community development and economic growth projects in underserved areas by providing tax credits to investors in such projects.

34.     Athol NMTC has no operations or employees.  Athol NMTC is a 501(c)(3) supporting organization of Athol Hospital. It is a non-member corporation whose board is appointed by Athol Hospital.

35.     <u>Heywood Realty Corporation</u>. Debtor Heywood Realty, a Massachusetts not-for-profit corporation, was established in April of 1996 to manage the purchase, leasing and sale of real property for the Heywood Healthcare system.

**D.    Community Investment**

36.     Heywood has a proud history of providing essential healthcare services and community support to address increasing social determinants of health, consisting of high rates of

4893-8219-1219

suicide, food insecurity, mental illness, childhood trauma, and displacement due to economic burden[2].

37.    Heywood is committed to advancing the community's well-being by intentionally addressing race, sexual orientation, and gender identity inequities and working collaboratively with partners to increase prevention efforts, address social determinants of health, and improve access to care. Heywood's deep investments to meet community needs and to address increasing regional social determinants are largely supported through the acquisition of competitive grants and philanthropic dollars, securing more than $26 million over the past ten years.

38.    Heywood Healthcare conducts a triennial community health needs assessment and uses the data received from that assessment to provide additional services to its patients and the wider community.

39.    Over the past ten years, Heywood Healthcare has deeply invested in youth and adolescents through strengthening the network of care and addressing prevalent community health challenges including suicide prevention, mental health, access to acute healthcare services, food insecurity, childhood trauma, teen birth rates and economic empowerment.   Heywood Healthcare also led the use of tele-behavioral health services for adolescents in Massachusetts.   Heywood Healthcare is unique in the deep engagement with local school districts, employing 38 employees (each of which are employed by Heywood Hospital or Athol Hospital) including mental health clinicians, nurse practitioners, community health workers, youth mentors and community advocates, who are 100% grant-funded, to work in our local school districts, coordinating access to healthcare, addiction treatment, youth mentorship, behavioral health, and community resources for youth and families.

---

[2] Further detail regarding Heywood's Community Programs is set forth in the Debtors' Motion to Continue Community Programs, filed concurrently herewith.

4893-8219-1219

E.      **Debtors' Prepetition Debt Structure**

40.     The following chart shows the Debtors' current long-term debt obligations, as further described below:

| Funded Debt Obligations Maturity | | Original Issue Amount | Outstanding Principal Amount |
|---|---|---|---|
| **Secured** | | | |
| Massachusetts Development Finance Agency Revenue Bonds, Heywood Healthcare Issue | Series 2019A | $28,350,000 | $26,040,000 |
| | Series 2019B-1 | $10,525,000 | $9,665,000 |
| | Series 2019B-2 | $11,005,000 | $10,105,000 |
| Siemens Financial Services Term Loan | | $10,000,000 | $8,205,402 |
| MassDevelopment New Markets CDE #25, LLC Loans | Note A-1, Note A-2 and Note B | $16,660,000 | $16,660,000 |
| **Subtotal** | | | $70,700,402 |
| **Unsecured** | | | |
| Other Unsecured Debt | | $6,000,000 | $6,000,000 |
| **Subtotal** | | | $6,000,000 |
| **Total Outstanding Debt** | | $76,540,000 | $76,700,402 |

41.     As of the Petition Date, the Debtors' consolidated long-term debt obligations total approximately $76.7 million.  The primary components of the Debtors' consolidated funded debt obligations as of the Petition Date are as follows:

**(a)      Secured Debt**

(i)      Prepetition Bond Facility and Term Loan Facility

42.     To refinance certain expiring debt and to aid in the construction, renovation, furnishing, and equipping of emergency and radiology facilities, an ambulatory care/maternity

11

building and medical building, a rural health clinic, and an imaging department and renovate and equip a treatment/retreat center, Heywood Healthcare, Heywood Hospital, Athol Hospital, Heywood Medical Group, and Quabbin[3] (collectively, the "Obligated Bond Group" and each member thereof an "Obligated Bond Group Member") secured financing through a bond issuance and related loan facilities, which originally closed on November 1, 2019 (the "Prepetition Bond Facility").

43.     Pursuant to three loan and trust agreements each dated as of November 1, 2019 (as amended, supplemented, restated or otherwise modified from time to time, the "Prepetition LTAs"), the Massachusetts Development Finance Agency (the "Issuer"), a body corporate and politic and public instrumentality of the Commonwealth of Massachusetts created by and existing under the Massachusetts General Laws, Chapter 23G (with its successors, the "Series 2019 Bond Issuer"), issued certain tax-exempt bonds totaling approximately $49.9 million in principal  (the "Series 2019 Bonds"), consisting of: (i) the Series 2019A Bonds in an aggregate principal amount of $28,350,000 (the "Series 2019A Bonds"), (ii) the Series 2019B-1 Bonds in an aggregate principal amount of $10,525,000 (the "Series 2019B-1 Bonds"), and (c) the Series 2019B-2 Bonds in an aggregate principal amount of $11,005,000 (the "Series 2019B-2 Bonds").  As of the Petition Date, there is approximately $26,040,000 outstanding under the Series 2019A Bonds, $9,665,000 outstanding under the Series 2019B-1 Bonds, and $10,105,000 under the Series 2019B-2 Bonds.

44.     In connection with each of the Series 2019 Bonds, the Debtors entered into a corresponding continuing covenant agreement, each dated as of November 1, 2019 (each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, a "CCA" and collectively, the "CCAs") with Siemens Public, Inc. (the "Bondholder"), pursuant to

---

[3] Quabbin was released from the Obligated Bond Group in 2022.

which the Bondholder purchased the applicable Series 2019 Bond and became the sole registered and beneficial owner of such bond.

45.     Separate from their bond debt obligations, Heywood Healthcare, Athol Hospital, Heywood Hospital, Quabbin,[4] and Heywood Medical Group (the "Obligated Term Loan Group" and together with the Obligated Bond Group, the "Obligated Group" and any individual member of the Obligated Group, an "Obligated Group Member") are also party to that certain Loan Agreement, dated as of April 12, 2022 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Siemens Loan Agreement") with Siemens Financial Services, Inc., a corporation organized and existing under the laws of the State of Delaware ("SFS" and together with the Bondholder, the "Prepetition Lenders"), pursuant to which SFS provided the Obligated Group with a term loan in the aggregate principal amount of $10,000,000 (the "Prepetition Term Loan Facility"). As of the Petition Date, the Obligated Group Members have approximately $8,200,000 outstanding under the Prepetition Term Loan Facility.  The Prepetition Term Loan Facility is secured by Gross Receipts (as defined in the Master Indenture (as defined herein) and all other property pledged to the Master Trustee under the Master Indenture.

46.     The Obligated Group Members' obligations owing to the Bondholder and SFS are evidenced and secured by the Obligated Group Members' obligations under that certain Master Trust Indenture, dated as of November 1, 2019, by and among the Debtors and U.S. Bank Trust Company, National Association, successor in interest to U.S. Bank National Association (the "Master Trustee" and together with the Prepetition Lenders, the "Prepetition Secured Parties") (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Master Indenture"), including through the issuance of a note for each such obligation

---

[4] Quabbin was released from the Obligated Term Loan Group in 2022.

4893-8219-1219

thereunder (each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, collectively, the "Prepetition Notes").  The Prepetition Notes, together with the Prepetition LTAs, the Series 2019 Bonds, the CCAs, the Master Indenture, the Siemens Loan Agreement, and together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the Prepetition Secured Parties, including, without limitation, all security agreements, notes, mortgages, Uniform Commercial Code financing statements, documents and instruments are herein collectively referred to as the "Prepetition Bond and Term Loan Documents."

