# <u>Exhibit A to Notice</u>

***Modified Second Amended Plan of Reorganization of Heywood Healthcare, Inc., et al., Pursuant to Chapter 11 of the Bankruptcy Code***

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HEYWOOD HEALTHCARE, INC., *et al.*[1], | ) | Case No. 23-40817 |
| | ) | |
| | ) | Honorable Elizabeth D. Katz |
| Debtors-in-Possession. | ) | |
| | ) | (Jointly Administered) |

# MODIFIED SECOND AMENDED PLAN OF REORGANIZATION OF HEYWOOD HEALTHCARE, INC., *ET AL.*, PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Dated: September 26, 2024

John M. Flick (#652169)
**FLICK LAW GROUP, P.C.**
144 Central Street, Unit 201
Gardner, MA 01440
Tel: (978) 632-7948
jflick@flicklawgroup.com

Edward J. Green (*Admitted Pro Hac Vice*)
**FOLEY & LARDNER LLP**
321 N. Clark Street, Suite 3000
Chicago, IL 60654
Tel: (312) 832-4500
Fax: (312) 832-4700
egreen@foley.com

Tamar N. Dolcourt (*Admitted Pro Hac Vice*)
Jake W. Gordon (*Admitted Pro Hac Vice*)
**FOLEY & LARDNER LLP**
500 Woodward Avenue, Suite 2700
Detroit, MI 48226
Tel: (313) 234-7100
Fax: (313) 234-2800
tdolcourt@foley.com
jake.gordon@foley.com

Alissa M. Nann (*Admitted Pro Hac Vice*)
**FOLEY & LARDNER LLP**
90 Park Avenue
New York, NY 10016
Tel: (212) 682-7474
Fax: (212) 687-2329
anann@foley.com

*Counsel to the Debtors and Debtors in Possession*

[1] The Debtors in these Chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal identification number are: Heywood Healthcare, Inc. (0658); The Henry Heywood Memorial Hospital (3581); Athol Memorial Hospital (6583), Heywood Medical Group, Inc. (3589), Athol Memorial Hospital NMTC Holdings, Inc. (2189), Quabbin Healthcare, Inc. (7153) and Heywood Realty Corporation (7447).

# TABLE OF CONTENTS

**ARTICLE I.** DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW ..... 1

A. Defined Terms. ..... 1

B. Rules of Interpretation. ..... 20

C. Computation of Time. ..... 20

D. Governing Law. ..... 21

E. Reference to Monetary Figures. ..... 21

F. Reference to the Debtors or the Reorganized Debtors. ..... 21

G. Controlling Document. ..... 21

**ARTICLE II.** ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS ..... 21

A. Administrative Claims. ..... 21

B. Professional Fee Claims. ..... 22

C. Priority Tax Claims. ..... 23

**ARTICLE III.** CLASSIFICATION AND TREATMENT OF CLAIMS ..... 24

A. Classification of Claims. ..... 24

B. Treatment of Claims ..... 25

C. Special Provision Governing Unimpaired Claims. ..... 30

D. Elimination of Vacant Classes ..... 30

E. Voting Classes, Presumed Acceptance by Non-Voting Classes ..... 30

F. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. 30

G. Controversy Concerning Impairment. ..... 30

H. Subordinated Claims. ..... 30

**ARTICLE IV.** MEANS FOR IMPLEMENTATION OF THE PLAN ..... 31

A. General Settlement of Claims. ..... 31

B. Restructuring Transactions and Committee Settlement. ..... 31

C. Reorganized Debtors. ..... 34

D. Sources of Consideration for Distributions. ..... 34

E. Corporate Existence. ..... 37

F. Vesting of Assets in the Reorganized Debtors. ..... 37

G. Cancellation of Existing Agreements. ..... 38

H. Corporate Action. ..... 38

I. New Organizational Documents. 39

J. Directors and Officers of the Reorganized Debtors. 39

K. Effectuating Documents; Further Transactions. 39

L. Section 1146 Exemption. 40

M. Director and Officer Liability Insurance. 40

N. Employee and Retiree Benefits. 40

O. Preservation of Causes of Action. 41

P. Assumption, Ratification, Reaffirmation, and Reinstatement of NMTC Documents and Waiver of Discharge and Injunction with Respect Thereto. 41

Q. Dissolution of Quabbin. 42

R. The 457 Plan. 42

S. Preservation of Medicare Provider Agreements. 43

T. Preservation of Insurance. 43

U. Avoidance Actions 43

**ARTICLE V.** PROVISIONS REGARDING THE LIQUIDATING TRUST 43

A. Establishment and Administration of the Liquidating Trust 44

B. Liquidating Trust Assets 44

C. Liquidating Trust Distributions and Expenses 44

D. Appointment of the Liquidating Trustee 45

*A. Liquidating Trust Beneficiaries* 45

*B. Liquidating Trust Interests* 45

E. Certain Powers and Duties of the Liquidating Trust and Liquidating Trustee 46

**ARTICLE VI.** TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES 48

A. Assumption and Rejection of Executory Contracts and Unexpired Leases. 48

B. Indemnification Obligations. 49

C. Claims Based on Rejection of Executory Contracts or Unexpired Leases. 49

D. Cure of Defaults for Executory Contracts and Unexpired Leases Assumed. 50

E. Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases. 50

F. Insurance Policies. 51

G. Modifications, Amendments, Supplements, Restatements, or Other Agreements. 51

H. Reservation of Rights. 51

I. Nonoccurrence of Effective Date. 51
J. Contracts and Leases Entered into After the Petition Date. 51
K. Special Provisions Related to Pavilion-Related Claims and Underlying Agreements. 52
L. Assumption of Doctor Agreements. 52
M. Special Provision Regarding Cigna Contracts. 52

**ARTICLE VII.** PROVISIONS GOVERNING DISTRIBUTIONS 53
A. Timing and Calculation of Amounts to Be Distributed. 53
B. Disbursing Agent. 53
C. Rights and Powers of Disbursing Agent. 53
D. Delivery of Distributions and Undeliverable or Unclaimed Distributions. 54
E. Manner of Payment. 55
F. Compliance with Tax Requirements. 55
G. Allocations. 55
H. No Postpetition Interest on Claims. 55
I. Foreign Currency Exchange Rate. 55
J. Setoffs and Recoupment. 56
K. Claims Paid or Payable by Third Parties. 56

**ARTICLE VIII.** PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS 57
A. Allowance of Claims. 57
B. Claims Administration Responsibilities. 57
C. Estimation of Claims. 57
D. Adjustment to Claims without Objection. 57
E. Time to File Objections to Claims. 57
F. Disallowance of Claims. 58
G. Amendments to Claims. 58
H. No Distributions Pending Allowance. 58
I. Distributions After Allowance. 58
J. Provisions Related to Pavilion-Related Claims. 59

**ARTICLE IX.** SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS 59
A. Discharge of Claims. 59
B. Release of Liens. 59
C. Releases by the Debtors. 60

D. Releases by Holders of Claims. .... 61
E. Exculpation. .... 62
F. Injunction. .... 62
G. Protections Against Discriminatory Treatment. .... 63
H. Document Retention. .... 63
I. Reimbursement or Contribution. .... 64
**ARTICLE X.** CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN .... 64
A. Conditions Precedent to the Effective Date. .... 64
B. Waiver of Conditions. .... 65
C. Effect of Failure of Conditions. .... 65
**ARTICLE XI.** MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .... 66
A. Modification and Amendments .... 66
B. Effect of Confirmation on Modifications. .... 66
C. Revocation or Withdrawal of Plan. .... 66
**ARTICLE XII.** RETENTION OF JURISDICTION .... 66
**ARTICLE XIII.** MISCELLANEOUS PROVISIONS .... 69
A. Immediate Binding Effect. .... 69
B. Additional Documents. .... 69
C. Payment of Statutory Fees. .... 69
D. Statutory Committee and Cessation of Fee and Expense Payment. .... 69
E. Reservation of Rights. .... 69
F. Successors and Assigns. .... 70
G. Notices. .... 70
H. Term of Injunctions or Stays. .... 71
I. Entire Agreement. .... 71
J. Exhibits. .... 71
K. Nonseverability of Plan Provisions. .... 71
L. Votes Solicited in Good Faith. .... 72
M. Closing of Chapter 11 Cases. .... 72
N. Waiver or Estoppel. .... 72
O. Conflicts. .... 72

# INTRODUCTION

The Debtors propose this Plan to address and otherwise resolve the outstanding claims against the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Holders of Claims may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, accomplishments during the Chapter 11 Cases, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

This Plan, in addition to addressing Claims, effectuates the Committee Settlement and implements the Restructuring Transactions, which provide for, among other things, (a) the reinstatement of the outstanding Series 2019 Bonds through the delivery of New Bonds in replacement or amendment of the Series 2019 Bonds and an exchange of the outstanding Series 2019 Bonds for the New Bonds, (b) the closing of a superpriority exit facility, and (c) the distribution of the GUC Cash Amount and the GUC Note to the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries. Except as otherwise provided by order of the Bankruptcy Court, Distributions will occur on the Effective Date or as soon thereafter as is practicable or such other date as set forth in this Plan or the Liquidating Trust Agreement. This Plan provides that, upon the Effective Date, the Liquidating Trust Assets available as of such date will be transferred to the Liquidating Trust. The Liquidating Trust Assets will be held, administered and/or distributed as soon as practicable pursuant to the terms of the Plan and the Liquidating Trust Agreement.

ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

*A. Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1. "*457 Plan*" means the Debtors' 457(b) Plan, a non-qualified deferred compensation plan under section 457(b) of the Internal Revenue Code, which allows certain of the Debtors' eligible employees to make elections to defer the payment of a certain amount or percentage of their regular base salary or bonus for future payment.

2. "*Act*" means Massachusetts General Laws, Chapter 23G and, to the extent incorporated therein, Massachusetts General Laws, Chapter 40D, both as amended from time to time.

3. "*Administrative Claim*" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (a) the

actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930; (d) administrative claims of one or more of the Prepetition Secured Parties, if any, under any one or more interim cash collateral orders or other cash collateral orders (whether interim or final and whether consensual or non-consensual) entered by the Bankruptcy Court in these Chapter 11 Cases; and (e) Prepetition Secured Parties Priority Claims, if any.

4. "*Administrative Claims Bar Date*" means the deadline for filing requests for payment of Administrative Claims, which shall be 30 days after the Effective Date. For the avoidance of doubt, the Debtors or the Reorganized Debtors, as applicable, may allow for the extension of the Administrative Claim Bar Date at their sole discretion.

5. "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

6. "*Allain Claim*" means any Claim held by Allain Sitework, Inc., including Claim No. 211, filed on December 14, 2023.

7. "*Allain Deficiency Claim*" means a deficiency claim for the portion of the Allain Claim that is not a Secured Allain Claim.

8. "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) a Claim that is evidenced by a Proof of Claim Filed by the Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable. For the avoidance of doubt, a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim; (y) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law. "Allow" and "Allowing" shall have correlative meanings.

9. "*Avoidance Action*" means any and all actual or potential avoidance, recovery, subordination, or other claims or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including any avoidance claim brought under the Committee Adversary Proceeding and other claims or remedies under sections 502, 510, 542, 544, 545, 547–553, and

724(a) of the Bankruptcy Code or under other similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

10. "*Avoidance Action Schedule*" means a list of potential Avoidance Actions preserved by Debtors following Confirmation, which shall be filed as part of the Plan Supplement and is subject to consultation rights of the Committee.

11. "*Ballot*" means the Ballot accompanying the Disclosure Statement and the Plan, on which Holders of Impaired Claims entitled to vote on the Plan may indicate their acceptance or rejection of the Plan in accordance with the Voting Instructions.

12. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

13. "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Massachusetts.

14. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

15. "*Bar Date*" means March 12, 2024, for all entities that are not Governmental Units, and March 29, 2024, for all Governmental Units, as set by the Bar Date Order.

16. "*Bar Date Order*" means that certain *Order Establishing Bar Date for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* [Docket No. 444] entered by the Bankruptcy Court on January 11, 2024.

17. "*Bond Debt*" means the debt issued pursuant to the bond indebtedness in the initial aggregate principal amount of $49,880,000 and all other obligations under the Bond Documents.

18. "*Bond Documents*" means collectively, the Prepetition LTAs, the Master Indenture, the CCAs and all other agreements, documents, and instruments evidencing or securing the Bond Debt, delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents).

19. "*Bond Trustee*" means U.S. Bank Trust Company, National Association, as successor in interest to U.S. Bank National Association, as trustee under the Prepetition Bond Facility, in its capacity as Bond Trustee under the Prepetition Bond Facility.

20. "*Bondholder*" means Siemens Public, Inc.

21. "*Bondholder Claim*" means a Claim held by the Bond Trustee, the Master Trustee or the Bondholder arising from the Prepetition LTAs, the CCAs, the Master Indenture, and all documents related thereto.

22. "*Bondholder Deficiency Claim*" means an unsecured Claim in the aggregate amount of approximately $1,800,000 on account of the Bondholder agreeing to waive such Claim in its entirety and receive no distribution or rights under the Plan or the Liquidating Trust Agreement for such Claim, pursuant to the Committee Settlement.

23. "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

24. "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

25. "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, including but not limited to, (a) Avoidance Actions, (b) the Committee Adversary Proceeding, (c) Former D&O Actions, (d) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (e) the right to object to or otherwise contest Claims; (f) claims pursuant to sections 362, 543, 546 of the Bankruptcy Code; (g) the Quabbin Sale Claim, (h) the Pavilion Claims and (i) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

26. "*CCAs*" means, collectively, the corresponding continuing covenant agreements, each dated November 1, 2019, pursuant to which the Bondholder became the sole registered and beneficial owner of such bond.

27. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

28. "*Cigna Contracts*" means, collectively, (i) the Provider Group Services Agreement, as amended, between Cigna HealthCare of Massachusetts, Inc. and Heywood Medical Group, effective August 1, 2010; (ii) the Hospital Services Agreement, as amended, between Cigna Health and Life Insurance Company and Henry Heywood Memorial Hospital, effective August 1, 2010; and (iii) the Hospital Services Agreement, as amended, between CHLIC and Athol Memorial Hospital, effective June 1, 2010.

29. "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

30. "*Claims and Balloting Agent*" means Stretto, Inc., the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases by Bankruptcy Court order.

31. "*Claims Register*" means the official register of Claims maintained by the Claims and Balloting Agent.

32. "*Class*" means a class of Claims as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

34. "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee as of October 20, 2023 [Docket No. 127] and all of its individual members in their capacity as members thereof.

35. "*Committee Adversary Proceeding*" means that certain Adversary Proceeding No. 24-04022 pending in the Bankruptcy Court, as initiated by the Committee against certain defendants pursuant to the complaint filed therein, as amended.

36. "*Committee Settlement*" means the compromise and settlement by and among the Committee, the Debtors, and the Prepetition Secured Parties, as reflected in that certain Global Settlement Term Sheet, a copy of which is attached hereto as **Exhibit C**.

37. "*Commonwealth*" means the Commonwealth of Massachusetts.

38. "*Company*" means Heywood Healthcare, Inc. and each of its direct and indirect Debtor subsidiaries and affiliates.

39. "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article X.A of the Plan having been (a) satisfied or (b) waived pursuant to Article X.B of the Plan.

40. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

41. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, pursuant to sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

42. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

43. "*Consigli Claim*" means any Claim held by Consigli Construction Co., Inc., including Claim No. 357 filed on March 7, 2024.

44. "*Consigli Deficiency Claim*" means a deficiency claim for the portion of the Consigli Claim that is not a Secured Consigli Claim.

45. "*Consummation*" means the occurrence of the Effective Date.

46. "*Cure Claim*" means a Claim based upon the Debtors' defaults on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

47. "*Current D&O*" means any director or officer of any Debtor employed as of the Petition Date.

48. "*Debtors*" means, collectively, each of the following: Heywood Healthcare, Inc., The Henry Heywood Memorial Hospital, Athol Memorial Hospital, Heywood Medical Group, Inc., Athol Memorial Hospital NMTC Holdings, Inc., Quabbin Healthcare, Inc., and Heywood Realty Corporation.

49. "*Disallowed Claim*" means (i) a Claim, or any portion thereof, that has been disallowed by a Final Order; (ii) a Claim that has been or is hereafter listed in the Schedules at zero, contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed; (iii) a Claim that has not been listed in the Schedules and as to which no Proof of Claim has been timely Filed or (iv) a Claim that has been withdrawn.

50. "*Disbursing Agent*" means the Liquidating Trustee, the Reorganized Debtors, or the Entity or Entities selected by the Liquidating Trustee, the Debtors, or the Reorganized Debtors, as applicable, to make or facilitate Distributions pursuant to the Plan or the Liquidating Trust Agreement.

51. "*Disclosure Statement*" means the *Third Amended Disclosure Statement Relating to the Second Amended Plan of Reorganization of Heywood Healthcare, Inc., et al., Pursuant to Chapter 11 of the Bankruptcy Code*, dated August 23, 2024, as approved by the Disclosure Statement Order including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law, each as may be amended, modified, or amended and restated from time to time.

52. "*Disclosure Statement Order*" means the order of the Bankruptcy Court entered on August 23, 2024 [Docket No. 984], approving the Disclosure Statement and the procedures for the solicitation of this Plan.

53. "*Disputed Claim*" means any Claim that is not an Allowed Claim or a Disallowed Claim.

54. "*Disputed Claims Reserve*" means the reserve to be established by the Liquidating Trustee, if necessary (and, thereafter, to be maintained as necessary), to hold in one or more segregated accounts, Cash or other assets equal to the aggregate amounts that would have been distributed on account of a Disputed Claim.

55. "*Distribution*" means any distribution to be made by the Disbursing Agent in accordance with the Plan or the Liquidating Trust Agreement, as applicable, in either (a) Cash or (b) any other consideration or residual value to be distributed to Holders of Allowed Claims under the terms and provisions of the Plan or Liquidating Trust Agreement, as applicable.

56. "*Distribution Record Date*" means the record date for purposes of making Distributions under the Plan on account of Allowed Claims, which date shall be the first day of the Confirmation Hearing.

57. "*Doctor Agreements*" means contracts between the Debtors and doctors employed by the Debtors, which are in effect as of the Effective Date.

58. "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect, (b) all conditions precedent to the occurrence of the Effective Date set forth in Article X.A. of the Plan have been satisfied or waived in accordance with Article X.B. of the Plan, and (c) the Debtors, declare the Plan effective. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

59. "*Employment Obligations*" means any existing obligations to employees to be assumed, reinstated, or honored, as applicable, in accordance with Article IV.N of the Plan.