47.    As of the Petition Date, the outstanding principal amounts owed by the Obligated Group Members under the Prepetition Bond Facility and Prepetition Term Loan Facility is approximately $45,810,000 (together with any accrued and unpaid interest, fees, expenses, and disbursements due thereunder, including, without limitation, any attorneys', advisors, accountants, appraisers, financial advisors, and other consultants' fees and expenses (in each case that are chargeable or reimbursable under the Prepetition Bond and Term Loan Documents), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the obligations pursuant to the Prepetition Bond and Term Loan Documents, including, for the avoidance of doubt, all interest, fees, costs, and other charges allowable under section 506(b) of the Bankruptcy Code (collectively, the "Prepetition Bond and Loan Obligations")). Payment of the Prepetition Bond and Loan Obligations is secured by (i) (a) in the case of any Obligated Group Member providing health care services (xx) patient service revenues, net of charitable care, and third party payor discounts, (yy) other operating and non-operating revenues, (zz) unrestricted contributions, (b) in the case of any other Obligated Group Member,

14

all gross revenues less sale discounts and sale returns and allowances, as determined in accordance

with generally accepted accounting principles, and in either case all rights to receive the same

whether in the form of accounts, accounts receivable, health-care-insurance receivables, contract

rights, documents, letter-of-credit rights, chattel paper, electronic chattel paper, tangible chattel

paper, instruments, investment property, promissory notes, rights under insurance, deposit

accounts, general intangibles, or payment intangibles of the Obligated Group or any member of

the Obligated Group, and the proceeds thereof; but excluding in either case (A) any unrealized

gain or loss resulting from changes in the valuation of investment securities or unrealized changes

in the value of derivative instruments and (B) unrealized earnings resulting from any reappraisal,

revaluation or write-up of fixed or capital assets; *provided, however*, that if such calculation is

being made with respect to the Obligated Group, such calculation shall be made in such a manner

so as to exclude any revenues attributable to transactions between any Obligated Group Member

and any other Obligated Group Members and (c) all other property pledged to the Master Trustee

under the Master Indenture; (ii) real property located at 2033 Main Street, Athol, Massachusetts

01331 (the "Athol Property") pursuant to that certain *Mortgage and Security Agreement* dated as

of November 20, 2019, from Athol Hospital to the Master Trustee (as amended, restated,

supplemented or otherwise modified from time to time, the "Athol Mortgage");[5] (iii) the real

property located at 242 Green Street (including 250 Green Street), Gardner, MA, 01440 pursuant

to that Mortgage and Security Agreement dated as of November 20, 2019, from Heywood

Healthcare to the Master Trustee (as amended, restated, supplemented or otherwise modified from

time to time, the "Heywood Mortgage", and together with the Athol Mortgage, the "2019

Mortgages"), and (iii) all rates, payments, rents, fees, charges and other income and receipts paid

---

[5] The Athol Mortgage is subject to the NMTC Lien (as defined below), to the extent set forth in the Prepetition Bond and Term Loan Documents.

to the Issuer and all other property pledged to the Master Trustee under the Prepetition Bond and Term Loan Documents (the "Bond and Term Loan Collateral").

(ii)   MassDevelopment New Markets CDE #25, LLC Loans

48.   Prior to the Petition Date, Athol NMTC, and limited guarantor Athol Hospital, sought funds in the amount of $16,600,000 under the NMTC Program (the "NMTC Loan Amount") to complete a project wherein Athol NMTC, formed as a special purpose entity, would (i) lease land from Athol Hospital, (ii) design, permit and construct a new medical office building on the land, (iii) renovate the Athol Hospital Imaging Department, (iv) acquire certain medical equipment, and (v) lease the improvements and equipment to Athol Hospital and other tenants..

49.   On December 7, 2017, Athol NMTC obtained funding from MassDevelopment New Markets CDE #25, LLC, a Massachusetts limited liability company (together with any successors and assigns, "MassDev") and entered into that certain Loan Agreement (as modified, amended, or supplemented from time to time, the "NMTC Loan Agreement"), pursuant to which MassDev extended a term loan (the "NMTC Loan") in the aggregate principal amount of the NMTC Loan Amount.  The NMTC Loan is evidenced by three promissory notes: (i) Note A-1 dated as of December 7, 2017, in the original principal amount of $11,150,000 ("Note A-1"); Note A-2 dated as of December 7, 2017, in the original principal amount of $289,300 ("Note A-2"); and Note B dated as of December 17, 2017, in the original principal amount of $5,220,700 ("Note A-3" and together with Note A-1 and Note A-2, the "NMTC Notes"). The terms of the NMTC Loan Agreement provide for interest-only payments during the initial seven (7) years of the loan and Athol Hospital provided a limited guaranty of the interest payments, and other items, to MassDev.

50.   As of the Petition Date, the approximate principal amount outstanding remains in the amount of the NMTC Loan Amount (together with any accrued and unpaid interest, fees, expenses, and disbursements due thereunder, collectively, the "NMTC Loan Obligations").  The

16

4893-8219-1219

NMTC Loan Obligations are secured by all property now or hereafter pledged, mortgaged, assigned, hypothecated or otherwise provided to MassDev as collateral security of the obligations, including a mortgage granted on the Athol Property, as evidenced by the NMTC Loan Agreement, whether to secure the NMTC Notes, or any other instrument, indebtedness or undertaking (collectively, the "NMTC Lien").

51.      Under the NMTC Program, it is expected that in December 2024, seven years after the initial loan date, Athol Hospital, as project sponsor, will acquire the interests of MassDev in the NMTC Loan for a nominal sum and will forgive the NMTC Loan Obligations in exchange for the cancellation of the land lease to Athol NMTC and the leaseback to Athol Hospital, which will result in Athol Hospital owning all of the improvements and equipment in fee. The Debtors believe that it is in the best interest of their estates and MassDev to assume agreements relating to the NMTC Loan such that the loan can ride through the bankruptcy case, preserving the value of the tax credits for the MassDev investors, as well as the unwind described above. The Debtors have notified counsel for MassDev, as well as the underlying investors, regarding their plans with respect to the NMTC Loan.

**(b)      Unsecured Debt**

52.      The Debtors' books and records indicate approximately $6,000,000 (the "Interim Payment Amount") outstanding on account of an advance interim payment from MassHealth pursuant to that certain Administrative Bulletin delivered to "MassHealth Provided" by Mohamed Sesay. On December 19, 2022, MassHealth provided the funds to the Debtors to assist with working capital requirements. During the remainder of 2023, MassHealth will continue to pay properly submitted and payable claims in accordance with preexisting practice. On January 1, 2024, however, MassHealth will start withholding 100% of the payable amount of the Debtors adjudicated to pay claims processed through the Medicaid Management Information System on or

17

after January 1, 2024, regardless of the date of service, until the total amount withheld by MassHealth equals the Interim Payment Amount.  Upon receiving the full Interim Payment Amount, MassHealth will cease withholding a portion of paid claims.

53.    In addition, the Debtors have approximately $39 million in trade debt as of the Petition Date.

**F.    Events Leading to Chapter 11 Filings**

54.    As set forth above, during the past three years, the Debtors have experienced a series of events which eventually led them to file these Chapter 11 Cases. During and since the pandemic, Heywood Healthcare—and community hospitals across the country—were adversely affected by workforce shortages, supply chain challenges and the increased expenses and related revenue shortfalls they caused.

55.    Heywood Healthcare also continues to be significantly impacted as one of the lowest commercially reimbursed health systems in the Commonwealth.  Heywood Hospital and Athol Hospital have consistently been among the lowest-ranked hospitals in the Commonwealth of Massachusetts for reimbursement rates for medical care.[6] Based on the most recent data published by CHIA (Center for Health Information Analysis), Heywood Hospital's reimbursement for care provided to commercially covered patients is at a relative price index of 0.79. Comparatively, healthcare institutions in a similar cohort (*i.e.*, High Public Payer community hospitals) have an average relative price index of 0.96 for care provided to commercially covered patients.  The Debtors' low reimbursement rate continues to create cash flow challenges.

---

[6] See Massachusetts Center of Health Information and Analysis *Provider Price Variation in the Massachusetts Commercial Market Databook*, August 2023, available at:
https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.chiamass.gov%2Fassets%2Fdocs%2Fr%2Fpubs%2F2023%2FRelative-Price-Databook-2021.xlsx&wdOrigin=BROWSELINK

4893-8219-1219

56.    Heywood Healthcare was also negatively impacted by a costly and lengthy EMR transition, which occurred in the middle of the COVID pandemic, and created serious revenue cycle management issues, and led to significant accounting staff turnover.  The Debtors are still making efforts to address the effects of this transition.  In addition, during this time, the Debtors engaged in a milestone construction project, which costs quickly escalated.

57.    The chronic low reimbursement coupled with the other issues discussed herein have left the Debtors with no option other than to file for these Chapter 11 Cases.

**(a)    Transition to EMR and Impact on Revenue Cycle Management**

58.    A costly and lengthy EMR conversion took place beginning in 2021. This EMR transition was designed to provide all patients of Heywood Healthcare entities with one patient record and one portal by moving from the Athena platform then in place to Meditech Expanse. The implementation was problematic, and providers were not satisfied that they had the staff and support to efficiently transition without jeopardizing patient care due to a lack of timely information.  This ultimately resulted in the ambulatory side of the health system discontinuing the transition of Meditech and transitioning back to Athena with certain revisions to address patient and provider needs—a costly endeavor.

59.    The Debtors' billing infrastructure was also tied to the new EMR (Meditech) and the transition issues resulted in the inability to bill and collect accounts receivable for a significant period of time.  Accordingly, the Debtors experienced significant issues with their revenue cycle management, *e.g.*, how and when medical care is billed, payments received and posted from payors.