60. "*Entity*" means any entity, as defined in section 101(15) of the Bankruptcy Code.

61. "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

62. "*Excluded Parties*" means, collectively, and in each case, any Entity and any current or former officer, director, principal, member, employee, agent, or advisory board member thereof that (a) objects to, opposes or seeks any relief materially adverse to the Committee Settlement, Restructuring Transactions or any relief sought by the Debtors in the Chapter 11 Cases, (b) is entitled to vote on the Plan and does not vote to accept the Plan, (c) does not opt in to any third-party releases sought in connection with the Plan, or (d) objects to the Plan or causes an objection to the Plan to be made; *provided*, that no Current D&O shall be an Excluded Party.

63. "*Exculpated Parties*" means, collectively, and in each case (a) excluding any Excluded Parties and (b) in its capacity as such: (i) each of the Debtors; (ii) the Committee and its members; and (iii) with respect to each of the foregoing, such Entity and its current Related Parties, and such Entity's and its current Affiliates' current Related Parties; *provided* that neither (a) the Excluded Parties nor (b) the Former D&Os shall be Exculpated Parties.

64. "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

65. "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

66. "*File*" or "*Filed*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

67. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek reargument or

seek certiorari has expired and no appeal, request for reargument or petition for certiorari has been timely taken, or as to which any appeal that has been taken, any request for reargument or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment could be appealed, reargued or from which certiorari could be sought, or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice. In any event, the term Final Order shall include each and every interim cash collateral order or other cash collateral order (whether interim or final and whether consensual or non-consensual) entered by the Bankruptcy Court in the Chapter 11 Cases.

68. "*Former D&O*" means any director or officer of any of the Debtors that was no longer acting in such capacity as of the Petition Date.

69. "*Former D&O Actions*" means any and all Causes of Action filed or that may exist against any Former D&O.

70. "*General Unsecured Claim*" means any Claim other than an Administrative Claim, a Professional Fee Claim, an Other Secured Claim, a Priority Tax Claim, an Insured Claim, a Patient Refund Claim, a Secured Bondholder Claim, a Secured M&M Lien Claim, a Secured Term Lender Claim, a Secured Pavilion-Related Claim, a Bondholder Deficiency Claim, a Term Lender Deficiency Claim, or any other Claim that is not legally entitled to treatment as a General Unsecured Claim. For the avoidance of doubt, General Unsecured Claims shall include M&M Lien Deficiency Claims, Pavilion-Related Claims (to the extent such Claims are not Secured Pavilion-Related Claims) and rejection damages claim in connection therewith, other unsecured Claims asserted by the Pavilion Parties (including the Rockland Deficiency Claim) and Insured Deficiency Claims (unless otherwise released pursuant to Article III.B.9 hereof).

71. "*Governmental Unit*" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

72. "*GUC Cash Amount*" means Cash in the amount of $4,750,000, of which $4,000,000 shall be disbursed from the Debtors to the Liquidating Trustee on the Effective Date and the remaining $750,000 balance shall be disbursed from the Reorganized Debtors to the Liquidating Trustee on October 1, 2025.

73. "*GUC Note*" means an unsecured, subordinated promissory note in substantially the form included in the Plan Supplement, executed by the Reorganized Debtors and delivered to the Liquidating Trustee on the Effective Date for the benefit of the Liquidating Trust Beneficiaries (a) in the principal amount of $5,250,000, (b) bearing interest at 2% per annum, (c) which shall solely be paid from the Excess Cash Sweep (as defined in the GUC Note, which definition shall not be amended absent the reasonable consent of the Prepetition Secured Parties), (d) which shall be subject to the Intercreditor Agreement and subordinated to the New Secured Debt. Further, the GUC Note shall include provisions for calculating, determining, evaluating, challenging and/or disputing the amount of Excess Cash (as defined in the GUC Note, which definition shall not be amended absent the reasonable consent of the Prepetition Secured Parties) available for distribution under the GUC Note.

74. "*Harley Claim*" means any Claim held by Harley Ellis Devereaux Corporation, including Claim No. 361, filed on March 8, 2024.

75. "*Harley Deficiency Claim*" means a deficiency claim for the portion of the Harley Claim that is not a Secured Harley Claim.

76. "*Holder*" means a Person or Entity holding a Claim against any Debtor.

77. "*HTS Claim*" means any Claim held by HTS Engineering, Inc., including Claim No. 132, filed on November 21, 2023.

78. "*HTS Deficiency Claim*" means a deficiency claim for the portion of the HTS Claim that is not a Secured HTS Claim.

79. "*Impaired*" means, with respect to a Class of Claims, a Class of Claims that is impaired within the meaning of section 1124 of the Bankruptcy Code.

80. "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

81. "*Insurance Policy*" means any insurance policy maintained by or for the benefit of any of the Debtors, or for the benefit of their directors and officers or employees (with respect to the latter, solely related to their employment), as of the Petition Date, regardless of whether such Insurance Policy is set forth in a schedule to the Plan Supplement.

82. "*Insured Claim*" means a medical malpractice or tort claim against any of the Debtors, their respective Estates, assets, or properties arising from any incident or occurrence that is covered by an applicable and available Insurance Policy and is included on **Exhibit B** attached hereto. For the avoidance of doubt, no medical malpractice or tort claim against any of the Debtors, their respective Estates, assets, or properties arising as a matter of applicable law following the Petition Date shall be an Insured Claim.

83. "*Insured Deficiency Claim*" has the definition set forth in Article III.B.8.

84. "*Insurer*" means any Entity (and its successors) that is an issuer of an Insurance Policy.

85. "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

86. "*Intercreditor Agreement*" means an intercreditor agreement (as amended, restated, supplemented or otherwise modified from time to time), by and among the New Master Trustee, the Superpriority Exit Facility Agent and the Liquidating Trustee, which agreement shall contain terms and provisions governing such parties' rights and remedies with respect to the Reorganized Debtors and each other, in substantially the form included in the Plan Supplement and in form and substance acceptable to the New Master Trustee, the Superpriority Exit Facility Agent and the Committee or the Liquidating Trustee.

87. "*Interim Compensation Order*" means the *Order Granting Consensual Motion for Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of*

*Expenses of Professionals* [Docket No. 285], entered by the Bankruptcy Court on December 7, 2023, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Professional or otherwise.

88. "*Issuer*" means the Massachusetts Development Finance Agency.

89. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

90. "*Leverage Loans*" means those certain loans made by Athol Memorial Hospital in connection with the NMTC Transaction.

91. "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

92. "*Liquidating Trust*" means the trust established on the Effective Date that, among other things, shall make Distributions in accordance with the terms hereof and the Liquidating Trust Agreement. With respect to any action required or permitted to be taken by the Liquidating Trust, the term includes the Liquidating Trustee, or any other Person or Entity authorized to take such action in accordance with the Liquidating Trust Agreement.

93. "*Liquidating Trust Agreement*" means the agreement establishing the Liquidating Trust in conformity with the provisions of the Plan approved in the Confirmation Order and entered into by the Reorganized Debtors on behalf of the Liquidating Trust Beneficiaries and the Liquidating Trustee on the Effective Date pursuant to the terms of the Plan. A copy of the form of the Liquidating Trust Agreement shall be Filed with the Plan Supplement.

94. "*Liquidating Trust Assets*" means the funds payable to the Liquidating Trust pursuant to the Plan, including (a) the GUC Note, (b) the GUC Cash Amount, and (c) the Liquidating Trust Pavilion Claim Cash Proceeds.

95. "*Liquidating Trust Beneficiaries*" means Holders of General Unsecured Claims entitled to receive Distributions pursuant to the terms of the Plan and the Liquidating Trust Agreement, whether or not such Claims are Allowed as of the Effective Date; *provided* that the Holder of a General Unsecured Claim shall cease being a Liquidating Trust Beneficiary upon its Claim becoming a Disallowed Claim.

96. "*Liquidating Trust Expenses*" means all reasonable and documented fees, expenses, and costs incurred by the Liquidating Trust (including, but not limited to, payment of statutory fees, compensation of the Liquidating Trustee, and the reasonable fees and expenses of professionals or other persons retained by the Liquidating Trustee) in connection with carrying out the duties and responsibilities set forth in the Liquidating Trust Agreement and the Plan, which duties and responsibilities shall be funded solely from the Liquidating Trust Assets.

97. "*Liquidating Trust Interests*" means the uncertificated beneficial interests in the Liquidating Trust, which represent the right of the Liquidating Trust Beneficiaries to receive Distributions from the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement.

98. "*Liquidating Trust Pavilion Claim Cash Proceeds*" means 50% of the net Pavilion Claim Direct Cash Proceeds (if any), up to the then outstanding balance of the GUC Note for distributions to repay the last dollars out of such GUC Note.

99. "*Liquidating Trust Proceeds*" means the Cash proceeds generated by the Liquidating Trust after the Effective Date of the Plan including the Liquidating Trust Pavilion Claim Cash Proceeds.

100. "*Liquidating Trustee*" means the person appointed, by the Committee in consultation with the Debtors, to administer the Liquidating Trust with such rights, duties, and obligations as set forth herein and in the Liquidating Trust Agreement. The identity of the Liquidating Trustee shall be disclosed in the Plan Supplement.

101. "*M&M Lien*" means a mechanic's or materialman's lien and/or mineral lien on the Debtors' real property that is valid, enforceable, and nonavoidable as of the Petition Date and perfected under non-bankruptcy law, and timely perfected as permitted by section 546(b) of the Bankruptcy Code, including those liens set forth in the *Notice of Lien and Perfection Pursuant to 11 U.S.C. § 546(b)* [Docket No. 133], *Notice of Perfection of Mechanic's Lien by Allain Sitework, Inc. Pursuant to 11 U.S.C. § 546(b)(2) under Massachusetts Law* [Docket No. 134], *Amended Verified Notice of Mechanics Lien of HTS Engineering Inc.* [Docket No. 169], *Notice of Perfection of Mechanic's Lien by Miller Engineering & Testing, Inc.* [Docket No. 319] and *Notice of Perfection of Lien Pursuant to 11 U.S.C. § 546(b)* [Docket No. 474].

102. "*M&M Lien Claim*" means a Claim arising in connection with an M&M Lien.

103. "*M&M Lien Deficiency Claim*" means a General Unsecured Claim for the portion of any M&M Lien Claim that is not a Secured Claim and shall include the Consigli Deficiency Claim, the Allain Deficiency Claim, HTS Deficiency Claim, Miller Deficiency Claim, and Harley Deficiency Claim.

104. "*Master Indenture*" means that certain Master Trust Indenture, dated as of November 1, 2019, by and among the Debtors and the Master Trustee (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), which Debtors' obligations thereunder evidences and secures the Debtors' obligations owing to the Bondholder and Term Lender.

105. "*Master Trustee*" means U.S. Bank Trust Company, National Association as successor in interest to U.S. Bank, National Association, in its capacity as Master Trustee under the Master Indenture.

106. "*Miller Claim*" means any Claim held by Miller Engineering & Testing, Inc., including that Claim reflected in Schedule No. 2622810.

107. "*Miller Deficiency Claim*" means a deficiency claim for the portion of the Miller Claim that is not a Secured Miller Claim.

108. "*New Board*" means the board of trustees of the Reorganized Debtors on and after the Effective Date to be appointed by the Debtors, and the identities of the directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing.

109. "*New Bond Agreements*" means the loan or trust agreements governing the New Bonds.

110. "*New Bond Documents*" means, collectively, the New Bond Agreements, the New Loan and Trust Agreements, the New CCAs, and all other agreements, documents, and instruments evidencing or securing the New Bonds obligations, to be delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents).

111. "*New Bond Trustee*" means U.S. Bank Trust Company, National Association, in its capacity as the Bond Trustee under and as defined in the New Bond Documents.

112. "*New Bonds*" means the bonds to be reinstated and reissued pursuant to the Plan and the New Bond Documents, in the principal amount of $40,000,000, in exchange for the Series 2019 Bonds. Further, the New Bonds shall include provisions for calculating, determining, evaluating, challenging and/or disputing the amount of Excess Cash (as defined in the New Bonds) available for distribution under the New Bonds.

113. "*New CCAs*" mean, collectively, the corresponding continuing covenant agreements, pursuant to which the Bondholder becomes the sole registered and beneficial owner of the New Bonds, the form of which shall be included in the Plan Supplement.

114. "*New Loan and Trust Agreements*" means those certain loan and trust agreements with respect to the New Bonds.

115. "*New Master Trustee*" means U.S. Bank Trust Company, National Association, in its capacity as the Master Trustee as defined in the New Bond Documents.

116. "*New Notes*" means the notes issued with respect to New Bonds.

117. "*New Organizational Documents*" means the documents providing for corporate governance of the Reorganized Debtors, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which shall be consistent with the Secured Debt Restructuring Term Sheet and section 1123(a)(6) of the Bankruptcy Code (as applicable), and shall be included in the Plan Supplement.

118. "*New Secured Debt*" means, collectively, the secured obligations arising under the New Bond Documents and the Superpriority Exit Facility Documents.

119. "*New Secured Debt Lenders*" means, collectively, the Superpriority Exit Facility Lender and the bondholders under the New Bond Documents.

120. "*NMTC Claim*" means any Claim held by MassDevelopment New Markets CDE #25, LLC on account of the NMTC Loan Obligations.

121. "*NMTC Documents*" means all agreements, guaranties, indemnities, leases, certificates, statements, loans, security documents, promissory notes, or any other documents, instruments, or agreements of any kind or nature related to the NMTC Transaction as in effect on the Effective Date, including but not limited to the Investment Fund Put/Call Agreement among Capital One, National Association and certain of the Debtors.

122. "*NMTC Loan Obligations*" means the Debtors' obligations under the NMTC Loans.

123. "*NMTC Loans*" mean the loans issued by MassDevelopment New Markets CDE #25, LLC, a Massachusetts limited liability company, on December 7, 2017, in the aggregate amount of $16,600,000 evidenced by three promissory notes: (i) Note A-1 dated as of December 7, 2017, in the original principal amount of $11,150,000; (ii) Note A-2 dated as of December 7, 2017, in the original principal amount of $289,300; and (iii) Note B dated as of December 17, 2017 in the original principal amount of $5,220,700.

124. "*NMTC Transaction*" means the transaction under the New Markets Tax Credit Program issued to finance the construction of an approximately 43,551 square-foot medical office building and ancillary facilities in Athol, Massachusetts.

125. "*NMTC Transaction Lender/Equity Parties*" means, collectively, Capital One, National Association, and COCRF Investor 110, LLC, who are parties to certain of the NMTC Documents.

126. "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

127. "*Other Secured Claim*" means any Secured Claim, other than a Secured Bondholder Claim, a Secured M&M Lien Claim or a Secured Term Lender Claim, including any Claim arising under, derived from, or based upon any letter of credit issued in favor of one or more Debtors, the reimbursement obligation for which is either secured by a Lien on collateral or is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code. For the avoidance of doubt, each and every Other Secured Claim shall be a Disputed Claim, and no Other Secured Claim shall be Allowed other than pursuant to a Final Order of the Bankruptcy Court.

128. "*Patient A/R*" means any outstanding amounts due to the Debtors by a patient on account of healthcare services provided to the patient by the Debtors.

129. "*Patient Refund Claim"* means any Claim held by a patient of the Debtors on account of an overpayment by such patient to the Debtors for healthcare-related services.

130. "*Pavilion Claim*" means any claim or Cause of Action that has been or may be asserted by or on behalf of the Debtors or the Reorganized Debtors, as applicable, with respect to the Pavilion Ground Lease; Pavilion Space Lease; Rockland Claim; Rockland Mortgage; M&M Lien Claims; the acquisition, construction and/or financing of a surgical pavilion on a portion of certain property commonly known as 242 Green Street, Gardner, MA; and any matter related to any of the foregoing, against any party in connection with any of the foregoing, including, without

limitation, Heywood Green Street, LLC, Waterstone Properties Group, Inc., Rockland Trust Company, Consigli Construction Co., Inc., Allain Sitework, Inc., HTS Engineering, Inc., Miller Engineering & Testing, Inc. and Harley Ellis Devereaux Corporation.

131. *"Pavilion Claim Deadline"* means the date that is 180 days after the Effective Date, subject to extension for cause shown on notice to the counterparties to the Pavilion Ground Lease and to the other parties against whom or which the Reorganized Debtors hold the Pavilion Claims.

132. "*Pavilion Claim Direct Cash Proceeds*" means any Cash payments made to, or collected by, the Estates or the Reorganized Debtors by or from the obligor of a Pavilion Claim or an Affiliate of such obligor on account of such Pavilion Claim.

133. "*Pavilion Ground Lease*" means that certain Ground Lease dated as of June 30, 2021, by and between Henry Heywood Memorial Hospital, Inc., as landlord, and Heywood Green Street LLC, as tenant, related to a portion of that certain property commonly known as 242 Green Street, Gardner, MA and more particularly described in Exhibit A to the Ground Lease.

134. "*Pavilion-Related Claim*" means any claim or Cause of Action that has been or may be asserted against the Debtors or the Reorganized Debtors, as applicable, with respect to the Pavilion Ground Lease; Pavilion Space Lease; Rockland Claim; Rockland Mortgage; M&M Lien Claims; the acquisition, construction and/or financing of a surgical pavilion on a portion of certain property commonly known as 242 Green Street, Gardner, MA; and any matter related to any of the foregoing, brought by any party in connection with any of the foregoing, including, without limitation, Heywood Green Street, LLC, Waterstone Properties Group, Inc., Rockland Trust Company, Consigli Construction Co., Inc., Allain Sitework, Inc., HTS Engineering, Inc., Miller Engineering & Testing, Inc. and Harley Ellis Devereaux Corporation. For the avoidance of doubt, each and every Pavilion-Related Claim shall be a Disputed Claim, and no Pavilion-Related Claim shall be Allowed other than pursuant to a Final Order of the Bankruptcy Court.

135. "*Pavilion Parties*" means any party in connection with any Pavilion Claim or Pavilion-Related Claim (other than the Debtors or the Reorganized Debtors, as applicable).

136. "*Pavilion Space Lease*" means that certain Lease dated as of June 30, 2021 by and between Heywood Green Street, as landlord, and Henry Heywood Memorial Hospital, Inc., as tenant, and guaranteed by certain of the Debtors related to that certain parcel of land in Gardner, MA which is described more particularly in Exhibit A to the Lease and commonly known as a portion of 242 Green Street, Gardner, MA.