60.    Due to delays in the release of initial bills and the follow-up on open balances, the Debtors were also subject to timely filing limits and ultimately denied reimbursement by various insurers.  In addition, the delays in posting of cash receipts, as well as the failure to optimize billing

19

opportunities, resulted in several balances being deemed uncollectible. This loss in reimbursement, coupled with escalating cash draw due to rising expenses, created a significant cash flow hardship on the Debtors.

61.     To further exacerbate the issue, the Debtors experienced the departure of key staff that managed the Debtors' revenue cycle and accounting staff that support the revenue cycle. In particular, during the transition in EMR platforms, the Accounting Department experienced 100% turnover in staff. In addition, a significant number of key staff members in the Billing Office also left. These individuals and their historical knowledge of the Hospital were critical to ensuring a smooth transition between the EMR platforms and continuity of all functions (*i.e.*, account reconciliations, proper billing for services, proper posting of cash receipts, follow-up on unpaid patient accounts, optimization of reimbursement opportunities, etc.). Unfortunately, the loss of these staff members, difficulty in recruiting replacement staff and the struggles of operating thru the pandemic, created a significant breakdown in financial management.

(b)     **Efforts to Resolve Revenue Cycle Issues**

62.     In April 2022, the Debtors hired Huron Consulting Group ("Huron") to perform a review of the revenue cycle. Huron found many deficiencies in the process and made recommendations for improvements. In August 2022, the implementation of these recommendations began and in early September 2022, the Debtors contracted with Huron to manage and stabilize the Debtors' revenue cycle, including bringing in its own staff and redeploying employees of the Debtors to focus on specific billing and collections issues, and implementing cash management and operational efficiencies to improve cash flow. Since undertaking these efforts, the Debtors' cash collections have increased, stabilized and are more predictable. Billed accounts receivable have declined from approximately $57.5 million to a current $47 million, and the Debtors' cash position has improved by 8%.

4893-8219-1219

63.     Following on the success of the revenue cycle improvements, the Debtors also retained Huron's healthcare consultants to analyze and suggest operational improvements to increase their facilities' efficiency and improve cash flow, including labor cost reduction and provider productivity improvement; observation and long-length of stay reduction; supplies, lab, and purchased services savings; and pharmacy claim benefits.  Currently, the Debtors estimate that they will see an additional $6 million dollars per year in savings based on these actions, which are in the process of being implemented.

**(c)     The Waterstone "Surgical Pavilion"**

64.     To address certain aging infrastructure challenges, the Debtors determined that Heywood Hospital needed a new facility to perform surgery to improve the delivery of medical care (the "Surgical Pavilion"). The plan was to construct an addition to the existing Heywood Hospital facility to house new operating rooms. In 2021, Heywood Hospital commenced negotiations with Waterstone Properties Group, Inc., a for-profit real estate developer ("Waterstone").

65.     In June 2021, Waterstone and Heywood executed certain commercial lease agreements whereby Waterstone would lease land from Heywood Hospital, construct the Surgical Pavilion on the land, and lease the building back to Heywood Hospital as the operating entity of the Surgical Pavilion.  Under the lease agreements, Heywood Hospital's annual base rent would be based on a specified percentage of the total cost of the Surgical Pavilion construction, less certain cash contributions to be made by the Debtors. Site work began on the Surgical Pavilion in February of 2022.

66.     However, shortly after actual construction commenced in the summer of 2022, the projected costs of construction escalated, resulting in significant increases in projected rent and other costs.

### G.    Restructuring Plan

67.    The Debtors' restructuring plan entails multiple initiatives that are aimed to establish fiscal stability for the Heywood healthcare system and eliminate commitments that are detrimental to the future financial viability of the Debtors.  These initiatives include optimizing current operations and resources, consolidation of physical space and eliminating commitments that are not needed to continue providing care.

68.    Specifically, the Debtors plan to use these Chapter 11 Cases to reject unprofitable and unsustainable contracts and leases, including those related to the construction of the Surgical Pavilion, other real estate leases, and contracts for goods and services.  The Debtors will optimize operations in the short term by right-sizing certain service lines, temporarily suspending other services and in one case, eliminating a non-core service that currently is being provided by another healthcare provider in the service market.  In addition, Heywood will seek to optimize internal resources and eliminate other contractual relationships (*i.e.*, property leases, equipment leases, professional services, etc.) that are not needed to continue operations.

69.    The Debtors also plan, as part of their restructuring effort, to renegotiate agreements with various payors to increase their reimbursement rates, as Heywood and Athol Hospitals are among the lowest in reimbursement for hospitals in their cohort (*i.e.*, High Public Payer Community Hospitals).  The Debtors will also continue discussions with UMass and other potential interested parties about a merger or acquisition.

### H.    Chapter 11 Financing

70.    The Debtors (Heywood Hospital specifically) have negotiated an arrangement with the Commonwealth of Massachusetts Executive Office of Health and Human Services Office of Medicaid ("EOHHS") for the receipt of approximately $13.2 million in supplemental Medicaid

payments to be paid in equal installments over 6 months, to support their operations in this bankruptcy proceeding.

71.     Specifically, on September 29, 2023, Heywood Hospital and EOHHS entered into that certain *Supplemental Payment and Support Agreement* (the "SPS Agreement") by which EOHHS has agreed to provide to Heywood Hospital $13,259,577.17 in vital capital (the "State Funding"), which will be distributed over the course of five monthly installments of $2,200,000 each and one final payment of $2,259,577.17.  Per the terms of the SPS Agreement, the State Funding is to be used to fund working capital and general corporate purposes of Heywood Hospital, and is subject to certain other conditions and requirements, including that it be segregated and not used to pay existing debts and obligations.  The Debtors have concurrently herewith filed a motion to assume the SFS Agreement.

72.     Further, prior to the Petition Date, the Debtors successfully negotiated and finalized the terms of their consensual use of cash collateral (the "Cash Collateral") during the initial period of these Chapter 11 Cases with the Prepetition Secured Parties.

73.     The State Funding will enable the Debtors to fund a substantial portion of the payroll at Heywood Hospital while deploying their Cash Collateral to fund the balance of operations, run these Chapter 11 Cases, and provide the Debtors the necessary time to either reorganize or, if it would be more advantageous, identify and execute on an affiliation or merger with another non-profit health system. Prior to this filing, the Debtors engaged in some preliminary discussions with the UMass regarding a potential affiliation.  The Debtors intend to re-approach UMass in the near future to gauge their level of interest in a potential affiliation.

4893-8219-1219

## PART II

## FIRST DAY MOTIONS[7]

74.      The relief sought in each First Day Motion (a) enables the Debtors to operate in chapter 11 with minimum disruption to its business or loss of productivity or value and (b) constitutes a critical element in achieving the Debtors' goals of shedding expensive and burdensome contracts to clean up the balance sheet and position the hospital for a successful restructuring or sale.  Factual information in support of the First Day Motions is provided below and in each of the First Day Motions filed concurrently herewith. I have reviewed each First Day Motion (including the exhibits thereto) and can attest to the veracity of the facts set forth therein.

### A.      Administrative and Procedural Motions

### (a)      Debtors' Motion For Entry of An Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Administration Motion")

75.      By the Joint Administration Motion, the Debtors request entry of the Proposed Order, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 1015, directing the joint administration and consolidation of the Chapter 11 Cases for procedural purposes only.

76.      Many of the motions, applications, hearings, and orders that will arise in these Chapter 11 Cases will jointly affect the Debtors. More importantly, the Debtors' finances are intertwined. For these reasons, the joint administration of these Chapter 11 Cases—for procedural purposes only—would best serve the interests of the Debtors, their creditors, and other parties in interest, and will allow for an efficient and economical administration of the Chapter 11 Cases.

---

[7] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the respective First Day Motion.

4893-8219-1219

77.     For the foregoing reasons, the Debtors submit, and I believe that the relief requested in the Joint Administration Motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

**(b)     Debtors' Motion For An Order (I) Extending Time Within Which To File Schedules And Statements Of Financial Affairs, And (II) Granting Related Relief (the "Schedule Extension Motion")**

78.     By the Schedule Extension Motion, the Debtors seek an order extending the time by which to file the Schedules and Statements for an additional 30 days to and including November 14, 2023.

79.     The Debtors have several hundred creditors and hundreds of other parties in interest. Given the broad reach of the Debtors, and their limited administrative staff to assist with these mattes, the Debtors have not had a sufficient opportunity to gather the necessary information to prepare and file their Schedules and Statements.

80.     Although the Schedules and Statements were not filed with the Debtors' petitions, attached to the Debtors' petitions was a list containing the names and addresses of their thirty largest, unsecured, creditors. The Debtors also filed their creditor matrix along with their petitions.

81.     The Debtors have already commenced the extensive process of gathering the necessary information to prepare and finalize the Schedules and Statements but believe that the fourteen-day period to file the Schedules and Statements provided by Bankruptcy Rule 1007(c) will not be sufficient to permit completion of the Schedules and Statements.