137. "*Person*" means and includes a natural person, individual, partnership, corporation (as defined in section 101(a) of the Bankruptcy Code), or organization including, without limitation, corporations, limited partnerships, limited liability companies, general partnerships, joint ventures, joint stock companies, trusts, land trusts, business trusts, unincorporated organizations or associations, any ad hoc committee, or other organizations, irrespective of whether they are legal entities, governmental bodies (or any agency, instrumentality or political subdivision thereof), or any other form of legal entities; provided, however, the term "Person" does not include governmental units, except that a governmental unit that (a) acquires an asset from a Person (i) as a result of the operation of a loan guarantee agreement or (ii) as receiver or

liquidating agent of a Person; (b) is a guarantor of a pension benefit payable by or on behalf of the Debtor or an Affiliate of the Debtor; or (c) is the legal or beneficial owner of an asset of (i) an employee pension benefit plan that is a governmental plan, as defined in section 414(d) of the Internal Revenue Code of 1986 or (ii) an eligible deferred compensation plan, as defined in section 457(b) of the Internal Revenue Code of 1986, shall be considered for purposes of section 1102 of the Bankruptcy Code to be a Person with respect to such asset or such benefit..

138. "*Petition Date*" means October 1, 2023, the date on which the Debtors commenced the Chapter 11 Cases.

139. "*Plan*" means this *Second Amended Plan of Reorganization of Heywood Healthcare, Inc., et al. Pursuant to Chapter 11 of the Bankruptcy Code*, including the Plan Supplement, which is incorporated herein by reference.

140. "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan ((1) in each case, in form and substance satisfactory to the Debtors; (2) in the case of (ii) and (ix) below in form reasonably acceptable to the Committee and the Debtors, and in case of (iii) below in form and substance satisfactory to the Committee (with consultation rights to the Debtors); (3) in the case of (v) and (vi) below, in form reasonably acceptable to the Prepetition Secured Parties and the Debtors; and (4) in the case of (x) below, in form reasonably acceptable to the Prepetition Secured Parties, the Committee and the Debtors), each as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) including the following, as applicable: (i) New Organizational Documents; (ii) the form of Liquidating Trust Agreement; (iii) the identity of the Liquidating Trustee; (iv) Schedule of Assumed Executory Contracts and Unexpired Leases; (v) the form of New CCAs; (vi) the form of the Superpriority Exit Facility Credit Agreement; (vii) Schedule of Insurance Policies; (viii) the Avoidance Action Schedule; (ix) the form of the GUC Note; and (x) the form of the Intercreditor Agreement.

141. "*Prepetition Bond Facility*" means the bond facility provided under the Prepetition LTAs consisting of the Series 2019 Bonds.

142. "*Prepetition Lenders*" means, together, the Term Lender and the Bondholder.

143. "*Prepetition LTAs*" means the three loan and trust agreements among the Debtors, the Issuer, and the Bond Trustee, each dated as of November 1, 2019 (each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), pursuant to which the Issuer issued the Series 2019 Bonds.

144. "*Prepetition Secured Parties*" means, collectively, the Master Trustee, the Bond Trustee, and the Prepetition Lenders.

145. "*Prepetition Secured Parties Priority Claim*" means any Claim of one or more of the Prepetition Secured Parties granted priority under any interim cash collateral order entered by the Bankruptcy Court in the Chapter 11 Cases.

146. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

147. "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class.

148. "*Professional*" means an Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

149. "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses of Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.B of the Plan.

150. "*Professional Fee Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

151. "*Professional Fee Escrow Account*" means an interest-bearing account held by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

152. "*Proof of Claim*" means the form used by a creditor on which the specifics of a Claim are set forth as required by the Bankruptcy Code, the Bankruptcy Rules and the Bar Date Order, and which is filed in accordance with the procedures contained in the Bar Date Order.

153. "*Quabbin*" means Quabbin Healthcare Inc.

154. "*Quabbin Sale Claim*" means that certain alleged fraudulent conveyance claim related to the sale by Quabbin to Waterstone Petersham Medical, LLC of certain real estate and property located 211 North Main Street, Petersham, MA, which sale closed on or about August 18, 2022.

155. "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means, with respect to Claims, that the Claim shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

156. "*Related Party*" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, contractors, representatives, and other professionals.

157. "*Released Party*" means, collectively, the following Entities, each in their capacity as such (a) the Debtors; (b) the Committee and each of its members (only in their capacity as such); (c) the Prepetition Secured Parties and (d) with respect to any of the foregoing Entities, in each case, such Entity's Related Parties; *provided*, that Released Parties do not include any Excluded Party.

158. "*Releasing Parties*" means collectively, (a) all Holders of Claims that vote to accept the Plan and (b) each Holder of a Claim that (i) abstains from voting on the Plan, (ii) is deemed to accept or deemed to reject the Plan, or (ii) votes to reject the Plan and, in each case of clause (b), votes to opt in on its Ballot or Class 9 Ballot (as applicable), or submits an Opt-In Release Form, and returns it in accordance with the instructions set forth thereon, indicating such Holder's decision to consent to the releases set forth in Article IX.D of the Plan; *provided* that notwithstanding the foregoing, in no event shall the Pavilion Claims be released upon the occurrence of the Effective Date.

159. "*Reorganized Debtors*" means, collectively, each of the Debtors, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date except for Quabbin.

160. "*Restructuring Transactions*" means the transactions described in Article IV.B of the Plan.

161. "*Rockland Claim*" means any Claim held by Rockland Trust Company, including Claim No. 422, filed on March 12, 2024, for an unsecured, unliquidated amount.

162. "*Rockland Deficiency Claim*" means a deficiency claim for the portion of the Rockland Claim that is not a Secured Rockland Claim.

163. "*Rockland Mortgage*" means that certain Leasehold Mortgage, Security Agreement and Fixture Filing, by and between Heywood Green Street, LLC and Rockland Trust Company, dated as of August 30, 2022, and recorded on August 30, 2022, in the Worcester South District Registry of Deeds as Instrument No. 96684.

164. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, inclusive of proposed cure costs, as the same may be amended, modified, or supplemented from time to time.

165. "*Schedule of Insurance Policies*" means the schedule of Insurance Policies included in the Plan Supplement.

166. "*Schedules*" means, collectively, the schedules of assets and liabilities, Schedule of Assumed Executory Contracts or Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules, as they may be amended, modified, or supplemented from time to time.

167. "*Secured Allain Claim*" means that portion of the Allain Claim (if any) that is a Secured Claim.

168. "*Secured Bondholder Claim*" means a Bondholder Claim that is a Secured Claim.

169. "*Secured Claim*" means a Claim: (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

170. "*Secured Consigli Claim*" means that portion of the Consigli Claim (if any) that is a Secured Claim.

171. "*Secured Debt Restructuring Term Sheet*" means that certain document attached hereto as **Exhibit A**, as amended, which is hereby fully incorporated into the Plan by reference, the terms of which shall be binding on the Debtors, the Reorganized Debtors, the Issuer and all other creditors and parties-in-interest pursuant to the Confirmation Order.

172. "*Secured Harley Claim*" means that portion of the Harley Claim (if any) that is a Secured Claim.

173. "*Secured HTS Claim*" means that portion of the HTS Claim (if any) that is a Secured Claim.

174. "*Secured M&M Lien Claim*" means any M&M Lien Claim that is a Secured Claim, including the Secured Consigli Claim, and each such Secured M&M Lien Claim shall be a Disputed Claim until Allowed or Disallowed pursuant to applicable law.

175. "*Secured Miller Claim*" means that portion of the Miller Claim (if any) that is a Secured Claim.

176. "*Secured Pavilion Claim*" means that portion of any Pavilion Claim (if any) that is a Secured Claim.

177. "*Secured Pavilion-Related Claim*" means that portion of any Pavilion-Related Claim (if any) that is a Secured Claim.

178. *"Secured Rockland Claim*" means that portion of the Rockland Claim (if any) that is a Secured Claim.

179. "*Secured Term Lender Claim*" means a Term Lender Claim that is a Secured Claim, and the aggregate principal amount of all Secured Term Lender Claims as of the Petition Date shall be not less than $8,230,000.

180. "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa, or any similar federal, state, or local law.

181. "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

182. "*Series 2019 Bonds*" means, collectively, the Series 2019A Bonds, the Series 2019B-1 Bonds, and the Series 2019B-2 Bonds.

183. "*Series 2019A Bonds*" means the Series 2019A Bonds issued in an aggregate principal face value in the amount of $28,350,000.

184. "*Series 2019B-1 Bonds*" means the Series 2019B-1 Bonds issued in an aggregate principal face value in the amount of $10,525,000.

185. "*Series 2019B-2 Bonds*" means the Series 2019B-2 Bonds issued in an aggregate principal face value in the amount of $11,005,000.

186. "*Superpriority Exit Facility*" means the superpriority, exit, asset-based revolving loan facility provided for under the Superpriority Exit Facility Documents as of the Effective Date in the principal amount of $5,000,000.

187. "*Superpriority Exit Facility Agent*" means Siemens Financial Services, Inc., in its capacity as administrative agent for the Superpriority Exit Facility Lenders under the Superpriority Exit Facility Documents.

188. "*Superpriority Exit Facility Credit Agreement*" means that certain credit agreement (as amended, restated, supplemented or otherwise modified in accordance with its terms), a form of which shall be included in the Plan Supplement, governing the Superpriority Exit Facility, by and among the Reorganized Debtors and the Superpriority Exit Facility Lender.

189. "*Superpriority Exit Facility Documents*" means, in connection with the Superpriority Exit Facility, the Superpriority Exit Facility Credit Agreement, the other Loan Documents (as defined in the Superpriority Exit Facility Credit Agreement), all other collateral documents, Uniform Commercial Code filings, and other documents executed and delivered in connection with the Superpriority Exit Facility, to be dated as of the Effective Date governing the Superpriority Exit Facility and each in form and substance acceptable to the Prepetition Secured Parties.

190. "*Superpriority Exit Facility Lenders*" means the lenders under the Superpriority Exit Facility Documents.

191. "*Term Lender*" means Siemens Financial Services, Inc. in its capacity as lender under the Term Loan Agreement.

192. "*Term Lender Claim*" means a Claim held by the Term Lender pursuant to the Term Loan Agreement and the Master Indenture.

193. "*Term Lender Deficiency Claim*" means an unsecured Claim in the aggregate amount of the Secured Term Lender Claims (notwithstanding section 506(b) of the Bankruptcy Code), on account of the Term Lender agreeing to receive no distribution or rights under the Plan or the Liquidating Trust Agreement for its Secured Term Lender Claims. For the sake of clarity, the Term Lender Deficiency Claim (whether secured or unsecured) shall receive no distribution or rights under the Plan or the Liquidating Trust Agreement for such Claim.

194. "*Term Loan Agreement*" means that certain Loan Agreement, dated as of April 12, 2022, as amended, restated, supplemented, or otherwise modified from time to time, by and among the applicable Debtors and the Term Lender, pursuant to which the Term Lender provided a term loan in the original principal amount of $10,000,000.

195. "*U.S. Trustee*" means the United States Trustee for the District of Massachusetts.

196. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

197. "*Unimpaired*" means, with respect to a Class of Claims, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

198. "*Voting Deadline*" means the "Voting Deadline" reflected in the Disclosure Statement Order.

199. "*Voting Instructions*" means the instructions to vote set forth in the order approving the Disclosure Statement.

*B. Rules of Interpretation.*

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a holder of a Claim includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; and (14) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity.

*C. Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

*D. Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the Commonwealth of Massachusetts, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in Massachusetts shall be governed by the laws of the state of incorporation of the relevant Debtor or the Reorganized Debtors, as applicable.

*E. Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to the currency of the United States of America unless otherwise expressly provided.

*F. Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

*G. Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims set forth in Article III hereof.

*A. Administrative Claims.*

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each holder of an Allowed Administrative

Claim (other than holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except for Professional Fee Claims, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors no later than the Administrative Claims Bar Date (30 days after the Effective Date) pursuant to the procedures specified in the Confirmation Order and the notice of the occurrence of the Effective Date. Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (1) 180 days after the Effective Date and (2) 180 days after the Filing of the applicable request for payment of the Administrative Claims, if applicable. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by and satisfied in accordance with an order of the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for such payment of such Administrative Claims that do not file and serve such a request by the Administrative Claims Bar Date (30 days after the Effective Date) shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or any action by the Bankruptcy Court.

*B. Professional Fee Claims.*

1. Final Fee Applications and Payment of Professional Fee Claims.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will hold in trust for the Professionals and fund with Cash equal

to the Professional Fee Amount on the Effective Date. For the avoidance of doubt, the U.S. Trustee shall not be required to file an administrative claim for its fees.

2. Professional Fee Escrow Accounts.

On the Effective Date, the Reorganized Debtors shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Amount. The Professional Fee Escrow Accounts shall be maintained in trust solely for the Professionals. The amount of Professional Fee Claims owed to the Professionals shall be paid in cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Accounts as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be released into Reorganized Debtors' working capital cash management system without any further action or order of the Bankruptcy Court. In the event the Professional Fee Escrow Account is insufficient to pay the Professional Fee Claim of any specific Professional, then the Reorganized Debtors shall pay the difference between the Professional Fee Escrow Account for such Professional and the Allowed amount of the Professional Fee Claim within fourteen (14) calendar days after such Professional Fee Claim is Allowed; *provided* that the Debtors or Reorganized Debtors reserve the right to object to the reasonableness of any Professional Fee Claim.

3. Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date and shall deliver such estimate to the Debtors no later than five days before the Effective Date. If a Professional does not provide an estimate, or if the Debtors object to such estimate as being unreasonable, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

4. Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to the implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327-331, 363, and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Code.

*C. Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority

Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS

*A. Classification of Claims.*

This Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II of the Plan, all Claims are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim qualifies within the description of such other Classes. A Claim is also classified in a particular Class for the purpose of receiving Distributions under the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming the Debtors' Estates substantively consolidated into a single Estate for certain limited purposes related to the Plan, including voting, confirmation and distribution. As a result of the deemed substantive consolidation of the Estates, each Class of Claims will be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors. The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights under the Plan.

The classification of Claims against the Debtors pursuant to the Plan is as follows:

| Class | Claims | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | NMTC Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | Patient Refund Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 5 | Secured Bondholder Claims | Impaired | Entitled to Vote |
| Class 6 | Secured M&M Lien Claims | Impaired | Entitled to Vote |
| Class 7 | General Unsecured Claims | Impaired | Entitled to Vote |
| Reserved | Reserved | Reserved | Reserved |
| Class 9 | Insured Claims | Impaired | Entitled to Vote |

| Class | Claims | Status | Voting Rights |
|---|---|---|---|
| Class 10 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

*B. Treatment of Claims*

1. Class 1 – Other Secured Claims

(a) *Classification:* Class 1 consists of any Other Secured Claims against any Debtor. Upon information and belief from the Debtors' diligence to date, Class 1 is an empty class.

(b) *Treatment:* On the Effective Date, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Other Secured Claim, each holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:

(i) payment in full in Cash of its Allowed Other Secured Claim;

(ii) the collateral securing its Allowed Other Secured Claim;

(iii) Reinstatement of its Allowed Other Secured Claim; or

(iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c) *Impairment and Voting:* Class 1 is Unimpaired under the Plan. Holders of Other Secured Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2. Class 2 - Other Priority Claims

(a) *Classification:* Class 2 consists of any Other Priority Claims against any Debtor. Upon information and belief from the Debtors' diligence to date, Class 2 is an empty class.

(b) *Treatment:* On the Effective Date, except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim.

(c) *Impairment and Voting:* Class 2 is Unimpaired under the Plan. Holders of Other Priority Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3. <u>Class 3 – NMTC Claims</u>

(a) *Classification:* Class 3 consists of all NMTC Claims against any Debtor.

(b) *Treatment:* On the Effective Date, each holder of an Allowed NMTC Claim shall receive Reinstatement of its NMTC Claims. All NMTC Documents and the related legal, equitable, and contractual rights shall remain in full force and effect.

(c) *Impairment and Voting:* Class 3 is Unimpaired under the Plan. Holders of Claims in Class 3 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

4. <u>Class 4 – Patient Refund Claims</u>

(a) *Classification:* Class 4 consists of all Patient Refund Claims against any Debtor.

(b) *Treatment:*

(i) On the Effective Date, each Holder of Patient Refund Claims, except to the extent that a Holder of an Allowed Patient Refund Claim agrees to a less favorable treatment, shall receive in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Patient Refund Claim:

a) to the extent the Holder of such Patient Refund Claim has any Patient A/R, a credit against such Patient A/R up to the full amount of such Holder's Patient Refund Claim; provided, that, if the Patient Refund Claim exceeds the Patient A/R, the Holder shall receive the balance of the Patient Refund Claim in cash; or

b) if no Patient A/R exists for such Holder, the Holder of such Allowed Claim may be paid in the ordinary course of business consistent with past practices.

(c) *Impairment and Voting:* Class 4 is Unimpaired under the Plan. Holders of Patient Refund Claims in Class 4 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

5. Class 5 – Secured Bondholder Claims

(a) *Classification:* Class 5 consists of all Secured Bondholder Claims on account of the Series 2019 Bonds.

(b) *Allowance*: The Secured Bondholder Claims shall be allowed in an aggregate principal amount of $40,000,000.

(c) *Treatment:* On the Effective Date, except to the extent that a Holder of a Secured Bondholder Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Secured Bondholder Claim, $40,000,000 of the outstanding principal amount of the Series 2019 Bonds shall be reinstated and exchanged for the New Bonds issued on the terms set forth in the Secured Debt Restructuring Term Sheet and the New Bond Documents, and the Bondholder Deficiency Claim comprised of the remaining approximately $1,800,000 in outstanding principal amount of the Series 2019 Bonds shall be waived in its entirety and entitled to no distribution or rights as against the Liquidating Trust.

(d) *Impairment and Voting:* Class 5 is Impaired under the Plan. Holders of Allowed Secured Bondholder Claims in Class 5 are entitled to vote to accept or reject the Plan.

6. Class 6 – Secured M&M Lien Claims

(a) *Classification:* Class 6 consists of the Secured M&M Lien Claims.

(b) *Treatment:* On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Secured M&M Lien Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for its Allowed Secured M&M Lien Claim, each Holder of an Allowed Secured M&M Lien Claim shall receive, at the Debtors' option: (a) payment in full in Cash; (b) Reinstatement of its Allowed Secured M&M Lien Claim; (c) such other treatment rendering its Allowed Secured M&M Lien Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code; or (d) such other treatment necessary to satisfy section 1129(b)(2)(A) of the Bankruptcy Code.