82.     Consequently, the Debtors estimate that, at this juncture, it will require an additional 30 days (for a total of 44 days), to and including November 14, 2023, by which to file their Schedules and Statements. The Debtors thus request that the Court establish November 14, 2023, as the date on or before which each must file their Schedules and Statements, without

25

prejudice to the Debtors' right to seek any further extensions from this Court, or to seek a waiver of the requirement of filing certain schedules.

83.    For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in the Extension Motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

(c)    **Debtors' Motion for Entry of an Order (I) Authorizing Consolidated Creditors List, (II) Authorizing Redaction of Certain Personal Identification Information, (III) Limiting the Scope of Notice, and (IV) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information ("<u>Consolidated Creditors Motion</u>")**

84.    The Debtors request that the Court (a) authorize them to prepare a consolidated list of creditors in the format currently maintained in the ordinary course of business in lieu of submitting any required mailing matrix and to file a consolidated list of the Debtors' 30 largest unsecured creditors and (b) approve the form and manner of notice of notifying creditors of the commencement of these bankruptcy cases through the mailing of the Notice of Commencement by Stretto (the "<u>Claims Agent</u>").

85.    The Debtors believe that preparing the consolidated list in the format or formats currently maintained by the Debtors in the ordinary course of business will be sufficient to permit the Claims Agent to promptly provide notices to all applicable parties. Accordingly, the Debtors believe that maintaining their lists of creditors and equity holders in an electronic format rather than preparing and filing separate matrices will maximize efficiency, increase accuracy, and reduce costs to the benefit of these estates.

86.    The Debtors respectfully submit that cause exists to authorize the Debtors to redact certain information of individual creditors—some of whom are the Debtors' employees and patients—from the Creditor Matrix because such information could be used to perpetrate identity theft.

4893-8219-1219

87.     The Debtors request that the Court limit the scope of service of notices to the Debtors employees.   The Debtors employ approximately 1,650 employees (collectively, the "Employees").   Contemporaneously herewith, the Debtors are seeking authority to pay any outstanding prepetition amounts owed to Employees.

88.     For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in the Consolidated Creditors Motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

**(d)     Debtors' Motion For Order (A) Appointing Stretto Inc. As Claims And Noticing Agent And (B) Authorizing Retention And Employment Of Stretto, Inc. As Administrative Advisor ("Claims and Noticing Agent Motion")**

89.     To avoid unduly burdening the Court and the Clerk with noticing and claims administration matters involving such a large creditor body, the Debtors seek appointment of Stretto pursuant to 28 U.S.C. § 156(c) as claims and noticing agent with primary responsibility for the administration of noticing and claims administration matters in this case. I believe that allowance of the Claims and Noticing Agent Motion will promote the efficient administration of these Chapter 11 Cases and help to alleviate an otherwise significant administrative burden upon the Court.

90.     For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in the Claims and Noticing Agent Motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

**B.     Motions Regarding Business Operations**

**(a)     Debtors' Motion For Entry Of An Order (A) Prohibiting Utilities From Altering, Refusing Or Discontinuing Services, (B) Determining Adequate Assurance Of Payment For Future Utility Services And (C) Establishing Procedures For Determining Requests For Adequate Assurance Of Payment (the "Utility Motion")**

91.     By the Utility Motion, and to ensure continued provision of utility services (the "Utility Services") to the Hospital, the Debtors seek entry of an order prohibiting utility providers from altering or discontinuing service on account of prepetition invoices, deeming utilities adequately assured of future payment and establishing procedures for determining adequate assurance of payment for future utility payments. The Debtors propose to establish a segregated account into which the Debtors will deposit a sum equal to approximately half of the Debtors' estimated monthly costs for Utility Services (collectively, the "Adequate Assurance Deposit") and, additionally, has proposed procedures to address any request made by the Utility Companies for additional adequate assurance (as set forth in the Utility Motion, the "Procedures").

92.     In the normal conduct of its business operations, the Debtors incur utility expenses for water, sewer service, electricity, natural gas, telephone service, internet service, waste management service and other services (collectively, "Utility Costs"). Approximately twenty-three utility providers (as such term is used in section 366 of the Bankruptcy Code, collectively, the "Utility Providers") provide these services. The Utility Providers are listed on Exhibit A of the Utility Motion and incorporated by reference herein (the "Utility Service List").[8] The Utility Providers do not include parties that are obligated to provide services to the Debtors pursuant to the terms of a contract.

93.     On average, the Debtors spend approximately $266,558.30 each month on Utility Costs.

---

[8]     Although the Debtors believe that the Utility Service List includes all of the Hospital's Utility Providers, the Debtors reserve the right, without the need for further order of the Court, to supplement the Utility Service List if any Utility Provider has been omitted. Additionally, the listing of an entity on the Utility Service List is not an admission that such entity is a utility within the meaning of section 366 of the Bankruptcy Code, and the Debtors reserve the right to contest any such characterization in the future.

4893-8219-1219

94.     Uninterrupted utility services are essential to the Debtors' ongoing hospital operations and the provision of care to its patients and, therefore, to the success of this Chapter 11 Case.  Simply put, without utility services, the Debtors' operations will shut down.

95.     Based upon cash flow from operations and use of Cash Collateral, the Debtors expect to have ample liquidity to timely pay all postpetition obligations owed to their Utility Providers.

96.     Nevertheless, to provide additional assurance of payment for future services to the Utility Providers, the Debtors will deposit $133,279.15 (the "Adequate Assurance Deposit") into a newly created segregated account within 30 days of the Petition Date (the "Adequate Assurance Account," and together with the cash flow from operations, the "Proposed Adequate Assurance"). This amount represents a sum equal to 50% of the Debtors' estimated aggregate monthly cost of utility services.  The Debtors submit that the Proposed Adequate Assurance provides protection well in excess of that required to grant sufficient adequate assurance to the Utility Providers.

97.     Notwithstanding the Proposed Adequate Assurance, if a Utility Provider is not satisfied that the establishment of the Adequate Assurance Account provides adequate assurance of future payment, the Debtors propose the following procedures (the "Procedures") under which the Utility Provider may make additional requests for adequate assurance:

    a.     If a Utility Provider is not satisfied with the assurance of future payment provided by the Debtors, the Utility Provider must serve a written request setting forth the location at which the given utility services are provided, the account number(s) for such location, the outstanding balance for each account and a summary of the Debtors' payment history in each account (each, a "Request").

    b.     The Request must be served upon: (i) the Debtors, Heywood Healthcare, Inc., Heywood Hospital, 242 Green St., Gardner, MA 01440, Attn: Thomas Sullivan, Co-Chief Executive Officer; (ii) proposed counsel to the Debtors, Foley & Lardner LLP, 321 N. Clark Street, Suite 3000, Chicago, Illinois 60654-5313, Attn.:  Edward J. Green (egreen@foley.com) and 500 Woodward Avenue, Suite 2700, Detroit, MI 48226, Attn: Tamar Dolcourt

(tdolcourt@foley.com); and Flick Law Group, 144 Central Street, Gardner, MA 01440, Attn: (jflick@flicklawgroup.com) (iii) counsel to any statutory committee appointed in these Chapter 11 Cases (if one has been appointed); and (v) the Office of The United States Trustee, Richard T. King 446 Main Street, 14th Floor Worcester, MA 01608 (collectively, the "<u>Notice Parties</u>") so that it is actually received within thirty (30) days of the date of the order granting this Motion (the "<u>Request Deadline</u>").

c.      If the Debtors believe that a Request is unreasonable, the Debtors shall file a motion pursuant to section 366(c) of the Bankruptcy Code (a "<u>Determination Motion</u>") within 30 days after the Request Deadline. The Determination Motion shall seek a determination from the Court that the Utility Deposit account, plus any additional consideration offered by the Debtors, constitutes adequate assurance of payment. Pending notice and a hearing on a Determination Motion, the Utility Provider that is the subject of the Determination Motion may not alter, refuse or discontinue services to the Debtors or recover or set off against a prepetition deposit.

d.      Any Utility Provider that fails to make a timely Request shall be deemed to be satisfied that the Debtors' Adequate Assurance provides adequate assurance of payment to such Utility Provider within the meaning of section 366 of the Bankruptcy Code, and shall further be deemed to have waived any right to seek additional adequate assurance during the course of these Chapter 11 Cases.

98.      To the extent the Debtors subsequently identify additional providers of utilities, the Debtors seeks authority, in its sole discretion, to amend the Utility Service List to add or remove any Utility Provider. The Debtors will serve a copy of the Utility Motion, along with the applicable portion of the amended Utility Service List and any order entered in connection with the Utility Motion to those Utility Providers that are subsequently added to the Utility Service List. Any subsequently added Utility Provider that objects to the Debtors Adequate Assurance will be subject to the Procedures and must file a Request within 30 days of being served with the relevant order.