(c) *Impairment and Voting:* Class 6 is Impaired under the Plan. Holders of Secured M&M Lien Claims in Class 6 are entitled to vote to accept or reject the Plan.

7. Class 7 - General Unsecured Claims

(a) *Classification:* Class 7 consists of all General Unsecured Claims against any Debtor.

(b) *Treatment:* On, or as soon as reasonably practicable after, the Effective Date, except to the extent such Holder and the Reorganized Debtors or the Liquidating Trustee, as applicable, agree to a less favorable treatment, each Holder of an Allowed General Unsecured Claim shall receive, on account of, in exchange for, and in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed General Unsecured Claim its Pro Rata share of Liquidating Trust Interests.

(c) *Impairment and Voting:* Class 7 is Impaired under the Plan. Holders of Allowed Claims in Class 7 are entitled to vote to accept or reject the Plan.

8. Reserved

9. Class 9 – Insured Claims

(a) *Classification*: Class 9 consists of Allowed Insured Claims.

(b) *Treatment*: Each Insured Claim shall be deemed objected to and disputed and shall be resolved in accordance with this Section, notwithstanding any other Plan provision.

Except to the extent that a Holder of an Insured Claim agrees to different treatment, or unless otherwise provided by an order of the Bankruptcy Court directing such Holder's participation in any alternative dispute resolution process, on the Effective Date, or as soon thereafter as is reasonably practicable, each Holder of an Insured Claim will have received or shall receive on account of its Insured Claim relief from the automatic stay under section 362 of the Bankruptcy Code and the injunctions provided under this Plan for the sole and limited purpose of permitting such Holder to seek recovery, if any, as determined and Allowed by an order or judgment by a court of competent jurisdiction or under a settlement or compromise of such Holder's Insured Claim from the applicable and available Insurance Policies maintained by or for the benefit of any of the Debtors or Reorganized Debtors, as applicable. A Holder's recovery of insurance proceeds under the applicable Insurance Policy(ies) shall be the sole and exclusive recovery on an Insured Claim, subject to any recovery of an Insured Deficiency Claim, as described in the next paragraph. Any settlement of an Insured Claim within a self-insured retention or deductible must be approved by the Reorganized Debtors.

In the event the applicable Insurer denies the tender of defense or there are no applicable or available insurance policies, or proceeds from applicable and available insurance policies have been exhausted or are otherwise insufficient to pay in full a Holder's recovery, if any, as determined by an order or judgment by a court of competent jurisdiction or under a settlement or compromise of such Holder's Insured Claim, on account of its Insured Claim, then such Holder shall be entitled to its Pro Rata share of Liquidating

Trust Interests based on the amount of an Allowed Claim equal to the amount of the Allowed Insured Claim less the amount of available proceeds paid such Allowed Insured Claim from the applicable and available Insurance Policies (the "Insured Deficiency Claim"); *provided*, that if a Holder of an Insured Claim elects to "opt in" on its Ballot to provide a release of its Insured Deficiency Claim, (i) such Holder shall not be entitled to any recovery on account of its Insured Deficiency Claim, (ii) such Holder shall be deemed to have released the Debtors and the Reorganized Debtors, as applicable, for any such Insured Deficiency Claim (therefore forgoing any rights to or against the Liquidating Trust or as a Liquidating Trust Beneficiary) and (iii) such Holder shall receive a mutual release from the Debtors and the Reorganized Debtors, as applicable. In no event shall any Holder of an Allowed Insured Deficiency Claim be entitled to receive more than one hundred percent (100%) of the Allowed Amount of their respective Allowed Insured Deficiency Claim. In no event shall any Holder of an Allowed Insured Deficiency Claim receive payment on account of such Allowed Insured Deficiency Claim in an amount that, when summed with payment to such Holder from any policy of insurance with respect to the Allowed Insured Claim, exceeds the Pro Rata share of Liquidating Trust Interests such Holder would have received had the Holder's Claim been classified in Class 7.

Any amount of an Allowed Insured Claim within a deductible or self-insured retention shall be paid by the applicable insurance, in accordance with the applicable Insurance Policy, to the Claim Holder and such Insurer shall have a General Unsecured Claim (or Secured Claim, if it holds collateral) for the amount of the deductible or retention paid, provided that it has timely filed an otherwise not objectionable proof of claim encompassing such amounts. For purposes of retentions and deductibles in any Insurance Policy, including, but not limited to, an Insurance Policy insuring officers, directors, consultants or others against claims based upon prepetition occurrences, the Confirmation Order shall constitute a finding that the Debtors are insolvent and unable to advance or indemnify Insured Claims, from Estate or Debtor funds, for any loss, claim, damage, settlement or judgment of Debtors within the applicable retention or deductible amount. However, the foregoing sentence does not modify the Insurer's right to a claim described in the first sentence of this paragraph.

(c) *Impairment and Voting*: Class 9 is Impaired under the Plan. Holders of Allowed Claims in Class 9 are entitled to vote to accept or reject the Plan. Unless otherwise ordered by the Bankruptcy Court, each Holder of a Class 9 Insured Claim shall have a $1.00 vote for each filed Insured Claim.

10. Class 10 - Intercompany Claims

(a) *Classification:* Class 10 consists of all Intercompany Claims.

(b) *Treatment:* On the Effective Date, Class 10 Claims shall be canceled and released without any distribution upon implementation of this Plan.

(c) *Impairment and Voting:* Class 10 is Impaired under the Plan. Holders of Class 10 Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(f) or 1126(g) of the Bankruptcy Code. Holders of Class 10 Claims are not entitled to vote to accept or reject the Plan.

*C. Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

*D. Elimination of Vacant Classes*

Any Class of Claims that does not have a Holder of an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

*E. Voting Classes, Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims in such Class shall be deemed to have accepted the Plan.

*F. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by Class 5. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims.

*G. Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or any Class of Claims are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

*H. Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the

Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

*A. General Settlement of Claims.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the Other Secured Claims once Allowed or the Allowed Secured Bondholder Claims (including those in the Committee Adversary Proceeding) and (2) any claim to avoid, subordinate, or disallow any Other Secured Claim once Allowed or the Allowed Secured Bondholder Claim, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to Article VI and Article VII hereof, all Distributions made to holders of Allowed Claims (as applicable) in any Class are intended to be and shall be final.

*B. Restructuring Transactions and Committee Settlement.*

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in the Plan. The actions to implement the Restructuring Transactions shall include the execution and delivery of appropriate agreements, including the New Bond Documents that are consistent with the terms of the Plan, the Secured Debt Restructuring Term Sheet and the Intercreditor Agreement, satisfy the requirements of applicable law, and are reasonably satisfactory to the New Master Trustee. In addition, in connection with the execution of the New Bond Documents, (i) the Bondholder and its applicable Related Party has agreed to write down significant portions of the Prepetition Bond Facility and waive the Bondholder Deficiency Claim in its entirety, such that there is no recovery on such Claim and no rights in or to the Liquidating Trust on account of such Bondholder Deficiency Claim, and (ii) the Term Lender has agreed to write off the outstanding obligations under the Term Loan Agreement in exchange for a Term Lender Deficiency Claim for the full amount of the Secured Term Lender Claims, any recovery on which the Term Lender has agreed to waive such that the Term Lender Deficiency Claim (whether secured or unsecured) shall have no rights in or entitlement under the Liquidating Trust. The Reorganized Debtors shall be authorized and directed to enter into the New Bond Documents on the Effective Date.

Among other things, under the Committee Settlement, (i) the Reorganized Debtors shall distribute the GUC Cash Amount in the aggregate amount of $4,750,000 to the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries on the applicable dates ($4,000,000 on the Effective Date and $750,000 on October 1, 2025) and, on the Effective Date, issue the GUC Note in the principal amount of $5,250,000 to the Liquidating Trustee for the benefit of the Liquidating Trust Beneficiaries pursuant to the terms set forth in this Plan, the GUC Note and the Intercreditor Agreement, as applicable, (ii) the Bondholder and its applicable Related Party shall remit $2,500,000 to the Reorganized Debtors on the Effective Date, which amount shall be used contemporaneously to fund the GUC Cash Amount to be distributed to the Liquidating Trust, (iii) the Prepetition Secured Parties shall not receive any cash payments from the Debtors prior to the Effective Date, including reimbursement for interest, fees or expenses incurred, (iv) the treatment and disposition of the Pavilion Claims, the Pavilion-Related Claims and related matters shall be reasonably acceptable to the Prepetition Secured Parties and their applicable Related Party, (v) upon receipt of $4,000,000 of the GUC Cash Amount on the Effective Date, the Committee shall release any and all claims against the Prepetition Secured Parties, including those reflected in the Committee Adversary Proceeding and any associated or related claims against the Debtors (except for claims under the Committee Settlement and this Plan) and (vi) on the Effective Date, the Committee shall release any and all claims against the Debtors' Estates unless otherwise specified herein, and provided that the Committee shall not release any claims provided for under the Committee Settlement.

Entry of the Confirmation Order shall be an order pursuant to Bankruptcy Rule 9019 approving the Committee Settlement as embodied in the Global Settlement Term Sheet attached hereto as Exhibit C and incorporated by reference herein. The Committee reserves all rights to enforce the terms of the Committee Settlement reflected in the Global Settlement Term Sheet; provided that in the event of any conflict between the terms therein and this Plan, the Plan controls.

(1) On the Effective Date, the New Bond Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended under the New Bond Documents shall be deemed to have been extended in good faith for legitimate business purposes; and they are reasonable and shall not be subject to avoidance, re-characterization, or subordination (including equitable subordination) for any purpose whatsoever (unless specified herein) and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.

(2) On the Effective Date, all of the Liens and security interests to be granted in accordance with the New Bond Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on and security interests in the collateral granted thereunder in accordance with the terms of the New Bond Documents, (c) shall be deemed automatically perfected on the Effective Date (without any further action being required by the Reorganized Debtors, the New Bond Trustee, or any of Holders of New Bonds), having the priority set forth in the New Bond Documents and subject only to such Liens and security interests as may be permitted under the New Bond Documents, and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever (unless specified herein) and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. In addition to the

foregoing, any Liens and security interests granted to the Prepetition Secured Parties, pursuant to, or in connection with, the existing Bond Documents and any Final Order, shall (i) remain valid and effective from and after the Effective Date, and remain perfected as of the date on which they were first perfected and (ii) secure the obligations of the Reorganized Debtors under the New Bond Documents and the Superpriority Exit Facility Documents.

(3) The Reorganized Debtors, and the Entities granted such Liens and security interests are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required) and the Reorganized Debtors will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

(4) The Reorganized Debtors shall cause the Issuer to issue the New Bonds, the primary economic terms of which are set forth in the Secured Debt Restructuring Term Sheet. The issuance of the New Bonds and New Notes for distribution under the Plan is authorized without the need for further corporate action by the Reorganized Debtors, and all of the New Notes issued or issuable under the Plan shall be duly authorized and validly issued under the Plan.

(5) The Reorganized Debtors shall cause to be delivered customary legal opinions and other documents in connection with the issuance of the New Bonds, in form and substance acceptable to the New Bond Trustee and the New Secured Debt Lenders, including, without limitation, (a) the opinion of Bond Counsel described in the New Bond Documents, and (b) a lender's title policy with respect to the real property securing the Reorganized Debtors' obligations under the New Bond Documents, and the mortgage position of the New Bond Trustee, subject to such exceptions as are reasonably acceptable to the New Bond Trustee and the New Secured Debt Lenders and as set forth herein.

(6) The offering, issuance, and distribution of the New Bonds and New Notes issued under the Plan, if applicable, shall be exempt from, among other things, the registration requirements of the Securities Act, and under section 1145(a)(1) of the Bankruptcy Code. Any and all New Bonds issued under the Plan will be freely tradable under the Securities Act by the recipients thereof, subject to all other applicable laws, statutes or regulations.

(7) The Reorganized Debtors shall fund the Liquidating Trust with the GUC Cash Amount.

(8) On the Effective Date, the GUC Note shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended under the GUC Note shall be deemed to have been extended in good faith for legitimate business purposes; and they are reasonable and shall not be subject to avoidance, re-characterization, or subordination (including equitable subordination) for any purpose whatsoever (other than with respect to the New Bond Documents and the Superpriority Exit Facility Documents as set forth herein and the Intercreditor Agreement) and

shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.

*C. Reorganized Debtors.*

On the Effective Date, the New Board shall be established and shall be comprised of the members of the current board of trustees. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

*D. Sources of Consideration for Distributions.*

The Reorganized Debtors shall make distributions to be made in (i) Cash, (ii) New Bonds, (iii) the Superpriority Exit Facility, and (iv) the GUC Note. Distributions on behalf of the Allowed General Unsecured Claims shall be made only from the Liquidating Trust.

1. Cash on Hand

   i. The Reorganized Debtors shall use Cash on hand to fund Distributions to certain Holders of Allowed Claims and to the Liquidating Trust in accordance with Articles II and III of the Plan.

   ii. On the Effective Date, the Bondholder and its applicable Related Party shall remit $2,500,000 to the Debtors or Reorganized Debtors for contemporaneous use by the Debtors or Reorganized Debtors, as applicable, in funding GUC Cash Amount.

2. New Bonds

On the Effective Date, the outstanding Series 2019 Bonds shall be reinstated through the delivery of the New Bonds in replacement of the Series 2019 Bonds and an exchange of the outstanding Series 2019 Bonds for the New Bonds and all documents related thereto, on the terms and conditions of the Secured Debt Restructuring Term Sheet. The New Bonds shall be tax-exempt and shall be paid pursuant to the terms and conditions reflected in the Secured Debt Restructuring Term Sheet. The New Bonds shall be secured by a security interest against substantially all assets of the Reorganized Debtor, which shall be senior in priority to all other Liens and security interests except for those otherwise permitted under the New Bond Documents.

The issuance of the New Bonds is authorized without the need for any further corporate action or further action by the Bondholder. All Holders of Allowed Secured Bondholder Claims entitled to Distributions hereunder shall be deemed to be a party to, and bound by, the New Bond Documents, regardless of whether such Holder has executed a signature page. On the Effective Date, all of the Liens and security interests to be granted in accordance with the New Bond Documents (1) shall be deemed to be granted, (2) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Bond Documents, (3) shall be deemed perfected on the Effective Date and (4) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not

constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law.

Subject to the occurrence of the Effective Date, the New Bond Documents shall constitute legal, valid, and binding obligations of the Reorganized Debtors party thereto and shall be enforceable in accordance with their respective terms. Each distribution and issuance of the New Bonds under the Plan shall be governed by the terms and conditions set forth in the Plan and Secured Debt Restructuring Term Sheet applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. For the avoidance of doubt, the acceptance of New Bonds by any Holder of any Claim shall be deemed as such Holder's agreement to the New Bond Documents, as each may be amended or modified from time to time following the Effective Date in accordance with its terms.

The Reorganized Debtors and the Holders that are granted such Liens and security interests shall be authorized to make all filing and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of entry of the Confirmation Order, and any such filings, recording, approvals, and consents shall not be required), and the Reorganized Debtors shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interest to third parties. The Liens and security interests granted under the New Bond Documents shall be senior in priority to all other Liens and security interests except for those previously granted pursuant to, or in connection with, the Bond Documents and any Final Order (which Liens and security interests shall remain valid and effective from and after the Effective Date) or otherwise permitted under the New Bond Documents.

The New Bonds do not constitute a general obligation of the Issuer or a debt or pledge of the faith and credit of The Commonwealth of Massachusetts or any political subdivision thereof. The principal, purchase price, redemption price of, and interest on the bonds are payable solely from the revenues and funds pledged for their payment under the New Bond Documents. The Issuer has no taxing power under the Act.

The Excess Cash Sweep threshold shall be reduced to 28 Days Cash on Hand for all test periods; provided that following the first payment of $1,750,000 on account of the GUC Note referenced in Article IV.D.4, the Excess Cash Sweep threshold shall be further reduced to 27 Days Cash on Hand for all test periods – and this threshold shall be applicable to all subsequent payments on account of the GUC Note and the New Secured Debt.

3. <u>Superpriority Exit Facility</u>

On the Effective Date, the applicable Reorganized Debtors shall execute and deliver the Superpriority Exit Facility Credit Agreement and the other Superpriority Exit Facility Documents. Confirmation shall be deemed approval of the Superpriority Exit Facility (including transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or Reorganized Debtors in connection therewith). The

Reorganized Debtors shall execute and deliver those documents necessary or appropriate to obtain the Superpriority Exit Facility, including the Superpriority Exit Facility Documents. The primary economic terms of the Superpriority Exit Facility are set forth in the Secured Debt Restructuring Term Sheet. Pursuant to the Committee Settlement, any commitment fee under the Superpriority Exit Facility shall be deferred until the earlier of the payment in full of the Superpriority Exit Facility or the maturity of the Superpriority Exit Facility.

On the Effective Date, as applicable, all Liens and security interests granted pursuant to, or in connection with, the Superpriority Exit Facility Credit Agreement shall be deemed granted by the Reorganized Debtors pursuant to the Superpriority Exit Facility Credit Agreement, and all Liens and security interests granted pursuant to, or in connection with the Superpriority Exit Facility Credit Agreement (including any Liens and security interests granted on the Reorganized Debtors' assets) shall (i) be valid, binding, perfected, enforceable liens and security interests in the property described in the Superpriority Exit Facility Credit Agreement and the other "Loan Documents" (as defined therein or any similar defined term), (ii) have the same first priority with any Liens and security interests granted pursuant to, or in connection with, the New Bond Documents and the Bond Documents and (iii) not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan or the Confirmation Order.

The applicable Reorganized Debtors shall also execute, deliver, file, record and issue any other related notes, guarantees, deeds of trust, security documents or instruments (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case, without (A) further notice to or action, order, or approval of the Bankruptcy Court or (B) further act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such liens and security interests to third parties.

4. GUC Note

On the Effective Date, the Reorganized Debtors shall execute and deliver the GUC Note. Specifically, the GUC Note shall be an unsecured, subordinated promissory note in the principal amount of $5,250,000, bearing interest at 2% per annum, and, further, shall solely be paid from the Excess Cash Sweep (as defined in the GUC Note, which definition shall not be amended absent the reasonable consent of the Prepetition Secured Parties), subject to the Intercreditor Agreement (in which the definition of the Excess Cash Sweep likewise shall not be amended absent the reasonable consent of the Prepetition Secured Parties) and subordinated to the New Secured Debt. Confirmation shall be deemed approval of the GUC Note (including transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or Reorganized Debtors in connection therewith). The Reorganized Debtors shall execute and deliver those documents necessary or appropriate to issue the GUC Note, including, but not limited to, the Intercreditor Agreement.