99.      The proposed Procedures are necessary in these Chapter 11 Cases. If they are not approved, the Debtors could be forced to address numerous requests by their Utility Providers in a disorganized manner during the critical first weeks of the case. Moreover, the Debtors could be blindsided by a Utility Provider unilaterally deciding—on or after the 30th day following the

Petition Date—that it is not adequately protected and discontinuing service or making an exorbitant demand for payment to continue service. Discontinuation of Utility Service could essentially shut down operations, and any significant disruption of operations could put these Chapter 11 Cases in jeopardy.

100.    For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in the Utility Motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

     **(b)     Debtors' Motion For Entry Of An Order (I) Authorizing The Debtors To (A) Maintain Existing Insurance Coverage, (B) Satisfy All Prepetition Obligations Related To Insurance Coverage In The Ordinary Course Of Business, And (C) Renew, Supplement, Or Enter Into New Insurance Coverage In The Ordinary Course Of Business, And (II) Granting Related Relief (the "<u>Insurance Motion</u>")**

101.    By the Insurance Motion, the Debtors seek entry of an order (i) authorizing, but not directing, the Debtors to maintain, continue and renew the Insurance Programs, on an uninterrupted basis and consistent with their prepetition practices; (ii) authorizing applicable Banks and other financial institutions to receive, process, honor and pay any and all checks drawn on the Debtors' general disbursement account and other transfers to the extent such checks and transfers relate to any of the foregoing; and (iii) granting related relief.  The Debtors maintain their various liability, property, casualty, workers' compensation and other insurance programs, in the ordinary course of their businesses (collectively, the "<u>Insurance Programs</u>") through several private insurance carriers (collectively, the "<u>Insurance Carriers</u>").

102.    All of the Insurance Programs are essential to the ongoing operation of the Debtors' businesses and the preservation of the value of the Debtors' estates.

103.    As of the Petition Date, the Debtors are current on all amounts due under the Insurance Premiums.  The premiums for the Insurance Programs (collectively, the "<u>Insurance</u>

31

Premiums") are determined annually. The Insurance Programs are due to be renewed and the annual Insurance Premiums paid in October of 2023.

104.    The Debtors' aggregate annual Insurance Premiums under the Insurance Programs total approximately $2,542,264.92.

105.    Finally, pursuant to the Insurance Programs, the Debtors may be required to pay various deductibles or self-insured retention amounts (collectively, the "Insurance Deductibles") depending upon the type of claim and insurance policy involved. As of the Petition Date, the Debtors do not believe that any prepetition obligations relating to Insurance Deductibles exist; however, out of an abundance of caution, the Debtors seek authority, but not direction, to satisfy, in their sole discretion, any unpaid prepetition Insurance Deductibles.

106.    I believe that the nature of the Debtors' businesses makes it essential for the Debtors to maintain their Insurance Programs on an ongoing and uninterrupted basis. The non-payment of any premiums, deductibles or related fees under the Insurance Programs could result in one or more of the Insurance Carriers terminating or declining to renew their insurance policies or refusing to enter into new insurance policies with the Debtors in the future. If any of the Insurance Programs lapse without renewal, the Debtors could be in violation of state and/or federal law and be exposed to substantial liability for personal and/or property damages, to the detriment of all parties in interest.

107.    In addition, pursuant to contractual obligations with numerous third-party property owners, customers, suppliers, distributors, contractors and lenders, the Debtors are obligated to remain current with respect to certain of the Insurance Programs. Furthermore, the Debtors must maintain the Insurance Programs to comply with the operating guidelines of the Office of the United States Trustee for Region 1. Thus, in order for the Debtors to maintain their operations in

4893-8219-1219

compliance with various legal and contractual obligations, the Debtors must be able to continue the Insurance Programs without disruption.

108.    The Debtors' ability to maintain and honor their Insurance Programs in a timely manner is critical to the ongoing operation of their businesses, and, therefore, necessary to maximize the value of the Debtors' estates.  Thus, continuation of the Insurance Programs falls within the sound business judgment of the Debtors and will benefit the Debtors' creditors by preserving the property of the Debtors' estates.

109.    For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11, and therefore should be approved.

    **(c)**    **Debtors' Motion For Entry Of An Order (I) Authorizing The Payment Of Certain Prepetition Taxes And Fees And (II) Granting Related Relief (the "Taxes Motion")**

110.    Pursuant to the Taxes Motion, the Debtors seek entry of an order authorizing the Debtors to remit and pay certain prepetition taxes, assessments, and fees that will become payable during the pendency of these Chapter 11 Cases, as well as to pay the same that accrue postpetition in the ordinary course of business.

111.    The Debtors collect, withhold, and incur sales, use, and excise taxes, withholding taxes, property taxes, health safety net assessments and unemployment assessments, as well as other business and regulatory fees (the "Taxes and Fees").  The Debtors remit the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities (the "Authorities").  Taxes and Fees are remitted and paid by the Debtors through checks and electronic funds transfers that are processed through their banks and other financial institutions. The Debtors

estimate that their known and determined prepetition liability for taxes, assessments or business fees is approximately $134,000.00.

112.    In addition, the Debtors seek approval of streamlined notice and objection procedures to address any additional prepetition Taxes and Fees that the Debtors may become aware of during the pendency of these Chapter 11 Cases.

113.    Failing to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways. First, failing to pay certain of the Taxes and Fees likely would cause the Debtors to lose their ability to conduct business and maintain its staff. Second, the Authorities could initiate audits, suspend operations, file liens, or seek to lift the automatic stay, which would unnecessarily divert the Debtors' attention from the reorganization process. Third, failing to pay Taxes and Fees could subject certain of the Debtors' directors and officers to claims of personal liability, which would likely distract those key employees from their duties related to the Debtors' restructuring. Fourth, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both, which could negatively impact the Debtors' business. Finally, the U.S. Trustee requires that debtors pay all tax obligations arising after the filing of the petition in full when due.

114.    For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in the Taxes Motion is in the best interest of the Debtors, their estates and creditors, and therefore should be approved.

**(d)    Debtors' Motion For Entry Of An Order (I) Authorizing Debtors To (A) Continue Community Programs In The Ordinary Course Of Business, And (B) Pay Any Prepetition Obligations Related Thereto, And (II) Granting Related Relief (the "Community Programs Motion")**

115.    By the Community Programs Motion, the Debtors are seeking authority to (a) pay and honor the prepetition obligations related to their Community Programs (as defined therein), which include in-school and community medical clinics, suicide prevention hotlines, and social

34

and economic empowerment programs, as they deem appropriate, and (b) continue, renew, replace, implement, or terminate the Community Programs as they deem appropriate, in each case in the ordinary course of business.

116. In addition to their best-in-class hospital services, the Debtors offer a variety of programs to the community, including in schools. Through the Community Programs, the Debtors work collaboratively with community partners to increase prevention efforts, address social determinants of health, and improve access to care. Further, over the past ten years, the Debtors have deeply invested in youth and adolescents through strengthening the network of care and addressing prevalent community health challenges including suicide prevention, food insecurity, childhood trauma, teen birth rates and economic empowerment, among others. Heywood Healthcare also led the use of tele-behavioral health services for adolescents in Massachusetts. Heywood Healthcare is unique in its deep engagement with local school districts, and employs 38 employees (mental health clinicians, nurse practitioners, and community health workers) to work in the local school districts, coordinating access to healthcare, addiction treatment, youth mentorship, behavioral health, and community resources for youth and families. These in-school clinics, as well as all of other the Community Programs, are 100% grant-funded.

117. To facilitate the Community Programs, the Debtors incur certain upfront costs including salaries and benefits for the 38 employees dedicated to the Community Programs, as well as office supplies, clinical session supplies, outreach materials, mentor and student transportation fees, and school supplies, among others. These Community Program Costs, however, are fully reimbursed to the Debtors by the grant funds.

118. While the Debtors worked to reconcile and pay the Community Program Costs prior to filing these Chapter 11 Cases, as of the date of the Community Programs Motion, there

4893-8219-1219

may be small amounts due to program vendors on account of Prepetition Obligations. For

example, the Debtors may receive invoices postpetition for various Community Program Costs

incurred prepetition. By the Community Programs Motion, the Debtors seek the authority to pay

the Prepetition Obligations as they come due in the ordinary course, and the Debtors will promptly

seek reimbursement from the Grants. The Debtors also seek the authority to continue these

Community Programs in the ordinary course.

119.    For the foregoing reasons, the Debtors submit, and I believe, that the relief

requested in the Community Programs Motion is in the best interest of the Debtors, their estates,

and their creditors, and therefore should be approved.