Pursuant to the Committee Settlement, the GUC Note and the New Bonds shall share distributions of the Excess Cash Sweep as follows: (1) the first $1,750,000 to the GUC Note; (2) the next $5,000,000 to the New Bonds; (3) after (a) the Liquidating Trust receives the entire GUC Cash Amount of $4,750,000 and the first $1,750,000 under the Excess Cash Sweep and (b) the holders of the New Bonds receive the next $5,000,000 of the Excess Cash Sweep, all subsequent distributions under the Excess Cash Sweep shall be paid 70% on account of the New Bonds and 30% on account of the GUC Note until the balance of the GUC Note is satisfied; (4) then all excess cash under the Excess Cash Sweep shall be paid on account of the New Bonds.

The applicable Reorganized Debtors shall also execute, deliver, file, record and issue any other related notes, amendments to the foregoing, or agreements in connection therewith, in each case, without (A) further notice to or action, order, or approval of the Bankruptcy Court or (B) further act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Entity.

5. Intercompany Claim Waivers

On the Effective Date, each Debtor that is a Holder of an Intercompany Claim shall waive its recoveries on account of such Claims.

*E. Corporate Existence.*

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other forms, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

*F. Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for the Liens securing obligations under the New Bond Documents or the Superpriority Exit Facility Documents and any other Liens reinstated or retained pursuant to the Plan (including the Liens and security interests granted pursuant to, or in connection with, the Bond Documents or any Final Order)). For the avoidance of doubt, the Pavilion Claims shall vest exclusively in the applicable Reorganized Debtors, free and clear of all Liens, Claims, charges, or other encumbrances (except for the Liens securing obligations under the New Bond Documents or the Superpriority Exit Facility Documents and any other Liens reinstated or retained pursuant to the Plan (including the Liens and security interests granted pursuant to, or in connection with, the

Bond Documents or any Final Order)), subject to rights of the Liquidating Trustee under the Committee Settlement. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules but subject to any restrictions of the Committee Settlement, including rights provided to the Liquidating Trustee.

*G. Cancellation of Existing Agreements.*

On the Effective Date, except to the extent otherwise provided in the Plan (including the reinstatement of the outstanding Series 2019 Bonds through the delivery of New Bonds in replacement of the Series 2019 Bonds and an exchange of the outstanding Series 2019 Bonds for the New Bonds and all documents related thereto), all notes, instruments, certificates, and other documents evidencing Claims (except with respect to any Claim that is Reinstated hereunder), including credit agreements and indentures, shall be canceled and the obligations of the Debtors and any non-Debtor affiliate thereunder or in any way related thereto shall be deemed satisfied in full, canceled, discharged, and of no force or effect. Holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan. Notwithstanding anything to the contrary in this section or otherwise, (i) none of the NMTC Loan Documents shall be cancelled and (ii) the Bond Documents shall be canceled and the obligations of the Debtors thereunder shall be deemed satisfied in full only upon the delivery of the New Bonds; *provided*, that (1) the Bond Documents shall continue in full force and effect (including in respect of any provision that provides for (a) indemnification or reimbursement of the Bond Trustee or the Master Trustee by any other Prepetition Secured Party, (b) the application of any amounts received by the Bond Trustee or the Master Trustee or the priority of any claim or lien of the Bond Trustee or the Master Trustee on any property or funds held or collected by the Bond Trustee or the Master Trustee, and (c) duties and rights of the Bond Trustee or the Master Trustee in respect of such actions to be taken under the Plan, including the cancelation of obligations thereunder or otherwise) to the extent necessary in order to enable the Prepetition Secured Parties to implement the terms of the Plan and (2) any Lien or security interest granted pursuant to, or in connection with, the Bond Documents and any Final Order shall remain valid and effective from and after the Effective Date, and any such Lien or security interest shall remain perfected as of the date on which it was first perfected.

*H. Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including (1) adoption or assumption, as applicable, of the Employment Obligations; (2) selection of the directors and officers for the Reorganized Debtors; (3) implementation of the Restructuring Transactions; (4) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (5) adoption of the New Organizational Documents (if any); (6) the applicable Reorganized Debtors' entry into, delivery, and performance under the New Bond Documents, (7) the applicable Reorganized Debtors' entry, delivery and performance under the Superpriority Exit Facility Documents, (8) the applicable Reorganized Debtors' entry, delivery and performance under the GUC Note, (9) the rejection,

assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (10) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date); and (11) execution and entry into the Liquidating Trust Agreement and all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the transactions included therein. All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, the New Organizational Documents (if any), the New Bond Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law so long as such authorizations and approvals are in accordance with section 1129(a)(16) of the Bankruptcy Code.

*I. New Organizational Documents.*

On or immediately prior to the Effective Date, the New Organizational Documents may be amended in a manner acceptable to Debtors, as may be necessary to effectuate the transactions contemplated by the Plan. Each of the Reorganized Debtors will file its New Organizational Documents, to the extent such documents are modified, with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation. The New Organizational Documents will prohibit the issuance of non-voting equity securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code.

*J. Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the current members of the board of trustees of the Debtors shall be appointed as members of the New Board for the Reorganized Debtors, and the officers of each of the Debtors shall be appointed by the Reorganized Debtors. In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the members of the New Board and any Person proposed to serve as an officer of the Reorganized Debtors shall be disclosed at or before the Confirmation Hearing, in each case to the extent the identity of such proposed director or officer is known at such time. To the extent any such director or officer of the Reorganized Debtors is an Insider, the Debtors also will disclose the nature of any compensation to be paid to such director or officer. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

*K. Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, the Superpriority Exit Facility Documents, the GUC Note, and the New Bond Documents, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

*L. Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

*M. Director and Officer Liability Insurance.*

Reasonable directors' and officers' Insurance Policies remained in place in the ordinary course during the Chapter 11 Cases and shall remain in place from and after the Effective Date.

*N. Employee and Retiree Benefits.*

Unless otherwise provided herein, all employee wages, compensation, and benefit programs in place as of the Effective Date with the Debtors including the 457 Plan shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

*O. Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof and the terms of the Committee Settlement, the Reorganized Debtors shall exclusively retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including the Pavilion Claims), whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article IX. All and any proceeds of any such Causes of Action shall remain exclusively with the Reorganized Debtors, provided that the Liquidating Trust Pavilion Claim Cash Proceeds shall be transferred to the Liquidating Trust as set forth herein.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article IX of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article IX of the Plan. The applicable Reorganized Debtors through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

*P. Assumption, Ratification, Reaffirmation, and Reinstatement of NMTC Documents and Waiver of Discharge and Injunction with Respect Thereto.*

Effective as of the Effective Date, the NMTC Documents constitute Executory Contracts capable of assumption under section 365(a) of the Bankruptcy Code and shall be deemed to be assumed by the applicable Reorganized Debtor pursuant to section 365(a) of the Bankruptcy Code

and the entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtor's assumption of such documents.

In addition to the assumption of those NMTC Documents as provided for herein, and notwithstanding anything to the contrary contained in the Plan or the Confirmation Order, all of the NMTC Documents, together with the terms and conditions thereof and each and every of the encumbrances and Liens granted pursuant thereto along with all obligations thereunder, shall be deemed ratified, confirmed, reaffirmed, reinstated and enforceable, and in full force and effect, as if no bankruptcy had been filed by the Debtor, and any and all such encumbrances and Liens shall continue to secure the payment and performance of the obligations due thereunder in accordance with their respective terms.

Notwithstanding anything to the contrary contained in the Plan or the Confirmation Order:

1. The discharge and the Injunction granted in the Plan do not apply to the NMTC Documents or any rights, Claims, interests, or entitlements of the NMTC Transaction Lender/Equity Parties related thereto or arising thereunder, and Confirmation of the Plan shall not discharge, impair, or otherwise modify or amend any terms, conditions, agreements or obligations arising out of or in any way related to the NMTC Documents; and

2. The Debtors do not maintain any Claims, Causes of Action, rights of setoff, recoupment or subordination, or other legal or equitable defense with respect to the NMTC Documents, the NMTC Transaction, or the NMTC Transaction Lender/Equity Parties. To the extent any such Claim, Cause of Action, right of setoff, recoupment or subordination, or other legal or equitable defense exists, it is hereby waived, released, and discharged; and

3. Neither any unexpired lease nor the Leverage Loans shall be made subject to any Lien or any encumbrance of any kind or nature, including, without limitation, any Lien or encumbrance related to or granted in connection with the New Bonds or Superpriority Exit Facility, except as otherwise expressly permitted by the NMTC Documents.

*Q. Dissolution of Quabbin.*

Upon a certification to be Filed with the Bankruptcy Court by the Reorganized Debtors of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, Quabbin shall be deemed to be dissolved without any further action by the Reorganized Debtors, including the filing of any documents with the secretary of state for the state in which Quabbin is formed or is operating in any other jurisdiction. Notwithstanding the foregoing, the Reorganized Debtors shall retain the authority to take all necessary actions to dissolve Quabbin in, and withdraw Quabbin from, applicable states and provinces to the extent required by applicable law.

*R. The 457 Plan.*

Certain employees and former employees of the Debtor participated in the 457 Plan. The 457 Plan shall be maintained under the same terms and conditions as existed prior to the

bankruptcy filings. Participants in the 457 Plan shall not be required to file a Proof of Claim to retain their rights and/or interests in the 457 Plan.

*S. Preservation of Medicare Provider Agreements.*

In accordance with the terms of the Plan and the Confirmation Order, the Debtors' Medicare Provider Agreements will be deemed assumed, including all benefits and burdens, identified by CMS Certification Number(s): (i) 1013529502; (ii) 1205448701; (iii) 1205823879; (iv) 1457685299; (v) 1568413540; (vi) 1699100057; (vii) 1841802782; (viii) 1982357109; (ix) 1073049441; (x) 1336120047; (xi) 1952966491; (xii) 1215304589; (xiii) 1518110352; (xiv) 1699762286; (xv) 1861095945; and (xvi) 1881123552. Following the Effective Date, the Medicare Provider Agreements shall be governed exclusively by the Medicare statute, regulations, policies, and procedures, and without regard to bankruptcy law or the Plan. These include, but are not limited to, the adjustment of all payments to account for all prior overpayments and underpayments, including those relating to the pre-petition periods.

Notwithstanding anything to the contrary in the Plan, any of its exhibits, the Plan Supplement, or the Confirmation Order, the right of recoupment of the Center for Medicare and Medicaid Services ("CMS") and its administration of the Debtors' Medicare Provider Agreements and federal Medicare laws and regulations, are unaffected by the Plan or the confirmation of the Plan.

*T. Preservation of Insurance.*

Nothing in this Plan shall diminish, impair or otherwise affect payments from the proceeds or the enforceability of any Insurance Policies that may cover (a) Claims by any Debtor, or (b) Claims against any Debtor or covered Persons thereunder.

*U. Avoidance Actions*

As of the Effective Date, each of the Reorganized Debtors waives all rights to commence or otherwise pursue any and all Avoidance Actions arising under section 547 of the Bankruptcy Code or any comparable "preference" action arising under applicable non-bankruptcy law, provided that, (i) no Debtor or Reorganized Debtor waives any rights to commence or pursue any Avoidance Actions arising under section 547 of the Bankruptcy Code or any comparable "preference" actions arising under applicable non-bankruptcy law against any parties related to the Pavilion Claims and/or the Pavilion-Related Claims; (ii) no Debtor or Reorganized Debtor waives any rights to commence or pursue any Avoidance Actions arising under section 547 of the Bankruptcy Code or any comparable "preference" actions arising under applicable non-bankruptcy law against any parties listed on the Avoidance Action Schedule to be filed with the Plan Supplement; and (iii) except as expressly provided in the Plan, the Reorganized Debtors shall retain the right to assert any Causes of Action assertable in any Avoidance Action as defenses or counterclaims in any Cause of Action brought by any Entity. For the avoidance of doubt, each Debtor or Reorganized Debtor, as applicable, and the Committee waives all rights to commence or otherwise pursue any and all Avoidance Actions against the Prepetition Secured Parties.

## ARTICLE V.
## PROVISIONS REGARDING THE LIQUIDATING TRUST

*A. Establishment and Administration of the Liquidating Trust*

On the Effective Date, the Debtors and the Liquidating Trustee shall sign the Liquidating Trust Agreement and, in its capacity as such, the Liquidating Trustee shall accept all Liquidating Trust Assets on behalf of the Liquidating Trust Beneficiaries, and be authorized to obtain, collect, seek the turnover of and liquidate all of the Liquidating Trust Assets not in its possession or control. The Liquidating Trust will then be created and effective without any further action by the Bankruptcy Court or any Person or Entity as of the Effective Date. For the avoidance of doubt, the applicable Reorganized Debtors, through their authorized agents or representatives, shall exclusively retain any and all Pavilion Claims, Avoidance Actions, and Causes of Action, and shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such claims, subject to the rights of the Liquidating Trustee pursuant to the Committee Settlement. To the extent the Estates or the Reorganized Debtors collect any Pavilion Claim Direct Cash Proceeds, the Liquidating Trustee shall be authorized to accept, and entitled to receive, the Liquidating Trust Pavilion Claim Cash Proceeds on behalf of the Liquidating Trust Beneficiaries and apply such proceeds to the outstanding principal amounts under the GUC Note in accordance with the Liquidating Trust Agreement and the Intercreditor Agreement.

The Liquidating Trust shall be established for the primary purposes of liquidating the Liquidating Trust Assets and making Distributions in accordance with the Plan and the Liquidating Trust Agreement to its beneficiaries, with no objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary to, and consistent with, the purpose of the Liquidating Trust.

Upon execution of the Liquidating Trust Agreement, the Liquidating Trustee shall be authorized to take all steps necessary to complete the formation of the Liquidating Trust. The Liquidating Trust shall be administered by the Liquidating Trustee in accordance with the Liquidating Trust Agreement. The Liquidating Trust and Liquidating Trustee shall hold the Debtors' attorney-client privilege with respect to the Liquidating Trust Assets. The Reorganized Debtors shall provide documents and information related to the Liquidating Trust Assets upon reasonable request from the Liquidating Trustee.

*B. Liquidating Trust Assets*

On the Effective Date, and periodically thereafter if additional Liquidating Trust Assets become available, the Debtors or Reorganized Debtors, as applicable, shall transfer and assign to the Liquidating Trust all of its right, title, and interest in and to all of the Liquidating Trust Assets and in accordance with section 1141 of the Bankruptcy Code, all such assets shall automatically vest in the Liquidating Trust free and clear of all Claims, Liens, and other interests, subject only to the interests of the Liquidating Trust Beneficiaries in the Liquidating Trust Assets and the Liquidating Trust Expenses, as set forth in the Plan and the Liquidating Trust Agreement. Thereupon, neither the Debtors nor the Reorganized Debtors shall have any interest in or with respect to the Liquidating Trust Assets.

*C. Liquidating Trust Distributions and Expenses*

Distributions from the Liquidating Trust shall be made from the Liquidating Trust Assets in accordance with the Plan and the Liquidating Trust Agreement. Such Distributions shall be made after paying, reserving against, or satisfying, among other things, the operating and administrative expenses of the Liquidating Trust, including but not limited to all costs, expenses, and obligations incurred by the Liquidating Trustee (or professionals who the Liquidating Trustee may employ in administering the Liquidating Trust) in carrying out its responsibilities to the Liquidating Trust under the Liquidating Trust Agreement, or in any manner connected, incidental, or related thereto. The Liquidating Trust Expenses shall be paid exclusively from the Liquidating Trust Assets.

*D. Appointment of the Liquidating Trustee*

The identity of the Liquidating Trustee shall be disclosed in the Plan Supplement and shall be selected by the Committee in consultation with the Debtors. The appointment of the Liquidating Trustee shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date. The Liquidating Trustee shall have and perform all the duties, responsibilities, rights, and obligations set forth in the Plan and Liquidating Trust Agreement.

The Liquidating Trustee shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. On the Effective Date, all Liquidating Trust Beneficiaries of the Liquidating Trust shall be deemed to have ratified and become bound by the terms and conditions of the Liquidating Trust Agreement. In the event that the Liquidating Trustee resigns or is removed, terminated, or otherwise unable to serve as Liquidating Trustee, then successors shall be appointed as set forth in the Liquidating Trust Agreement. Any successor Liquidating Trustee appointed shall be bound by and comply with the terms of the Plan, the Confirmation Order, and the Liquidating Trust Agreement.

Following the Effective Date, the Liquidating Trustee shall also be and shall enjoy the powers of the Debtors' authorized representative for all purposes relating to the Liquidating Trust Assets, including, without limitation, section 1123 of the Bankruptcy Code, *provided*, that with respect to the Liquidating Trust Pavilion Claim Cash Proceeds, the Liquidating Trustee shall only be authorized to accept, and entitled to receive, such proceeds on behalf of the Liquidating Trust Beneficiaries and apply such proceeds to the outstanding principal amounts under the GUC Note in accordance with the Liquidating Trust Agreement and the Intercreditor Agreement. No further proof of such power shall be necessary or required.

*A. Liquidating Trust Beneficiaries*

Holders of General Unsecured Claims entitled to receive Distributions pursuant to the terms of the Plan and the Liquidating Trust Agreement, whether or not such Claims are Allowed as of the Effective Date, shall be the Liquidating Trust Beneficiaries and shall be bound by the Liquidating Trust Agreement.

*B. Liquidating Trust Interests*

On the Effective Date, each Holder of a General Unsecured Claim shall, by operation of the Plan, receive its Pro Rata share of the Liquidating Trust Interests, as set forth in Article III above. Liquidating Trust Interests shall be reserved for Holders of Disputed General Unsecured

Claims and issued by the Liquidating Trust to, and held by the Liquidating Trustee in, the Disputed Claims Reserve pending allowance or disallowance of such Claims. No other entity shall have any interest, legal, beneficial, or otherwise, in the Liquidating Trust Assets upon the assignment and transfer of such assets to the Liquidating Trust.

The Liquidating Trust Interests shall be uncertificated and nontransferable except upon the death of the Holder or by operation of law. Holders of Liquidating Trust Interests, in such capacity, shall have no voting rights with respect to such interests.

As set forth in the Liquidating Trust Agreement, Distributions from the Liquidating Trust on account of Liquidating Trust Interests shall be made from the Liquidating Trust Proceeds after paying, reserving against, or satisfying, among other things, the operating and administrative expenses of the Liquidating Trust, including but not limited to the Liquidating Trust Expenses.