**(e)    Debtors' Motion For Entry Of Order (A) Authorizing (I) Payment Of Employee Wages, Salaries, And Accrued Prepetition Benefits, (II) Contributions To Employee Benefit Plans, (III) Payment Of Funds Deducted From Payroll, (IV) Payment To Individual Independent Contracts; (V) Payment To Staffing Agencies; And (VI) Reimbursement Of Employee Expenses, And (B) Directing All Banks To Honor Related Checks (the "<u>Wages Motion</u>")**

120.    By the Wages Motion, the Debtors are seeking authority to (i) pay, in their sole

discretion, the various prepetition employee obligations of the Debtors including, but not limited

to, the Employee Compensation and Reimbursement Claims, the Employee Benefit Claims and

the Payroll Taxes (each as defined in the Wages Motion, and collectively, the "<u>Employee</u>

<u>Obligations</u>") and all costs incident to such obligations, as well as prepetition amounts owed to

certain individual independent contractors and small medical groups; and (ii) continue providing

post-petition the programs and employee benefit plans described in the Wages Motion. To

effectuate such relief, the Debtors also seek an order authorizing and directing all banks to honor

all checks issued and transfers requested with respect to the Employee Obligations to the extent

sufficient funds are on deposit and authorize the Debtors to issue new post-petition checks, or to

36

effectuate new post-petition transfer requests, to replace any dishonored or rejected pre-petition checks issued or transfer requested on account of such obligations.

121.    As a healthcare provider, the Debtors' employees are essential to the success of their business and the welfare of their patients.  The Debtors pride themselves on the excellent service provided to its patients, and critical to its operations are its employees.  The employees, which are integral to every aspect of its business, may include doctors, nurses, radiology technicians, dieticians, pharmacists, security personnel, housekeeping staff, material management personnel, engineers, information technology specialists, financial and accounting personnel, medical record keepers, human resource personnel, administrators, and staff.

122.    On the Petition Date, the Debtors owed their Employees and independent contractors wages and compensation earned within 180 days of the Petition Date.  The Debtors believe that it is absolutely vital that they pay the pre-petition wages and business expenses of their Employees, honor other employee benefits and continue to contribute to the Employees' benefit plans to adequately incentivize the Employees and deter defections to other medical offices. Furthermore, the Debtors have several Employee Benefit Programs, including health and other insurance, earned time off, and retirement benefits.  The Debtors believe that if this Motion is not granted and they are not able to continue these programs, their efforts to restructure their operations, and maximize recovery for their creditors will be jeopardized.

123.    As of the Petition Date, the Debtors employed approximately 1,650 employees of which approximately 965 are full-time employees.  Heywood Healthcare also has contracts and/or service relationships with individual physicians, physician groups, and staffing agencies.  The Debtors estimates that they incur approximately $8,750,000 per month in payroll.

124.    The Debtors also provide a variety of other benefits to its Employees, for which they also have incurred prepetition liability.   These Employee Obligations include, without limitation, the following:

### (i)    Wages and Salaries

125.    Heywood Healthcare meets its payroll obligations on a weekly basis.    The Employees were last paid on September 30, 2023 for the weekly pay period ending on September 23, 2023.   The Debtors do not believe that any of the Employees whose wages are sought be paid in accordance with the Wagers Motion are owed in excess of $15,150 in pre-petition wages, other than the limited exceptions discussed in the Wages Motion.[9] The prepetition amount of wages to be paid postpetition under this Motion is approximately $2,200,000 for September 24, 2023 through the Petition Date. The next payroll date is October 5, 2023, and will include earnings for the time period of September 24, 2023 to September 30, 2023.

126.    There may also be additional prepetition obligations of the Hospital resulting from checks that were previously issued to Employees, but which have not yet been presented for payment or may not have cleared through the TD Bank system.   Accordingly, the aggregate amount of Prepetition Wages that have not yet been paid to the Employees would include all pay periods prior to the Petition Date.

127.    The Debtors' Employee Obligations also include obligations to physician contractors.   The continued services of these contractors are critical to Heywood Healthcare's continued operation and to its ability to provide patient care.   Indeed, without the continued service of these contractors, Heywood Healthcare would not be able to operate, and patients' lives would be at risk.

---

[9] The Debtors contract with a variety of physician and other medical providers, both as employees and independent contracts, and will file a motion to assume those contracts and pay the cure amounts owed under them as necessary.

128.     By this Motion, the Debtors seek an order authorizing them to pay all outstanding prepetition wages, salaries, and other compensation owed to the Employees and certain independent contractors, and to direct the bank to recognize and honor such checks and direct deposits.

### (ii)     Overtime, Holiday Pay, Flexible Spending and Paid Leave

129.     Non-exempt, hourly employees are subject to the minimum wage and overtime provisions of the Fair Labor Standards Act. Under these provisions, non-exempt Employees are paid one-and-one-half times their regular rate for hours worked in excess of 40 hours per week. Payments for overtime to employees covered by the Debtors' unions are governed by the applicable Collective Bargaining Agreement.

130.     Heywood Healthcare also provides its Employees with a health care flexible spending account.  With the flexible spending account, Employees can pay for their out-of-pocket medical expenses for medical services that are incurred during the plan year. Heywood Healthcare also offers a dependent care reimbursement account.

131.     All full-time and part-time non-union Employees who work at least 20 hours per pay period receive earned time off ("ETO"). They can also earn up to 10 days of holiday pay each year ("EHOL"). The Debtors request authorization to keep their current policies in place regarding approving ETO and EHOL and paying out time to Employees who resign or are terminated.

### (iii)     Expense Reimbursement

132.     In the ordinary course of their duties on the Hospital's behalf, various Employees may have, prepetition, incurred certain business expenses for which they are customarily reimbursed by the Debtors.  The Debtors seek authority to reimburse Employees for the prepetition Reimbursement Expenses.   The Debtors estimate that they have approximately $4,000 in

4893-8219-1219

prepetition expense reimbursements that have not been paid, and request authority to pay those amounts to their Employees in accordance with their existing policies.

### (iv)    Health Insurance, Union and Retirement Obligations

133.    In the ordinary course of business, the Debtors deduct certain amounts from Employees' paychecks in each pay period (the "Deductions").

134.    Heywood Healthcare offers its Employees a comprehensive health insurance program. The Hospital also offers long-term disability group insurance as well as related benefits.

135.    The deductions are made from the Employees' paychecks and transferred directly to the third-party benefit providers and/or government agencies in accordance with the payment schedules established by such providers and/or agencies. The Debtors seek authority to pay these Deductions to government agencies or third-party benefit providers as necessary.

136.    Over 300 of the Debtors' Employees are union members. In the ordinary course of business, the Debtors deduct union dues from the pay of certain eligible Employees. The Debtors remit the dues deducted from the eligible Employees' pay to the union.

### (v)    Workers' Compensation

137.    The Debtors provide workers' compensation benefits to the Employees. Each month, Heywood Healthcare pays for workers' compensation coverage. It is critical that the Debtors are permitted to continue their workers' compensation program and to pay pre-petition claims, assessments and premiums because alternative arrangements for workers' compensation coverage would certainly be more costly and the failure to provide coverage may subject the Debtors to harsh remedies.

### (vi)    Payroll Taxes

138.    The Debtors are required by law to withhold from their Employees' wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes

(collectively, the "Withholding Taxes"), and to remit the same to the appropriate taxing authorities

(collectively, the "Taxing Authorities").

139.    In addition, the Debtors are required to make matching payments from their own

funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross

payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for,

among other things, state and federal unemployment insurance (collectively, the "Employer

Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes"). The Payroll Taxes

are not property of the estate, but rather are held in trust for the various government agencies to

which they are paid.  The Wages Motion seeks authority to pay these amounts over to the

appropriate agency in accordance with applicable law.

### (vii)    Authority for Banks to Honor and/or Reissue Checks

140.    To the extent necessary, the Debtors also request entry of an Order directing

financial institutions to honor all outstanding checks evidencing obligations described above.

141.    For the foregoing reasons, the Debtors submit, and I believe, that the relief

requested in the Wages Motion is in the best interest of the Debtors, their estates and their creditors,

and therefore should be approved.[10]

**(f)    Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain Their Cash Management System and Existing Bank Accounts, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms And (III Granting Related Relief (the "Cash Management Motion")**

142.    As of the Petition Date, the Cash Management System is composed of 21 active

bank accounts (each, a "Bank Account," and collectively, the "Bank Accounts.")  Sixteen of the

Bank Accounts are held at TD Bank, N.A. ("TD Bank"), with the remaining accounts held at U.S.

---

[10] Nothing contained herein shall be deemed to be an admission regarding the existence or amount of liability for any obligations described herein.

4893-8219-1219

Bancorp ("U.S. Bank"), and GFA Federal Credit Union ("GFA" together with U.S. Bank and TD

Bank, the "Cash Management Banks").