*E. Certain Powers and Duties of the Liquidating Trust and Liquidating Trustee*

1. Powers and Duties of the Liquidating Trust

The Liquidating Trustee shall be deemed the Estates' representative with respect to the Liquidating Trust Assets (other than the Liquidating Trust Pavilion Claim Cash Proceeds) in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004, in addition to any powers granted by law or conferred to it by any other provision of the Plan, including without limitation any set forth herein; *provided, however*, that enumeration of the following powers shall not be considered in any way to limit or control the power and authority of the Liquidating Trustee to act as specifically authorized by any other provision of the Plan, the Liquidating Trust Agreement, and/or any applicable law, and to act in such manner as the Liquidating Trustee may deem necessary or appropriate, including, without limitation, to discharge all obligations assumed by the Liquidating Trustee or provided herein, to conserve and protect the Liquidating Trust and the Liquidating Trust Assets, as applicable, or to confer on the Liquidating Trust Beneficiaries the benefits intended to be conferred upon them by the Plan. The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include the authority, power, and responsibility, among other things, to:

a) receive, manage, invest, supervise, and protect Liquidating Trust Assets (unless otherwise specified in the Plan or the Liquidating Trust Agreement);

b) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Liquidating Trust Agreement;

c) pay taxes or other obligations incurred by the Liquidating Trust and issue to employees or other Persons, and/or file with the appropriate Governmental Units, applicable tax and wage returns and forms;

d) make Distributions from the Liquidating Trust to Holders of Allowed Claims with a beneficial interest in the Liquidating Trust as provided for in the Plan and the Liquidating Trust Agreement;

e) employ and compensate counsel or other advisors to assist in the performance of its duties, which counsel may include any counsel who has represented either the Debtors or the Committee during the pendency of the Chapter 11 Cases, *provided, however*, that any such compensation shall be made only out of the Liquidating Trust Assets except as otherwise provided in the Committee Settlement;

f) file all federal, state and local tax returns if necessary;

g) undertake all administrative functions of the Chapter 11 Cases, including the payment of U.S. Trustee fees incurred post-Effective Date with respect to Distributions from the Liquidating Trust (but not any U.S. Trustee fees incurred post-Effective Date with respect to any other Distributions or disbursements by the Reorganized Debtors) and the ultimate closing of the Chapter 11 Cases;

h) have consultation rights with the Reorganized Debtors with respect to Pavilion-Related Claims, including any rejection damages claims related thereto;

i) have standing to object to any of the Reorganized Debtors' proposed settlement, compromise, resolution and/or other disposition of the Pavilion-Related Claims, including any rejection damages claims related thereto, to the extent that such proposed treatment would incrementally increase the amount of Allowed Claims under Class 7 by more than the amount the Liquidating Trustee contends should be the Allowed amount (including subject to section 502(b)(6) of the Bankruptcy Code as to rejection damages claims) of the applicable Claims; provided that, in such instance of an objection to the appropriate Allowed amount of such Pavilion-Related Claim, neither the Reorganized Debtors' nor the Liquidating Trustee's business judgment shall be given greater deference as to the appropriate Allowed amount of such Claims, and any costs incurred by the Liquidating Trustee related to any objection it raises and any prosecution in connection therewith shall be paid solely from the Liquidating Trust Assets;

j) make the initial determination with respect any Claims objections (other than with respect to Pavilion-Related Claims);

k) seek standing to object to any Claims that the Reorganized Debtors unjustifiably refuse to object to, with the Reorganized Debtors paying reasonable and documented legal costs for the Liquidating Trustee if standing is granted;

l) object to any of the Reorganized Debtors' proposed settlement, compromise, resolution and/or other disposition of any Claim (other than the Pavilion-Related Claims), to the extent that the Liquidating Trustee believes the Reorganized Debtors' proposed treatment is not justifiable; provided that, if such objection is sustained, then any reasonable and documented legal fees and expenses incurred by the Liquidating Trustee related to any objection it raises and any prosecution in connection therewith shall be paid by the Reorganized Debtors; and

m) take such other action as may be vested in or assumed by the Liquidating Trustee consistent with the Plan, the Liquidating Trust Agreement, and any applicable orders of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of

the Plan, including the Liquidating Trustee's enforcement of its right to payment of the Liquidating Trust Pavilion Claim Cash Proceeds.

The Liquidating Trust Agreement may establish certain powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Liquidating Trust as a liquidating trust for United States federal income tax purposes. The Liquidating Trustee has full authority to take any steps necessary to administer the Liquidating Trust Agreement, including, without limitation, the duty and obligation to liquidate Liquidating Trust Assets, to make Distributions therefrom in accordance with the provisions of the Plan.

2. Investments of Cash

The Liquidating Trust may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code or in other prudent investments, *provided* that such investments are permitted to be made by a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities. Pursuant to the terms of the Liquidating Trust Agreement, the Liquidating Trustee may establish accounts for the Liquidating Trust.

3. Term of the Liquidating Trust

The Liquidating Trust will terminate on the earlier of the: (a) final liquidation, administration, and Distribution of the Liquidating Trust Assets in accordance with the terms of the Plan and the Liquidating Trust Agreement, and its full performance of all other duties and functions as set forth in the Plan or the Liquidating Trust Agreement; and (b) the fifth (5th) anniversary of the Effective Date. Notwithstanding the foregoing, multiple fixed-term extensions may be obtained so long as Bankruptcy Court approval is obtained within six months before the expiration of the term of the Liquidating Trust and each extended term, and provided that any further extension would not adversely affect the status of the Liquidating Trust as a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations for federal income tax purposes. After (a) the final Distributions pursuant to the Plan, (b) the filing by or on behalf of the Liquidating Trust of a certification of dissolution with the Bankruptcy Court, and (c) any other action deemed appropriate by the Liquidating Trustee, the Liquidating Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

## ARTICLE VI.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A. Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases, not previously assumed or rejected pursuant to an order of the Bankruptcy Court, will be deemed rejected, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that: (1) previously were assumed or rejected by the Debtors; (2) are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (3) are the subject of a motion to assume that is pending on the Confirmation Date; (4) are subject to a motion to reject pursuant to which

the requested effective date of such rejection is after the Effective Date; or (5) will otherwise terminate by their terms prior to the Effective Date.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute a Bankruptcy Order approving the assumptions or rejections of the Executory Contracts and Unexpired Leases set forth in the Plan or the Schedule of Assumed Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed pursuant to this Article VI.A or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases identified in this Article VI and in the Plan Supplement at any time through and including 60 days after the Effective Date; *provided*, however, that for any contract for which the treatment is altered, amended, modified, or supplemented by the Schedule of Assumed Executory Contracts and Unexpired Leases, the counterparty to such contract shall have thirty (30) days from the date of such altered, amended, modified, or supplemented treatment of the contract to object thereto.

*B. Indemnification Obligations.*

All indemnification provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date; *provided* that the indemnification provisions set forth in this Article VI.B shall not apply to Former D&Os.

*C. Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the**

**Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.6 hereof.

*D. Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. On or before September 10, 2024, the Debtors shall provide for notices of the Schedule of Assumed Executory Contracts and Unexpired Leases to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served, and actually received by the Debtors at least three days prior to the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged without further notice to or action, order, or approval of the Bankruptcy Court.**

*E. Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

*F. Insurance Policies.*

Each of the Debtors' Insurance Policies and any agreements, documents, or instruments relating thereto are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan or the Confirmation Order, on the Effective Date, (1) the Debtors shall be deemed to have assumed all Insurance Policies and any agreements, documents, and instruments relating to coverage of all insured Claims, and (2) such Insurance Policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

*G. Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

*H. Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contract and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is, in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

*I. Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

*J. Contracts and Leases Entered into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

*K. Special Provisions Related to Pavilion-Related Claims and Underlying Agreements.*

Notwithstanding anything to the contrary herein, this Plan shall not effect, and shall not be deemed to effect, the assumption or rejection of (or any other disposition of the parties' rights and obligations under) the Pavilion Ground Lease. The Reorganized Debtors reserve the right, and shall have the right (in both events, after consultation with the Prepetition Secured Parties), to seek by motion and/or adversary proceeding the Bankruptcy Court's approval of the assumption, rejection or other disposition of the parties' rights and obligations under the Pavilion Space Lease and the Pavilion Ground Lease by the Pavilion Claim Deadline.

In addition, notwithstanding anything to the contrary herein, the Reorganized Debtors shall have until the Pavilion Claim Deadline to file with the Bankruptcy Court or such other court or tribunal of competent jurisdiction any Cause of Action and/or related proceeding (including, without limitation, a motion or other request for relief under section 502 of the Bankruptcy Code or the applicable Federal Rules of Bankruptcy Procedure as to one or more of the Pavilion-Related Claims) with respect to the Pavilion Claims and/or the Pavilion-Related Claims.

Further, nothing in this Plan shall be deemed to extend any deadlines under section 365(d)(4) of the Bankruptcy Code as such deadlines apply to the Pavilion Space Lease. Pursuant to section 365(d)(4) of the Bankruptcy Code the Pavilion Space Lease to the extent that it is or was an executory contract or unexpired lease) was deemed rejected as of June 24, 2024.

*L. Assumption of Doctor Agreements.*

On the Effective Date, the Doctor Agreements will be deemed assumed, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code unless such Doctor Agreements (1) previously were assumed or rejected by the Debtors; (2) are subject to a motion to reject pursuant to which the requested effective date of such rejection is after the Effective Date; or (3) will otherwise terminate by their terms prior to the Effective Date. To the extent one exists, the cure amount related to the Doctor Agreements shall be reflected in the Schedule of Assumed Executory Contracts and Unexpired Leases. Article VI.D shall apply to any cure amounts related to the Doctor Agreements.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute a Bankruptcy Order approving the assumption of the Doctor Agreements pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

*M. Special Provision Regarding Cigna Contracts.*

Notwithstanding anything herein to the contrary, the Debtors shall, not later than 12:00 p.m. EST, three (3) business days prior to the deadline to object to the Plan, provide to Cigna, through its counsel, written notice of the Debtors' irrevocable (subject to the occurrence of the Effective Date of the Plan) decision as to whether or not Debtors propose to assume or reject each of the Cigna Contracts. The proposed cure amount related to such contract shall be reflected in the Schedule of Assumed Executory Contracts and Unexpired Leases.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute a Bankruptcy Order approving the assumption or rejection, as applicable, of the Cigna Contracts pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

## ARTICLE VII.
## PROVISIONS GOVERNING DISTRIBUTIONS

*A. Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof. Except as otherwise provided in the Plan, holders of Claims shall not be entitled to interest, dividends, or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

*B. Disbursing Agent.*

All Distributions under the Plan shall be made by the Disbursing Agent on the Effective Date. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

*C. Rights and Powers of Disbursing Agent.*

1. Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to (a) affect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all Distributions contemplated hereby and by the Liquidating Trust Agreement; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or the Liquidating Trust Agreement, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2. Expenses Incurred on or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors or the Liquidating Trust, as applicable.

*D. Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1. Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed, and any party responsible for making Distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date. For the avoidance of doubt, the Claims Register shall be deemed to include the Secured Bondholder Claims and the Secured Term Lender Claims.

2. Delivery of Distributions in General.

Except as otherwise provided herein, the Disbursing Agent shall make Distributions to holders of Allowed Claims as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; provided, however, that the manner of such Distributions shall be determined at the discretion of the Reorganized Debtors; provided further, however, that the address for each holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that holder.

3. Fractional and *De Minimis* Distributions.

No fractional units or amounts of New Secured Debt shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts, and such fractional amount shall be deemed to be zero. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of units or amounts of New Secured Debt is not a whole number, the actual distribution of units or amounts of New Secured Debt shall be rounded as follows: (a) fractions of greater than one-half shall be rounded to the next higher whole number, and (b) fractions of one-half or less shall be rounded to the next lower whole number with no further payment thereto. The total number of authorized units or amounts of New Secured Debt to be distributed to Holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

Notwithstanding anything herein to the contrary, other than to Holders of Patient Refund Claims, the Reorganized Debtors or Liquidating Trustee, as applicable, and the Disbursing Agent shall not be required (i) to make interim Distributions or payments of less than $50, or (ii) final Distributions or payments of less than $50, whether in Cash or otherwise, unless the Holder makes a written request in writing within 45 days of Allowance of such Holder's claim.

4. Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any holder of Allowed Claims is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; provided that every 180 days the Disbursing Agent shall file a notice describing such undeliverable distributions; *provided* that such Distributions described in such notice shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the filed notice. After such date, all unclaimed property or interests in property shall revert to the Disbursing Agent who initiated such distribution

automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder of Claims to such property shall be discharged and forever barred.

*E. Manner of Payment.*

All Distributions of Cash to the holders of Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor. At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

*F. Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

*G. Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes), and then, to the extent, the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

*H. No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.

*I. Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

*J. Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided, however*, that neither the failure to effectuate setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder.

*K. Claims Paid or Payable by Third Parties.*

1. Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full or in part a Claim, and such Claim shall be reduced or disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full or in part, as applicable, on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2. Claims Payable by Third Parties.

To the extent that one or more of the Debtors' Insurers agrees to satisfy in full or in part an Insurance Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such Insurers' agreement, the applicable portion of such Insurance Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3. Applicability of Insurance Policies.

Except as otherwise provided in the Plan, Distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Policy, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

# ARTICLE VIII.
# PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

*A. Allowance of Claims.*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately prior to the Effective Date.

*B. Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan (including Article V.G hereof with respect to the rights provided to the Liquidating Trustee pursuant to the Committee Settlement), after the Effective Date, the Reorganized Debtors shall have the sole authority to (1) File, withdraw, or litigate to judgment, objections to Claims; (2) settle or compromise any Disputed Claim without any further notice to, or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to, or action, order, or approval by the Bankruptcy Court.

*C. Estimation of Claims.*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that either is subject to appeal or has not been the subject of a Final Order shall be deemed to be estimated at zero dollars unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, which estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of Distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

*D. Adjustment to Claims without Objection.*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors or the Liquidating Trustee, as applicable, without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

*E. Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the later of (1) 180 days after the Effective Date and (2) such other period of limitation as may be specifically fixed by the Debtors

or the Reorganized Debtors, as applicable, or by a Final Order of the Bankruptcy Court for objecting to such claims.

*F. Disallowance of Claims.*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors. All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided herein, pursuant to a Bankruptcy Court order or otherwise agreed, any and all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.**

*G. Amendments to Claims.*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court, the Reorganized Debtors, and the Liquidating Trustee (to the extent such Claim would increase the size of Class 7), and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

*H. No Distributions Pending Allowance.*

If an objection to a Claim or portion thereof is Filed as set forth in Article VIII.E hereof, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

*I. Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law.

*J. Provisions Related to Pavilion-Related Claims.*

Pursuant to the Committee Settlement, the Reorganized Debtors shall object to any Claims filed by Pavilion Parties that the Reorganized Debtors believe are incorrect, inaccurate, and/or overstate the allowable amount and/or actual value (if any) of any Pavilion-Related Claims, including any rejection damages claims submitted by any of the Pavilion Parties. The Reorganized Debtors shall retain control over resolution of Pavilion-Related Claims, including rejection damages claims, subject to general consultation rights of the Liquidating Trustee. The Liquidating Trustee shall have standing to object to any of the Reorganized Debtors' proposed resolutions of any Pavilion-Related Claims to the extent that the Liquidating Trustee alleges that such resolution would incrementally increase the GUC pool by more than the amount of what the Liquidating Trustee contends should be the Allowed amount (including subject to section 502(b)(6) of the Bankruptcy Code as to rejection damages claims) of an applicable Claim. Neither the Reorganized Debtors' nor the Liquidating Trustee's business judgment as to the appropriate Allowed amount of the applicable Pavilion-Related Claim shall be given greater deference in the event the Liquidating Trustee objects to the proposed Allowed amount of such Claim. Any costs incurred by the Liquidating Trustee related to the prosecution of its contentions as to the Allowable amount of the applicable Pavilion-Related Claim(s) shall be paid solely from the Liquidating Trust Assets.

## ARTICLE IX.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

*A. Discharge of Claims.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Liquidating Trust or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim based upon such debt or right, is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims (except as otherwise specifically provided in the Plan or the Liquidating Trust Agreement) subject to the occurrence of the Effective Date.

*B. Release of Liens.*

**Except as otherwise provided in the Plan (including Article IV hereof), the Liquidating Trust Agreement, the Superpriority Exit Facility Documents, and the New Bond Documents, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

*C. Releases by the Debtors.*

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively (including the Committee through the derivative standing granted to it through any Final Order), by or through the foregoing entities, from any and all Causes of Action (including, without limitation, Avoidance Actions and the Committee Adversary Proceeding), including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of- court restructuring efforts, intercompany transactions, commencement and prosecution of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), entry into the New Bond Documents, entry into the Superpriority Exit Facility Documents, entry into the GUC Note, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan, or any document, instrument, or agreement executed to implement the Plan. Further, notwithstanding anything contained**

**herein to the contrary, the foregoing release does not release any claims that the Reorganized Debtors may have (i) against Excluded Parties, (ii) with respect to any Pavilion Claims or Pavilion-Related Claims, (iii) with respect to any Liquidating Trust Assets (other than those Liquidating Trust Assets relating to any Cause of Action against the Prepetition Secured Parties or their Related Parties) or (iv) for any claims or Causes of Action related to any act or omission that is determined by Final Order to have constituted actual fraud, willful misconduct, or gross negligence. For the avoidance of doubt, in no event shall the releases described in this Article IX.C be limited in any way whatsoever with respect to Causes of Action (including, without limitation, the Avoidance Actions and the Committee Adversary Proceeding) against the Prepetition Secured Parties or their Related Parties.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article IX.C by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article IX.C is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors, Reorganized Debtors, or Liquidating Trustee, as applicable, asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.**

*D. Releases by Holders of Claims.*

**As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, commencement and prosecution of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the New Bond Documents, the Superpriority Exit Facility Documents, the GUC Note, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release (i) any Lien or security interest granted to the Prepetition Secured Parties pursuant to, or in connection with, the Bond Documents or any Final Order; (ii) any obligations of any party under the Plan, or any document, instrument, or agreement executed to implement the Plan; or (iii) any rights under the Plan that the Holder of any Allowed Claim may have. Further, notwithstanding anything**

**contained herein to the contrary, the foregoing release does not release any claims against persons other than each Debtor, the Reorganized Debtors or the Prepetition Secured Parties (and their Related Parties) for conduct occurring prior to the commencement of, or during, the Chapter 11 Cases or claims related to any act or omission that is determined by Final Order to have constituted actual fraud, willful misconduct, or gross negligence.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article IX.D, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article IX.D is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors or Reorganized Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.**

*E. Exculpation.*

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, entry into the New Bond Documents, entry into the Superpriority Exit Facility Documents, entry into the GUC Note, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon the Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not liable for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such Distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, an Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date.**

*F. Injunction.*

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims that have been released, discharged, or are subject to**

**exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims released or settled pursuant to the Plan; *provided*, *however*, that nothing in this injunction shall limit the Holder of an Insured Claim from receiving the treatment set forth in Class 9.**

**Upon entry of the Confirmation Order, all holders of Claims and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each holder of an Allowed Claim, by accepting, or being eligible to accept, Distributions under or Reinstatement of such Claim, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article IX.F of the Plan.**

*G. Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

*H. Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

*I. Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE X.
## CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

*A. Conditions Precedent to the Effective Date.*

It shall be a condition to the occurrence of the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.B hereof:

1. the Bankruptcy Court shall have entered the Confirmation Order and shall;

   (a) authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

   (b) authorize the Debtors, as applicable or necessary, to: (i) implement the Restructuring Transactions; (ii) make all Distributions and issuances as required under the Plan; and (iii) enter into any agreements and transactions, as set forth in the Plan Supplement;

   (c) authorize and approve the terms of the Global Settlement Term Sheet;

   (d) authorize the implementation of the Plan in accordance with its terms; and

   (e) provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

2. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, including all governmental approvals (including from the Issuer) necessary for the issuance of the New Bonds;

3. unless otherwise set forth in the Plan, the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the Plan;

4. the Debtors have executed the New Bond Documents in form and substance reasonably acceptable to the parties thereto;

5. the Debtors have executed the Superpriority Exit Facility Documents in form and substance reasonably acceptable to the parties thereto;

6. the Debtors have executed the GUC Note, Liquidating Trust Agreement and Intercreditor Agreement in form and substance reasonably acceptable to the parties thereto;

7. all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts reasonably estimated to be sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Accounts pending approval by the Bankruptcy Court; and

8. the Debtors shall have implemented the Restructuring Transactions, and all transactions contemplated herein, in a manner consistent in all respects with the Plan, pursuant to documentation acceptable to the Debtors.