143.    The Cash Management System is largely centered around six operating accounts

located at TD Bank (accounts ending in -9597, -6541, -9534, -0660, -4648, and -6484) and one

operating account located at GFA (account ending in -2802) (collectively, the "Operating

Accounts"). Although the Cash Management System includes twenty-one Bank Accounts as of

the Petition Date, the Debtors may close existing accounts or open new accounts in the ordinary

course, in compliance with the Order approving the Cash Management Motion, any order granting

the Debtors authority to assume an agreement with the Commonwealth of Massachusetts regarding

supplemental payments from the Executive Office of Health and Human Services (the

"Supplemental Payment Order"), or any other order of the Court.[11]

### (i)    Operating Accounts and Collection Process

144.    *Core Operating Accounts*. The Debtors' cash earnings are primarily deposited into

one of the Operating Accounts.  Each of the Operating Accounts services one of the Debtor entities.

Both the Heywood Hospital Operating Account (account ending in -9597) (the "Heywood Hospital

Account") and the Athol Memorial Hospital Operating Account (account ending in -6541)

(the "AMH Operating Account") receive funds from miscellaneous deposits such as rent, rebates,

cafeteria purchases, and grants.  Further, both of those accounts receive funds from private and

government insurance as well as patient self-pay payments (the "Medical Care Proceeds").  The

HMG Operating Account, however, does not receive Medical Care Proceeds directly.  The

---

[11] The Debtors also maintain an account at Transamerica related to the 457(b) plan for certain employees' retirement
funds.  Relief to continue such program and maintain such account is requested and further described in the *Debtors'
Motion for Entry of Order (A) Authorizing (I) Payment of Employee Wages, Salaries, and Accrued
Prepetition Benefits, (II) Contributions to Employee Benefit Plans, (III) Payment of Funds Deducted from Payroll,
and (IV) Reimbursement of Employee Expenses, and (B) Directing All Banks to Honor Related Checks* filed
contemporaneously herewith.

Medical Care Proceeds originating from AthenaHealth flow into the U.S. Bank Account and are then deposited into the HMG Operating Account.  The Heywood Hospital Account also holds the bond proceeds from Series 2019 Bonds and certain other amounts (the "Bond Proceeds"), which then flow, as needed, to the Operating Accounts used to fund the AMH Operating Account and the Heywood Medical Group Operating Account (the "HMG Operating Account," together with the AMH Operating Account and the Heywood Hospital Account, the "Core Operating Accounts"). The U.S. Bank Account is further described below.

145.    *Supplemental Operating Accounts*. In addition to the three Core Operating Accounts, the Debtors also maintain three supplemental operating accounts, two of which are used by Quabbin (accounts ending in -0660 and -2802) (the "Quabbin Operating Accounts"). The Quabbin Operating Accounts receive funds from rent as well as miscellaneous operating receipts from cafes and other smaller sources of revenue. The Quabbin Operating Account located at GFA (account ending in -2802) is used mainly for physical deposits of cash from cafeteria sales at a rehabilitation facility in Petersham, Massachusetts (the "Quabbin Retreat").

146.    Heywood Realty also holds an operating account (account ending in -6484) into which it deposits miscellaneous operating receipts and rent.  Finally, Athol NMTC has an operating account that receives payment from rent and miscellaneous operating receipts, and this account is solely used to make interest payments.

147.    The Debtors have historically received between $700,000 and $800,000 a day in cash deposits and checks into the Operating Accounts, which amounts to approximately 90% of the Debtors' daily receipts. The Debtors' credit card sales are processed through a third-party processor, and the proceeds are deposited into the Operating Accounts, net of any fees and

43

chargebacks. The Debtors have historically received approximately $30,000 and $35,000 daily in credit card sales, which amounts to approximately 10% of the Debtors' revenue.

148.    Certain of the Debtors' accounts described above are located at the following banks, which are not included on the *United States Trustee's List of Authorized Depositories for Bankruptcy Cases Filed in Region One 8/8/2023* (the "Authorized Depositories"): (i) U.S. Bank; and (ii) GFA. The account held at GFA (the "GFA Account") is used to deposit cash funds received from the sale of cafeteria food at the Quabbin Retreat.  As of the Petition Date, approximately $60,000 is held in the two Quabbin Operating Accounts in the aggregate, well under the NCUA insurance limits.  Moving the money out of the GFA Account and identifying another bank would cause operational difficulties for the Debtors, as there are few other banks physically located in Petersham, MA, at which the Debtors can deposit cash regularly.  Further, the Debtors plan to reject the leases relating to the Quabbin Retreat during these Chapter 11 Cases; therefore, in the near term, the GFA Account will become inactive and can be closed with the funds being transferred into an Authorized Depository.

149.    The U.S. Bank Account is used solely to receive payments from AthenaHealth ("Athena").  Athena has partnered with U.S. Bank to streamline the process of sending payments to healthcare organizations like the Debtors. This allows both Athena and the Debtors to reconcile payments, eliminate lockbox charges and postage costs, and use the portal created by Athena to manage accounts, use reporting tools, and schedule transfers to other Bank Accounts more efficiently.  Finally, regardless of the Debtors' desire and willingness to consolidate their Bank Accounts in an Authorized Depository, U.S. Bank is the sole partner of Athena. Also, fees paid to U.S. Bank are included in the contract between the Debtors and Athena as long as it is used as a deposit-only account. Finally, if the Debtors did not have a U.S. Bank Account, they could not be

active on "athenaNet," Athena's client portal.  Maintaining the U.S. Bank Account is essential to ensure that revenues from Athena flow to the Debtors promptly. As further described below, U.S. Bank is well-capitalized and a well-known nationally chartered bank.  Funds held there should be considered safe and secure.

### (ii)    Disbursement Process and Intercompany Transactions

150.    The Debtors maintain the Operating Accounts to fund everyday business expenses. As described above, the Operating Accounts are generally financed by third-party insurance companies and payor receipts but also receive funding from the other Operating Accounts as needed. Each day, the Debtors manually transfer funds between the three Core Operating Accounts to fund disbursements being made that day on account of, among other things: (i) accounts payable, (ii) insurance coverage, (iii) Bank Fees (as defined below), (iv) payroll and benefits,[12] and (v) rent and taxes.

151.    The Core Operating Accounts are used to fund three separate bank accounts used to fund payroll (one for each of Athol Hospital, Heywood Hospital, and Heywood Medical Group) and accounts ending in -4407, -6533, -4390, respectively, the "Payroll Accounts"). The Payroll Accounts are solely used to fund payroll and other employee-related obligations. Each Payroll Account is funded from the respective Core Operating Account every week. At the end of the weekly payroll cycle, any amounts remaining in the Payroll Accounts are maintained in the Payroll Accounts and used for the subsequent payroll.

152.    After the Petition Date, the Debtors propose to continue using the Bank Accounts, subject to their right to open and close certain accounts in their discretion in the ordinary course and consistent with any order of the Court.

---

[12] The Debtors' wage and employee benefit obligations are described more fully in the Wages Motion.

4893-8219-1219

(iii)    **The Intercompany Transactions**

153.    In the ordinary course of business, the Debtors have historically engaged in routine business relationships with each other (collectively, the "Intercompany Transactions"), resulting in intercompany receivables and payables.[13] Accounting for Intercompany Transactions is a control-based framework that identifies the procedures required for the timely preparation, review, and approval of Intercompany Transactions in the general ledger and financial statements of the Debtors.

154.    A designated series of general ledger account numbers for intercompany accounts are contained within the chart of accounts for identification purposes. Certain sub-system limitations prevent posting intercompany activity through system feeds directly to intercompany accounts.  This activity is reclassified through the journal entry process.  Elimination entries for Intercompany Transactions are then created to attempt to ensure that consolidated financial statements are presented adequately according to Generally Accepted Accounting Principles

155.    Intercompany Transactions are created and maintained in an Excel Spreadsheet built by the Accounting Department.  At month end, the financial reporting staff verifies all intercompany account entries balance to zero (or below the $500 threshold) before the completion of consolidation.  System-wide reports are produced during the monthly close to ensure all intercompany balance sheets and income statement accounts are consistent. Any discrepancies

---

[13] In the ordinary course of business, Debtors Heywood Healthcare, Heywood Hospital, Athol Hospital and Heywood Medical Group do not engage in any intercompany transactions with, or remit any cash from their accounts to, the other Debtors and such other Debtors' accounts. For purposes of the *Debtors' Motion for Entry of Interim (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Relief,* filed contemporaneously herewith, such motion and any interim order entered shall apply solely to Debtors Heywood Healthcare, Heywood Hospital, Athol Hospital and Heywood Medical Group (and to Heywood Realty to the extent it receives cash from Athol on occasion as reflected in the Approved Budget (as defined therein).