*B. Waiver of Conditions.*

The Debtors may, with the prior written consent of (i) the Bondholder, the New Master Trustee and the New Bond Trustee solely with respect to those terms and provisions that relate to the New Bonds or would have a material adverse effect on the value of the distributions to the Bondholder, and (ii) the Committee, solely with respect to those terms and provisions that would have a material adverse effect on the value of the distributions to the Holders of General Unsecured Claims, waive any of the conditions to the Effective Date set forth in Article X.A of the Plan at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan; *provided* that, in no event, shall the conditions for the Debtors to obtain governmental approval for issuance of the New Bonds be waived.

*C. Effect of Failure of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors; (2) prejudice in any manner the rights of the Debtors, any holders of Claims, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims, or any other Entity including the Committee.

## ARTICLE XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

*A. Modification and Amendments.*

Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

*B. Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

*C. Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim, including the resolution of any request for

payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article VI hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7. enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8. enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, issuance of the New Bonds, entry into the Superpriority Exit Facility, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan except (other than as expressly stated in this subsection (9)) for cases, controversies, suits, disputes or Causes of Action arising in connection with or related to the New Bond Documents, the Superpriority Exit Facility Documents or the Intercreditor Agreement;

10. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the issuance of the GUC Note and any rights thereunder;

11. issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

12. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article IX hereof and enter such orders as may be necessary to implement such releases, injunctions, and other provisions;

13. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of Distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid;

14. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to any Pavilion Claim and/or the Quabbin Sale Claim;

15. enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16. determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, except for matters arising in connection with or related to the New Bond Documents, the Superpriority Exit Facility Documents or the Intercreditor Agreement;

17. enter an order concluding or closing the Chapter 11 Cases;

18. adjudicate any and all disputes arising from or relating to Distributions under the Plan;

19. consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

20. determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

21. hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, except for the disputes relating to the New Bond Documents, the Superpriority Exit Facility Documents or the Intercreditor Agreement;

22. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

23. hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan, including under Article IX hereof, regardless of whether such termination occurred prior to or after the Effective Date;

24. enforce all orders previously entered by the Bankruptcy Court; and

25. hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

*A. Immediate Binding Effect.*

Subject to Article X.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims (irrespective of whether such Claims are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

*B. Additional Documents.*

On or before the Effective Date, the Debtors may file such agreements and other documents with the Bankruptcy Court as may be necessary to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims receiving Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

*C. Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

*D. Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve, and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases except to the extent necessary for any Professionals to submit Professional Fee Claims. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date, except for any fees or expenses incurred after the Effective Date with respect to Professional Fee Claims.

*E. Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an

admission or waiver of any rights of any Debtor with respect to the holders of Claims prior to the Effective Date.

*F. Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

*G. Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1. if to the Debtors, to:

Heywood Healthcare, Inc.
242 Green Street
Gardner, MA 01440
Attention: John Bujak
Email address: john.bujak@heywood.org

with copies to:

**FOLEY & LARDNER LLP**
321 N. Clark Street, Suite 3000
Chicago, IL 60654
Fax: (312) 832-4700
Attention: Edward J. Green
E-mail address: egreen@foley.com

And

**FOLEY & LARDNER LLP**
500 Woodward Avenue, Suite 2700
Detroit, MI 48226
Attention: Jake W. Gordon
E-mail address: jake.gordon@foley.com

And

John M. Flick (#652169)
**FLICK LAW GROUP, P.C.**
144 Central Street, Unit 201
Gardner, MA 01440
Attention: John M. Flick
E-mail address: jflick@flicklawgroup.com

After the Effective Date, the Debtors have authority to send a notice to Entities that request to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

*H. Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

*I. Entire Agreement.*

Except as otherwise indicated, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

*J. Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.stretto.com/heywood/ or the Bankruptcy Court's website at https://www.mab.uscourts.gov/. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

*K. Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.

Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

*L. Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals nor the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan and any previous plan.

*M. Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

*N. Waiver or Estoppel.*

Each holder of a Claim shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

*O. Conflicts.*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

Dated: September 26, 2024

Heywood Healthcare, Inc.
on behalf of itself and all other Debtors

*/s/ Rozanna Penney*
Chief Executive Officer

# Exhibit A to the Plan

# Secured Debt Restructuring Term Sheet

# SECURED DEBT RESTRUCTURING TERM SHEET

This term sheet (this "Summary Term Sheet") sets forth a summary of the indicative terms and conditions of (i) treatment under a plan of reorganization (any such plan, the "Plan") to be proposed by Heywood Healthcare, Inc. (the "Debtor" or "Borrower") and its affiliates Athol Memorial Hospital, The Henry Heywood Memorial Hospital and Heywood Medical Group, Inc. (collectively with the Borrower, the "Obligated Group"),[1] and certain other affiliates of the Debtor that are not members of the Obligated Group of claims arising under certain continuing covenant agreements and other documents pertaining to bonds (collectively, the "Bond Documents") issued by Massachusetts Development Finance Agency (the "Issuer") and purchased by Siemens Public, Inc. ("Siemens Public"), and as to which one series of bonds has been participated to The Huntington National Bank ("Huntington"), and/or with respect to a loan made by Siemens Financial Services, Inc. ("SFS" and, collectively with Siemens Public, "Siemens") and related loan documents (the Issuer loaned the proceeds of the sale of such bonds to, and SFS made its loan to, the Obligated Group); (ii) an exit working capital financing to be funded by SFS and Huntington (collectively in such capacity, the "Lender"); and (iii) the note to be issued to a liquidating trust for the benefit of general unsecured claims (the "GUC Note").

**THIS SUMMARY TERM SHEET DOES NOT SET FORTH (OR PURPORT TO SET FORTH) ALL OF THE PLAN'S PROVISIONS. INSTEAD, IT SETS FORTH ONLY CERTAIN INITIAL, INDICATIVE TERMS OF THE TREATMENT UNDER THE PLAN OF THE BOND DOCUMENTS, THE GUC NOTE, AND OF THE EXIT WORKING CAPITAL FACILITY.**

This Summary Term Sheet is for discussion purposes only and is not binding on the parties. This Summary Term Sheet does not represent a commitment, obligation, or agreement by the Debtors, Siemens, Huntington or the Lender to consent to the Plan and/or to provide financing to the Obligated Group or its affiliates. None of the Debtors, Siemens, Huntington and the Lender shall be so obligated unless and until all internal approvals are sought and obtained, all definitive documentation (including, without limitation, the Plan) is negotiated and executed, all conditions precedent are satisfied or waived, and the Plan is confirmed by the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"). The definitive documentation may contain different or additional terms that vary from those described herein.

This Summary Term Sheet is subject to all applicable federal and state privileges for settlement communication.

The Obligated Group and its affiliates acknowledge and agree that none of Siemens, Huntington nor the Lender is recommending any action to the Obligated Group or its affiliates. Each of Siemens, Huntington, and the Lender acts for its own interests. None of Siemens, Huntington nor the Lender is a registered municipal advisor or is subject to any of the fiduciary duties imposed on municipal advisors. Without limiting the generality of the foregoing, none of Siemens, Huntington nor the Lender is an advisor to or fiduciary of the Obligated Group or its affiliates with respect to the transaction contemplated hereby, any of the discussions, undertakings, and procedures leading thereto, or any information or material provided in connection therewith. To the extent they deem appropriate, the Obligated Group and its affiliates have consulted and will continue to consult before taking any action, their own legal, financial, and other advisors regarding the transaction contemplated hereby, all matters related thereto, and any information or material provided in connection therewith.

[1] For purposes of this term sheet, the terms "Debtors" and "Reorganized Debtors" shall refer to the Obligated Group in their capacities as such; provided that, with respect to the GUC Note, the applicable obligors shall be all Reorganized Debtors as defined under the Plan.

| | |
|---|---|
| Reinstated Capital | Tax-exempt bonds reinstated with a principal balance of $40 million, issued pro-rata to each series of bonds currently outstanding under the Bond Documents. On the effective date of the Plan, the various debt service reserve funds shall be applied as Siemens and Huntington direct and in accordance with the terms and conditions of the existing bond documents.<br><br>Siemens Public and Huntington to waive any deficiency claim associated with obligations owed under the Bond Documents. |
| Reinstated Bonds Duration | 20-year maturity |
| Reinstated Bonds Interest | Heywood will pay cash interest of 2.00% per annum (on each series of reinstated bonds), semi-annually on the full outstanding principal balance of the bonds on April 1 and October 1 of each year; interest is to be remitted monthly to the bond trustee. |
| Reinstated Bond Assignability | Bonds may be assigned to a new borrower with the consent of Siemens Public and Huntington, as applicable, at the time of the assignment transaction. |
| Reinstated Bonds Amortization | Bonds will pay semi-annual principal based on the attached amortization schedule (Schedule A), which payments shall only become due and owing subject to the "Excess Cash Sweep", with all remaining outstanding principal owed under the bonds due as a bullet payment at the Maturity Date. To avoid doubt, nonpayment of any scheduled semi-annual principal amortization shall not be considered a default or event of default in the event no or insufficient Excess Cash Sweep is triggered.<br><br>The Reorganized Debtors will pay the Excess Cash Sweep (in accordance with the Excess Cash Sweep Waterfall described below) within 30 days following the end of April 1 and October 1 of each year, with such payment based on internal financial reports. Within 30 days following the completion of each fiscal year's audit, the Reorganized Debtors will report the final calculation of the Excess Cash Sweep payments (and the Excess Cash Sweep Waterfall allocation thereof) during such fiscal year and will pay any unpaid amounts at such time. Any overpayments paid on account of the Excess Cash Sweep shall be offset against the next interest payment coming due.<br><br>"Excess Cash Sweep" shall mean a payment equal to the sum of (i) 100% of Excess Cash until all scheduled amortization pursuant to Schedule A has been paid and (ii) 66.66% of Excess Cash thereafter. The other 33.33% of Excess Cash pursuant to clause (ii) of the preceding sentence (i.e., what Heywood retains) shall be referred to as the "Heywood Excess Cash Share."<br><br>"Days Cash on Hand" is defined as the quotient of (i) unrestricted cash and cash equivalents (excluding any donor-restricted funds |

| | |
|---|---|
| | and grant-restricted funds for a specified purpose[2] and excluding the amount of any interest owed on April 1 or October 1, as applicable, to the extent not already deducted), divided by (ii) the average daily cash operating expenses.<br><br>"Excess Cash" is defined as the amount of all unrestricted cash and cash equivalents (excluding any donor-restricted funds and grant-restricted funds for a specified purpose[3] and excluding the amount of any interest owed on April 1 or October 1, as applicable to the extent not already deducted) in excess of twenty-eight (28) Days Cash on Hand, less the cumulative amount of the Heywood Excess Cash Share retained by Heywood; *provided that* following payment of $1.75 million in principal to the GUC Note pursuant to the Excess Cash Sweep Waterfall, the reference to twenty-eight (28) days shall be reduced to twenty seven (27) days for all subsequent test periods.<br><br>Payments made to the Reinstated Bonds pursuant to the Excess Cash Sweep shall be applied in the following order: (1) to any previously scheduled but unpaid amortization; (2) to the amortization payment scheduled on the date of such Excess Cash Sweep payment; and (3) to the next scheduled principal amortization payment or payments as shown on Schedule A.<br><br>Excess Cash and Days Cash on Hand calculations shall be subject to standard audit and examination rights and alternative dispute resolution mechanisms. |
| Excess Cash Sweep Waterfall | Payments resulting from the Excess Cash Sweep described above shall be made as follows:<br>- The first $1.75 million to the GUC Note;<br>- The next $5.00 million to the Reinstated Bonds;<br>- 70% and 30% of all subsequent payments to the Reinstated Bonds and the GUC Note, respectively, until all obligations owed pursuant to the GUC Note have been satisfied; and<br>- Thereafter, 100% of all subsequent payments to the Reinstated Bonds. |
| Bond Covenants | In addition to traditional reporting covenants to be mutually agreed upon by Heywood and Siemens Public, no later than thirty (30) days after the beginning of each Fiscal Year, the capital and operating budgets for the Members of the Obligated Group for such Fiscal Year (in form and detail consistent with Exhibit A (which Exhibit shall be agreed upon no later than 10 days following entry of the order approving the Disclosure |

[2] Grant-restricted funds for a specified purpose would be limited to any grants with restricted or predefined uses (e.g., the Community Program Grants previously defined in Heywood's Motion for an Order Authorizing the Debtors to Continue Community Programs in the Ordinary Course of Business [Dkt. No. 7] or such similar grants) but would not include any general grants payable to Heywood (e.g., the Health Safety Net grants).

[3] See Footnote 1.

| | |
|---|---|
| | Statement), the "Budget") shall be provided to the Lender.[4] Moreover, Heywood's senior management will make themselves available to provide information and answer questions related to the Budget and Heywood's financial and operational condition.<br><br>Financial Covenants (levels/thresholds to be negotiated within ten days following entry of the order approving the Disclosure Statement)<br><br>1. Interest Coverage Ratio: tested annually, beginning with the fiscal year ending September 30, 2025, based on LTM interest expense.<br><br>2. Net Debt to EBITDA: tested annually, beginning September 30, 2026; reported annually, beginning September 30, 2025.<br><br>3. Days Cash on Hand: tested semi-annually, reported quarterly; testing beginning with the first full fiscal semi-annual period following emergence, reporting beginning with the first full fiscal quarterly period following emergence.<br><br>Other covenants: Same or substantially similar non-financial covenants as current (levels/thresholds to be negotiated) |
| Reinstated Bonds Collateral | Same as current; other available assets (including deposit account control agreements, instruction agreements) |
| Reinstated Bonds Debt Service Interest Reserve | $0 |
| Reinstated Bonds Issuance/Reissuance Fees | None |
| Reinstated Bonds Put Option | Year 10 after Plan effective date |
| Reinstated Bonds Exit Fee | 6% of outstanding principal at time of payoff; provided that, if the Obligated Group pays all outstanding bond obligations in full by Year 5 through a sale or refinancing, on terms and conditions acceptable to Siemens Public and Huntington, then the Reinstated Bonds Exit Fee shall be reduced to 3% of outstanding principal at time of payoff; provided that if (i) following a proposed assignment of the bonds, the bonds would be eligible to maintain their tax-exempt status and (ii) the proposed assignee |

[4] To the extent the Plan Effective Date occurs after September 30, 2024, the Parties agree that the Reorganized Debtors are permitted to present an "Adjusted EBITDA" for purposes of relevant covenant calculations (i.e., Interest Coverage Ratio and Net Debt to EBITDA covenants) to adjust for the one-time impact of the fees and expenses related to the Debtors' bankruptcy cases and emergence therefrom. The Reorganized Debtors are to provide an accounting of all EBITDA adjustments (the "Reconciliation") that must contain sufficient detail for all cash and non-cash add backs. There will be no adjustments to the Reorganized Debtors' cash balance for purposes of calculating the Days Cash on Hand covenant.