46

over $500 are investigated and resolved before the completion of the closing process. Discrepancies below this threshold are reconciled prior to the subsequent period close.

156.    Intercompany Transactions are essential to the Debtors' operations and centralized Cash Management System. More specifically, the Debtors engage in Intercompany Transactions to, among other things, facilitate daily operations and fund other necessary operating expenses. The Intercompany Transactions are trackable, and the Debtors intend to account for all postpetition Intercompany Transactions in accordance with past practice. Any interruption of the Intercompany Transactions would severely disrupt the Debtors' operations and greatly harm the Debtors' Estates and their stakeholders. Accordingly, the Debtors seek authority—and, to the extent applicable, relief from the automatic stay—to continue the Intercompany Transactions in the ordinary course of business on a postpetition basis consistent with the Debtors' past practice.

157.    As part of the Cash Management System, the Debtors utilize various Business Forms in the ordinary course of business, including letterhead, checks, correspondence forms, invoices, and other business forms (collectively, the "Business Forms"). The Debtors also maintain books and records to document, among other things, their profits and expenses. To minimize unnecessary additional costs to their estates, the Debtors request that the Court authorize their continued use of their Business Forms, as all such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the unnecessary expense, administrative burden, and delay of ordering entirely new forms as required under the U.S. Trustee Guidelines. Once the Debtors have exhausted their existing supply of Business Forms, they will reorder Business Forms with the designation "Debtor in Possession" and the corresponding bankruptcy case number on all such forms.

4893-8219-1219

158.    The Debtors incur periodic service charges and other fees in connection with the maintenance of the Cash Management System (collectively, the "Bank Fees"), which fees and services are generally paid each month.  The Debtors have historically incurred approximately $40,000 per month in Bank Fees and credit card processing fees in the aggregate, which are generally debited on the first week of each month from the respective Bank Account for which the applicable Bank Fee was incurred. The Bank Fees are comprised of merchant services fees, receipt transaction processing (EFT and lockbox), disbursement transaction processing (EFT and check), and account maintenance fees. As of the Petition Date, the Debtors estimate that approximately $40,000 in the aggregate in accrued and unpaid Bank Fees will be owed to the respective Cash Management Banks. The Debtors seek permission to pay these Bank Fees and continue paying the Bank Fees on a postpetition basis consistent with past practice.

**(g)    Debtors' Motion for Entry of an Order (I) Authorizing the Assumption of the Supplemental Payment and Support Agreement and (II) Granting Related Relief (the "SPS Motion")**

159.    Throughout the Debtors' history (as further described herein), the Commonwealth of Massachusetts has remained a steadfast partner, recognizing the value of the Debtors as well as the detrimental impact on Massachusetts residents' ability to access healthcare should there be an interruption of the Debtors' hospital services. In a continuing show of support, the Commonwealth has agreed to provide a grant to ensure the Debtors' ability to successfully navigate the restructuring process while maintaining essential healthcare services.

160.    Specifically, the Commonwealth of Massachusetts has agreed to provide $13,259,577.17 in vital capital (together with any proceeds thereof, the "State Funding"), which will be distributed over the course of five monthly installments of $2,200,000 each and one final payment of $2,259,577.17 (each such payment, an "Installment").  The State Funding will enable the Debtors to fund a substantial portion of their payroll while deploying their Cash Collateral to

48

run these Chapter 11 Cases and identify and effectuate a restructuring transaction. Absent the State Funding, the Debtors may be forced to sell their assets to a for-profit entity where such services could be limited. Here, the Debtors, with the support of the Commonwealth, can effectuate its restructuring while maintaining the valuable support they provide the community.

### (i)      Terms and Conditions of the SPS Agreement

161.   The State Funding is being provided pursuant to that certain *Supplemental Payment and Support Agreement between the Commonwealth of Massachusetts Executive Office of Health and Human Services Office of Medicaid and Heywood Hospital* (the "SPS Agreement"). The SPS Agreement includes certain restrictions requested by the Commonwealth to ensure that State Funding is used in a way that supports the common interests of both the Debtors and the Commonwealth. As set forth below, notwithstanding these restrictions, the State Funding undoubtedly is being provided to the benefit of the Debtors' Estates, their creditors, and all parties in interest. Specifically, to qualify for the delivery of any Installment, the Commonwealth has required that the Debtors:

(a)      Utilize the State Funding for the purposes of payroll, working capital and general corporate purposes of Heywood Hospital;

(b)      Utilize the State Funding for purposes other than refinancing or paying down any prepetition funded debt, paying any amounts due to any lenders or agents or their professional fees, or making any adequate protection payments to any secured creditor under the Bankruptcy Code;

(c)      Until such utilization thereof, hold the State Funding in a segregated account at a financial institution selected by the Debtors, which is not subject to any pre-existing or future security agreements, deposit account control account agreements, or other similar agreement (the "Supplemental Payment Installment Account");

(d)      Prevent the Stating Funding from (i) serving as collateral for any pre-existing debt or new debt incurred, or (ii) being treated as "Cash Collateral" under Section 363 of the Bankruptcy Code; and

(e)      Do not encumber the Supplemental Payment Installment Account.

162.    As further described in the Cash Collateral Motion, the Prepetition Secured Parties each acknowledge that the State Funding is not Cash Collateral, and have consented to the carve out the State Funding from the definition of Cash Collateral.

163.    Undoubtedly, the SPS Agreement was negotiated at arm's length and is in the best interest of the Debtors.  There are no repayment obligations.  In addition to the foregoing requirements on the State Funding, the Debtors also must continue to provide the following services: (a) Emergency Department Services; (b) Intensive Care Unit (including Telemetry Unit Services); (c) Maternal and Newborn Services (including OB Beds and labor and delivery rooms); (d) Medical/Surgical Inpatient Services; (e) inpatient psychiatric services, (f) outpatient psychiatric and mental health services, (g) surgical services; and (h) other essential health services deemed critical by EOHHS to support to the provision of MassHealth services in the communities served by the Debtors.

**(h)    Motion Of Debtors For Entry Of Interim And Final Orders (I) Authorizing Use Of Cash Collateral, (II) Granting Adequate Protection To Prepetition Secured Parties, (III) Granting Liens And Superpriority Claims, (IV) Modifying The Automatic Stay, (V) Scheduling A Final Hearing And (VI) Granting Related Relief (the "Cash Collateral Motion")**

164.    Prior to the Petition Date, the Debtors successfully negotiated and finalized the terms of their consensual use of Cash Collateral during the initial portion of these Chapter 11 Cases with the Prepetition Secured Parties.  The terms of the proposed Cash Collateral are described in further detail in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* (the "Cash Collateral Motion") filed contemporaneously herewith and which is incorporated herein.

4893-8219-1219

165.    As described above, the Debtors have procured State Funding, which will be distributed over six months under the SPS Agreement (approval of which is being requested under separate motion, filed concurrently herewith).

166.    In addition to the State Funding, however, the Debtors require the use of their Cash Collateral (as defined in section 363(a) of the Bankruptcy Code). The Debtors have negotiated a consensual arrangement for the continued use during the initial period of these Chapter 11 Cases of Cash Collateral with the Prepetition Secured Parties.

167.    With the execution of the SPS Agreement and the consensual use of Cash Collateral, the Debtors are comfortable that they will have sufficient cash to continue operations in the ordinary course during these Chapter 11 Cases, including the funding of amounts anticipated under the various first day motions. There are no projected incremental funding needs required during the interim period.

168.    Access to Cash Collateral, together with the State Funding, will provide a clear and strong message to the Debtors' customers, vendors, employees, and contract counterparties that operations are appropriately funded and that the bankruptcy filing will not impact the Debtors' businesses operationally; in particular, the continued provisions of core health care services to the community. There exists a risk of immediate and irreparable harm if the Debtors are denied access to Cash Collateral, as access to Cash Collateral will provide the Debtors with sufficient funds to pay wages to their employees, preserve and maximize the value of their estates, and administer these Chapter 11 Cases.

169.    Further, the Debtors' need to use Cash Collateral is immediate. The Debtors' businesses rely on the ability to use cash generated by the collection of accounts receivable to manage their day-to-day operations. The Orders (as defined herein) will give the Debtors the

necessary funding to continue the day-to-day operations of their businesses, preserve the value of their assets, and ensure a smooth transition into chapter 11. For these reasons, the Debtors submit that their continued use of Cash Collateral, on the terms set forth in the Orders, is in the best interests of the estates and should be approved.

## **CONCLUSION**

170.    In conclusion, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of this case, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

**[REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK]**

4893-8219-1219

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Gardner, Massachusetts
Dated: October 1, 2023

Thomas Sullivan
Co-Chief Executive Officer
(Administration & Finance)
Heywood Healthcare, Inc.