The Reconciliation is subject to the review of the Consultant, and the Reorganized Debtors will make themselves available to answer any requests of the Consultant related to the review of the Adjusted EBITDA calculations. The calculations shall also be subject to bondholder audit and examination rights consistent with such rights as to covenant calculations (e.g., Excess Cash Sweep and Days Cash on Hand) under the applicable bond documents. For the avoidance of doubt, Adjusted EBITDA is only permitted for covenant calculation periods in fiscal year 2025.

| | |
|---|---|
| | has a credit rating of BBB- or better (any such assignee, a "Reasonably Acceptable Assignee"), and Siemens Public or Huntington rejects the proposed assignment, then the Reinstated Bond Exit Fee shall be reduced by 50% of the Reinstated Bond Exit Fee then otherwise in effect. No Reinstated Bond Exit Fee shall become due based on any principal repaid with the Excess Cash Sweep. |
| Exit Transaction | Siemens Public and Huntington shall have the right to reject any exit transaction (including a sale or a refinancing) unless such exit transaction pays Siemens Public and Huntington the full amount in cash of the then outstanding bond obligations (including the then applicable Reinstated Bonds Exit Fee) at the time of the closing of the proposed exit transaction. |
| Existing Term Loan Treatment | Fully impaired and written off, and SFS to waive all deficiency claims. |
| Employment of a Consultant | No later than the effective date of the Plan, the Obligated Group shall engage a consultant (the "Consultant"). The Consultant (and the Consultant's engagement) shall be reasonably acceptable to Heywood, Siemens Public, and Huntington. Siemens Public and Huntington shall have direct access to the Consultant, and said Consultant's scope of services shall be limited to: (i) assisting the Obligated Group in its communications with Siemens Public and Huntington on the Obligated Group's Budget, financial statements, and other reasonably agreed upon reports; (ii) promptly providing information as reasonably requested by Siemens Public and Huntington; (iii) serving as a resource to management and the Board of Directors as to all such points as well as other points as management or the Board of Directors may request or direct; and (iv) preparing a semi-annual written assessment of the Obligated Group's performance and identifying any issues impacting the Obligated Group's performance. The report shall be delivered to the Chief Executive Officer and the Board of Directors for consideration (with a copy to Siemens Public and Huntington).<br><br>The Obligated Group shall continue to retain the Consultant so long as the outstanding principal amount of the bonds remains in excess of $30 million.<br><br>Upon the first occurrence of the Obligated Group's failure to meet 125% of the (a) Interest Coverage Ratio for any testing period, (b) the Days Cash on Hand covenant or threshold requirement, as applicable, for any corresponding testing period or any corresponding reporting period or (c) the Net Debt to EBITDA covenant or threshold requirement, as applicable, for any corresponding testing period or any corresponding reporting period (the "125% Threshold"), as applicable, then the Consultant, the Obligated Group, senior management of the Obligated Group, Siemens Public and Huntington shall hold an in-person conference within 30 days of reporting such |

| | |
|---|---|
| | occurrence, at a time and place mutually agreed upon by the parties.<br><br>In addition to the foregoing, upon (i) the occurrence of the Obligated Group's failure to satisfy the Interest Coverage Ratio covenant, the Days Cash on Hand covenant or the Net Debt to EBITDA covenant or (ii) the second consecutive occurrence of the Obligated Group's failure to meet 115% of (a) the Interest Coverage Ratio covenant, (b) the Days Cash on Hand covenant and or reporting threshold requirement for any testing or reporting (as applicable) period or (c) the Net Debt to EBITDA covenant and/or reporting threshold requirement for any testing or reporting period (the "115% Threshold"), in lieu of the Consultant (but whether or not a Consultant is engaged as of the applicable occurrence), the Obligated Group shall engage a chief restructuring officer ("CRO") (which CRO – and the terms and conditions of the Obligated Group's engagement thereof, including scope of services – shall be reasonably acceptable to Siemens Public and Huntington). The CRO shall be an employee of the Obligated Group and report directly to the Chief Executive Officer. For the avoidance of doubt, the second consecutive occurrence referenced herein shall not be limited to a failure to meet the 115% Threshold for the same financial covenant or reporting threshold, as applicable (e.g., clause (ii) described above shall be satisfied if the Obligated Group fails to meet the 115% Threshold of Days Cash on Hand and then subsequently fails to meet the 115% Threshold of Interest Coverage Ratio or vice versa and/or with respect to the Net Debt to EBITDA covenant).<br><br>The Obligated Group shall continue to retain the CRO until it achieves the 125% Threshold for the Interest Coverage Ratio, Days Cash on Hand covenant and Net Debt to EBITDA covenants for their most-recently tested period; provided, however, that, if, following the cessation of the retention of the CRO, one or both of the conditions set forth in the preceding paragraph is or are re-triggered, the Obligated Group shall again engage a CRO.<br><br>For the purposes of calculating the Financial Covenants only, all financial covenants shall be defined to exclude any impact of the compensation of the Consultant and the CRO on such calculated amount. |
| Releases | Plan to include release provisions from the Obligated Group, their affiliates, the committee, and, to the extent permitted under applicable law, the holders of claims, in each instance acceptable to Siemens and Huntington and for the benefit of Siemens, Huntington, and their respective affiliated persons and entities. |
| GUC Note (the "GUC Note") | Amount: $5.25 million |

| | |
|---|---|
| | Structure: Unsecured note, subordinated to the Exit Facility and the Reinstated Bonds, subject to an intercreditor agreement<br><br>Interest: 2.0%; cash interest paid semi-annually on April 1 and October 1 of each year<br><br>Maturity: 20-year term<br><br>Fees: None |
| Exit Working Capital Facility | Commitment Amount: $5.0 million<br><br>Structure of Facility: Revolving line of credit with an annual 30-day clean-up/rest period during each calendar year beginning on the anniversary of the Plan effective date.<br><br>Interest Rate, Payments: SOFR plus 6.00%; cash interest paid monthly through the maturity date.<br><br>Maturity: 3 years from the issuance date, subject to two 1-year extensions upon approval of the Lender<br><br>Collateral: Same as bonds; other available assets (including deposit account control agreements, instruction agreements)<br><br>Lien Priority: Senior to bond mortgages, liens<br><br>Commitment Fee: 4.00% of the Commitment Amount, payable in cash upon transaction consummation or termination of facility<br><br>Exit Fee: 4.00% of the Commitment Amount, payable upon transaction consummation or termination of facility<br><br>Unused Line Fee: 0.50% of Commitment Amount per year, payable in quarterly installments<br><br>Minimum Draw Amount: Not less than $500,000<br><br>Extension Fee (for each 1-year extension): 1.00% of Commitment Amount<br><br>Reporting, financial covenants: Same as bonds (including monthly accounts receivable reports and reconciliation)<br><br>Tax-exempt status: Taxable |
| Conditions to closing, effective date | • Plan, related disclosure statement, and any plan supplement are in form and substance acceptable to Siemens, Huntington, and Lender |

| | |
|---|---|
| | • Confirmation order is (i) in form and substance reasonably acceptable to Siemens, Huntington and Lender; (ii) a final order; and (iii) is not subject to any appeal or stay<br><br>• Siemens, Huntington, and Lender shall have completed all regulatory, financial, and operational due diligence to its satisfaction<br><br>• All documents modifying the current bonds or bond documents as outlined in the Plan or confirmation order (including the GUC Note and the applicable intercreditor agreement) are in form and substance acceptable to Siemens, Huntington, and Lender<br><br>• All documents setting forth the terms and conditions of the exit facility are in form and substance acceptable to the Lender<br><br>• Siemens and Huntington shall have received from bond counsel acceptable to Siemens and Huntington an opinion in form and substance acceptable to Siemens, Huntington as to the tax-exempt status of the bonds after the effective date of the Plan<br><br>• Obligated Group shall have received all necessary regulatory and other approvals for the bonds or other instruments or securities issued under the Plan and as to the transactions thereunder |
| Huntington Leases | To be executed prior to Effective Date |

**SCHEDULE A TO NEW SECURED DEBT TERM SHEET**

| Amortization Date | Scheduled Principal |
|---|---|
| 4/1/25 | $ 818,223.92 |
| 10/1/25 | 826,406.16 |
| 4/1/26 | 834,670.22 |
| 10/1/26 | 843,016.92 |
| 4/1/27 | 851,447.09 |
| 10/1/27 | 859,961.56 |
| 4/1/28 | 868,561.18 |
| 10/1/28 | 877,246.79 |
| 4/1/29 | 886,019.26 |
| 10/1/29 | 894,879.45 |
| 4/1/30 | 903,828.24 |
| 10/1/30 | 912,866.53 |
| 4/1/31 | 921,995.19 |
| 10/1/31 | 931,215.14 |
| 4/1/32 | 940,527.30 |
| 10/1/32 | 949,932.57 |
| 4/1/33 | 959,431.89 |
| 10/1/33 | 969,026.21 |
| 4/1/34 | 978,716.48 |
| 10/1/34 | 988,503.64 |
| 4/1/35 | 998,388.68 |
| 10/1/35 | 1,008,372.56 |
| 4/1/36 | 1,018,456.29 |
| 10/1/36 | 1,028,640.85 |
| 4/1/37 | 1,038,927.26 |
| 10/1/37 | 1,049,316.53 |
| 4/1/38 | 1,059,809.70 |
| 10/1/38 | 1,070,407.80 |
| 4/1/39 | 1,081,111.87 |
| 10/1/39 | 1,091,922.99 |
| 4/1/40 | 1,102,842.22 |
| 10/1/40 | 1,113,870.64 |
| 4/1/41 | 1,125,009.35 |
| 10/1/41 | 1,136,259.44 |
| 4/1/42 | 1,147,622.04 |
| 10/1/42 | 1,159,098.26 |
| 4/1/43 | 1,170,689.24 |
| 10/1/43 | 1,182,396.13 |
| 4/1/44 | 1,194,220.10 |
| 10/1/44 | 1,206,162.30 |
| | **$ 40,000,000.00** |

# Exhibit B to the Plan

## Class 9 Insured Claims

# EXHIBIT B

Class 9 Insured Claims

| Claimant | Case Name | Claim (Schedule) No. | Nature of Claim |
|---|---|---|---|
| **Todd Budry** | **Todd Budry v. Heywood Healthcare, et. al,** Worcester Superior Court Docket No. 2385CV00688 | 340 | Tort |
| **Cathy Budry** | **Cathy Budry v. Heywood Healthcare, et. al,** Worcester Superior Court Docket No. 2385CV00558 | 341 | Tort – Medical Malpractice |
| **Ian Hill** | **Ian Hill v. Heywood Healthcare, Inc.,** Suffolk Superior Court Case No. 2184CV02043 | 401, 471 | Personal Injury |
| **Donna L. Rouleau** | **Donna L. Rouleau v. Heywood Healthcare, Inc., et al,** Worcester Superior Court Docket No. 1685CV00514 | (2587784) | Tort – Medical Malpractice |
| **Rinka Takahashi** | **Rinka Takahashi v. Henry Heywood Memorial Hospital, Inc.,** Worcester Superior Court Docket No. 2385CV00019 | (2628492) | Tort |
| **Kristin Geyster** | **Kristin Geyster v. Heywood Healthcare, Inc.** | 289 | Employment Discrimination |

# Exhibit C to the Plan

## Global Settlement Term Sheet

# Global Settlement Term Sheet

Parties agree to the Plan as-filed, subject to the following modifications:

A. **GUC Treatment**

- Total cash distribution to General Unsecured Creditors ("GUCs") increased to $4.75 million.
  - $4 million paid on the Effective Date
  - $750,000 paid on October 1, 2025

- GUCs to receive a $5.25 million promissory note issued by the Reorganized Debtors (see terms below, the "GUC Note")

- Prepetition Secured Parties to waive all deficiency claims.

B. **Terms of the GUC Note**

- $5.25 million unsecured note, subordinated to the Exit Facility and the New Bonds (bonds distributed to the Prepetition Secured Parties)

- Same economic terms (2.0% cash interest; semi-annual payments) and same maturity date as the New Bonds, but no exit fee

- Plan to include a reference that GUC Note and New Bonds documents will provide, among other things, provisions for calculating, determining, evaluating, challenging, etc., the amount of Excess Cash (as modified below) available for distribution under such documents.

- GUC Note and New Bonds to share in the existing Excess Cash sweep (as modified below) as follows:
  - First $1.75 million to the GUC Note;
  - Next $5 million to the New Bonds;
  - After the Committee receives the $4.75 million in cash and the $1.75 million on the GUC Note, and the Prepetition Secured Parties receive the $5 million identified above, all subsequent distributions shall be paid 70%/30% to the Prepetition Secured Parties and to the GUC Note, respectively, until the balance of the GUC Note is satisfied; all excess cash thereafter to the New Bonds.

C. **Terms of the New Bonds**

- Unchanged from the terms in the Plan, except the principal balance reduced to $40 million par amount of New Bonds

- Debtors agree that the Excess Cash sweep threshold be reduced to 28 Days Cash on Hand for all test periods; *provided that* following the $1.75 million payment to the GUC Note referenced in Section B, the Excess Cash sweep threshold shall be further reduced to 27 Days Cash on Hand for all test periods – applicable for the GUC Note and New Bonds

D. **Exit Facility**

- Terms of the $5 million Superpriority Exit Facility to be provided by Siemens and Huntington to be unchanged from the Plan terms, except for deferral of the Commitment Fee.

E. **Prepetition Secured Parties Contribution**

- Prepetition Secured Parties to provide, on the Effective Date, $2.5 million of cash to the Debtors for contemporaneous use by the Debtors in funding a commensurate portion of the cash distribution described in point A above.

- Prepetition Secured Parties do not receive any cash payments from the Debtors prior to the Effective Date, including reimbursement for interest, fees or expenses incurred.

F. **Pavilion Claims**

- Debtors retain ownership and control of causes of action against Waterstone, Rockland, Consigli, and all related parties with respect to the parcel, ground lease, ground lease mortgage, space lease, etc., which will remain with the Debtors' Estate.

- All such claims held by Debtors, and any proceeds thereof, will not be transferred to the Liquidating Trust; provided that to the extent the Debtors receive any cash proceeds on behalf of claims or prosecution thereof, 50% of such net cash proceeds shall be distributed to the Liquidating Trust for distributions to repay the last dollars out of the GUC Note.

- For the avoidance of doubt, rejection damages and any other damages claims against the Debtors filed by Waterstone, Rockland, Consigli, and all related parties with respect to the parcel remain with the estate (e.g., space lease, rejection damages (if any)), and if allowed, will be a part of the GUC pool.

- The treatment/disposition of the ground lease and related matters under the Plan shall be reasonably acceptable to Prepetition Secured Parties.

- Debtors will object to any claims filed by Waterstone that the Debtors believe are incorrect, inaccurate, and/or overstate the allowable amount and/or actual value (if any) of any Waterstone claims, including any rejection damages claims submitted by Waterstone. Debtors to retain control over resolution of Waterstone claims, including rejection damages claims, subject to general consultation rights of Liquidating Trustee. The Liquidating Trustee shall have standing to object to any of the Debtors' proposed resolution of any Waterstone claim to the extent that the Liquidating Trustee alleges that such resolution would incrementally increase the GUC pool by more than the amount of what the Liquidating Trustee contends should be the allowed amount (including subject to section 502(b)(6) of the Bankruptcy Code as to rejection damages claims) of the applicable Waterstone claim. Neither party's business judgment as to the appropriate allowed amount of the applicable Waterstone claim shall be given greater deference in the event the Liquidating Trustee objects to the proposed allowed amount of such claim. Any costs incurred by the Liquidating Trustee related to the prosecution of its contentions as to the allowable amount of the applicable Waterstone claim(s) shall be paid solely from the Liquidating Trust Assets.

G. **Medical Malpractice and Tort Claims**

- To the extent Medical Malpractice Claims or Tort Claims are subject to an Insurance Policy, such claims will be put in a separate class restricted to recovering against insurance. Plan treatment will require that to the extent any judgment is entered against any Debtor in a medical malpractice or tort action, the satisfaction of such judgment will be limited solely to the Debtors' available insurance proceeds. Further, claim treatment will include an optional, "opt-in" release of any other or further recovery or claims against the Debtors and their estates in exchange for a mutual release. The Debtors will seek the elimination of deductibles and any other uninsured amounts pursuant to the Plan. For the avoidance of doubt, Medical Malpractice Claims or Tort Claims not subject to an Insurance Policy shall be a part of the GUC pool.

H. **Committee Release**

- Upon the $4 million Effective Date cash payment, the Committee releases any and all claims against the Prepetition Secured Parties, including those reflected in the Adversary Proceeding and any associated or related claims against the Debtors.

- Upon the Effective Date, Committee releases any and all claims against the Debtors' Estates including, but not limited to (1) the 457(b) plan, (2) prepetition deposits, (3) restricted funds, (4) D&Os, and (5) fraudulent conveyance actions; provided, however, that the Committee does not release any claims provided for under this settlement.

I. **Control of Claims Objection (except for Pavilion Claims under paragraph F)**

- Debtors to retain control over claims objections subject to general consultation rights of Liquidating Trustee, except that the Liquidating Trustee shall have authority to seek standing to object to any claims that the Debtors unjustifiably refuse to object to, with the Debtors paying reasonable and documented legal costs for the Liquidating Trustee if standing is granted.

- Liquidating Trustee to be appointed by Committee with consultation rights to the Debtors.

- Liquidating Trustee to make the initial determination of claims for objection. The Debtors agree that as consideration for entering into this Term Sheet, the Debtors will cooperate in good faith with the Committee to identify objectionable claims prior to confirmation.

J. **Preference Claims**

- Except for preference claims against Waterstone, all preference claims shall be waived except for those identified on a schedule to be prepared by the Debtors and filed as a plan supplement.

- Prior to filing such a schedule, the Debtors shall provide the Committee with a list of all preference claims and shall consult with the Committee on which preferences are to be included on the schedule.

K. **Patient Refund Claims**

- Patient Refund Claims will be in a separate unimpaired class and will ride through to be paid in full or set off in the ordinary course.

L. **Motion/Objection Withdrawal**

- Upon email confirmation by counsel of agreement upon a definitive and binding term sheet, the Committee will withdraw:
  - (1) without prejudice its motion to terminate exclusivity;
  - (2) with prejudice its objection to the Houlihan employment application amendment;
  - (3) without prejudice its objection to the Plan and the Disclosure Statement;
  - (4) adversary proceeding to be held in abeyance between now and Effective Date; and
  - (5) with prejudice its objection to the Recoupment Motions.
  - (6) Further, the Committee shall support the Debtors' request for continued exclusivity through the confirmation of the plan on the terms and conditions of this settlement.

M. **Documentation**

- The existing Plan shall be amended to incorporate these terms and shall be filed as the Debtors' Plan and each party shall document its support of the Plan, provided that the Plan, once filed, remains in form and substance agreed to by the parties herein.

- The Committee agrees to issue a letter to its constituents in which it recommends acceptance of the Plan, provided that the Plan, once filed, remains in form and substance agreed to by the Committee.

N. **Exculpation**

- Under the Plan, the Committee and its members and professionals in their capacities as such, shall receive exculpation to the maximum extent permitted by law.

O. **Cash Collateral**

- Settlement transaction is subject to all parties' review and approval of post-August 9 cash collateral budget.

- Further, upon email confirmation by counsel of agreement upon a definitive and binding term sheet, the Debtors shall file a non-consensual cash collateral order substantially similar to the currently effective cash collateral order entered at Docket No. 888 and the Committee and the Prepetition Secured Parties shall file or indicate on the record their support/no objection.

P. **Miscellaneous**

- Further, this settlement shall be subject to written confirmation reasonably acceptable to Prepetition Secured Parties from bond issuer counsel that note/bond structure does not give rise to issues as to the tax-exempt status of the New Bonds and will not unreasonably extend the timeline for the issuance thereof (note that receipt of an acceptable (to Prepetition Secured Parties) opinion as to the New Bonds is already a condition to the effectiveness of the Plan).

- Huntington Lease modification to be executed on previously agreed-upon terms.