**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

IN THE MATTER OF:              :     Case No. 23-40817

HEYWOOD HEALTHCARE, INC.,      :
                                     Worcester, Massachusetts
    Debtor,                    :     **September 30, 2024**
                                     9:21:16 a.m.
                               :


: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

OFFICIAL COMMITTEE OF          :     AP 24-04022
UNSECURED CREDITORS OF
HEYWOOD HEALTHCARE, INC.,      :

    Plaintiff,                 :

        v.                     :

U. S. BANK TRUST COMPANY,      :
NATIONAL ASSOCIATION, et al.,
: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :


**CASE NO. 23-40817**
**TRANSCRIPT OF HEARING ON:**
**[#14] DEBTOR'S EMERGENCY MOTION FOR ENTRY OF**
**INTERIM AND FINAL ORDERS (I) AUTHORIZING USE OF**
**CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION**
**TO PRE-PETITION SECURED PARTIES, (III) GRANTING**
**LIENS AND SUPERPRIORITY CLAIMS, (IV) MODIFYING**
**AUTOMATIC STAY, (V) SCHEDULING FINAL HEARING AND**
**(VI) GRANTING RELATED RELIEF; [#810] DEBTOR'S MOTION**
**FOR ENTRY OF ORDER APPROVING FIRST AMENDMENT**
**TO RECOUPMENT AND FORBEARANCE AGREEMENT WITH**
**THE COMMONWEALTH OF MASSACHUSETTS; [#1019] MOTION**
**OF CARDINAL HEALTH 110, LLC FOR RELIEF FROM**
**AUTOMATIC STAY, FOR CAUSE, TO SET OFF MUTUAL**
**PRE-PETITION OBLIGATIONS OR, IN THE ALTERNATIVE,**
**FOR AN ORDER PERMITTING RECOUPMENT OF TRADE**
**CREDIT; CONFIRMATION HEARING;**


**CASE NO. AP 24-04022**
**TRANSCRIPT OF PRE-TRIAL CONFERENCE**
**BEFORE THE HONORABLE ELIZABETH D. KATZ, J.U.S.B.C.**

1  **APPEARANCES:**

2  <u>For United States Trustee</u>:     Office of the U. S. Trustee
                                    BY:  STEPHEN E. MEUNIER, ESQ.
3                                    446 Main Street, 14th Floor
                                    Worcester, MA  01608

4  ALSO PRESENT:                     ROZANNA PENNEY
5                                    President and CO
                                    Heywood Healthcare

6                                    JOHN BUJAK, CFO
7                                    Heywood Healthcare

8  **APPEARANCES (via Zoom):**

9  <u>For the Debtor</u>:              Foley & Lardner LLP
                                    BY:  EDWARD J. GREEN, ESQ.
10                                       DAVID B. GOROFF, ESQ.
                                    321 N. Clark Street, Suite 3000
11                                   Chicago, IL  60654

12                                   Foley & Lardner LLP
                                    BY:  JAKE WILLIAM GORDON, ESQ.
13                                   500 Woodward Avenue, Suite 2700
                                    Detroit, MI  48226

14                                   Foley & Lardner LLP
15                                   BY:  ALISSA NANN, ESQ.
                                    90 Park Ave
16                                   New York, NY  10016

17

18  <u>Audio Operator</u>:             ALBERTO BARRERA, ECRO

19

   Transcript prepared by:           JANICE RUSSELL TRANSCRIPTS
20                                   1418 Red Fox Circle
                                    Severance, CO  80550
21                                   (757) 422-9089
                                    trussell31@tdsmail.com

22

23  Proceedings recorded by electronic sound recording; transcript
   produced by transcription service.

24

25

```
 1   APPEARANCES (via Zoom continued):

 2   For Siemens Financial        McGuireWoods LLP
     Services, Inc. and Siemens   BY:  BRIAN SWETT, ESQ.
 3   Public, Inc.:                     SHAWN R. FOX, ESQ.
                                  1251 Avenue of the Americas-Fl.20
 4                                New York, NY  10020

 5   For Plaintiff, Official      Dentons Bingham Greenebaum, LLP
     Committee of Unsecured       BY:  ANDREW C. HELMAN, ESQ.
 6   Creditors:                   1 City Center, Suite 11100
                                  Portland, ME  04101
 7
                                  Dentons US LLP
 8                                BY:  LAUREN M. MACKSOUD, ESQ.
                                  1221 Avenue of the Americas-Fl.25
 9                                New York, NY  10020

10   For Huntington National      Riemer & Braunstein LLP
     Bank:                        BY:  STEVEN E. FOX, ESQ.
11                                Times Square Tower
                                  Seven Times Square, Suite 2506
12                                New York, NY  10036

13   For Defendant, U. S. Bank    Sulivan & Worcester LLP
     Trust Company, NA, etc.:     BY:  AMY A. ZUCCARELLO, ESQ.
14                                     KERI W. COSTELLO, ESQ.
                                  One Post Office Square
15                                Boston, MA  02109

16   For Consigli Construction    Holland & Knight LLP
     Co., Inc.:                   BY:  JOHN J. MONAGHAN, ESQ.
17                                10 St. James Avenue
                                  Boston, MA  02116
18
     For Cigna Health and Life    Connolly Gallagher LLP
19   Insurance Company:           BY:  JEFFREY C. WISLER, ESQ.
                                  1201 North Market St., 20th Floor
20                                Wilmington, DE  19801

21   For Joseph J. Tomaino,       Mintz Levin
     Patient Care Ombudsman:      BY:  IAN HAMMEL, ESQ.
22                                One Financial Center
                                  Boston, MA  02111
23
     For Cardinal Health 110, LLC: Chiesa Shahinian & Giantomasi PC
24                                BY:  TERRI J. FREEDMAN, ESQ.
                                  105 Eisenhower Parkway
25                                Roseland, NJ  07068
```

```
 1   ALSO PRESENT (via Zoom):        DAYNA STAHL
                                     THOMAS SULLIVAN
 2                                   Heywood Hospital

 3                                   JOSEPH J. TOMAINO
                                     Patient Care Ombudsman
 4
                                     Houlihan Lokey
 5                                   BY:  GRANTLAND HUBBELL, ESQ.
                                     111 South Wacker Dr., 37th Fl.
 6                                   Chicago, IL  60606

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        P R O C E E D I N G S

2            THE COURTROOM DEPUTY:  Please be seated.

3            Case No. 23-40817, Heywood Healthcare.  This is a

4    hearing on the Motion of the Debtors for Entry of an Order

5    Approving the First Amended. First Amendment to the Recoupment

6    and Forbearance Agreement with the Commonwealth of

7    Massachusetts; a hearing on the Motion of Cardinal Health 110,

8    LLC for Relief from the Automatic Stay for Cause to Set Off

9    Mutual Pre-Petition Obligations, or, in the Alternative, for an

10   Order Permitting Recoupment of Trade Credit.  We are also here

11   on a confirmation hearing as well as the Debtor's Motion for

12   Use of Cash Collateral.

13           And in Adversary Proceeding 24-4022, the Creditors'

14   Committee versus U. S. Bank Trust for a pre-trial conference.

15           Judge, participating by video for this hearing, we

16   have Attorneys Edward Green and Alissa Nann, Jake Gordon, and

17   David Goroff, who are counsels to the debtor.

18           We also have Mr. Thomas Sullivan, who is the Co-Chief

19   Executive Officer of the debtor, as well as Ms. Dayna Stahl,

20   who is the Chief Nursing Officer for the debtor.  We have Mr.

21   Joseph Tomaino, who is the Patient Care Ombudsman.  Mr. Ian

22   Hammel, who is counsel to the Patient Care Ombudsman; Attorneys

23   Andrew Helman and Lauren Macksoud, who are counsel for the

24   Creditors' Committee. We have Mr. Brian Swett for Siemens, Mr.

25   Shawn Fox from Siemens; Mr. Grant Hubbell of Houlihan Lokey;

 1   Mr. Steven Fox of the Huntington National Bank; Ms. Amy

 2   Zuccarello and Ms. Keri Wintle Costello, who are counsels to

 3   U. S. Bank Trust; Mr. John Monaghan, who is counsel to Consigli

 4   Construction; and Mr. Jeffrey Wisler, who is counsel to Cigna.

 5           Beginning with Mr. Meunier in the courtroom, I'm going

 6   to ask the folks to please identify themselves.

 7           MR. MEUNIER:  Good morning, your Honor.  Stephen

 8   Meunier for the United States Trustee.

 9           THE COURT:  Good morning.

10           MS. PENNEY:  Good morning, your Honor.  Rozanna

11   Penney, President and CO of Heywood Healthcare.

12           THE COURT:  Good morning.

13           MR. BUJAK:  Good morning, your Honor.  John Bujak,

14   Chief Financial Officer for Heywood Healthcare.

15           THE COURT:  Good morning.

16           So good morning, Attorney Green.

17           MR. GREEN  Thank you, your Honor.  Are we ready to go?

18           THE COURT:  Yes, please.

19           MR. GREEN:  All right.  Thank you again and thank

20   everybody who's actually on the call and in the courtroom.  I

21   find confirmation hearings to always be a culmination event

22   because they may translate into 15-to-20 minutes of court time,

23   but they literally, in this case, reflect one entire year of

24   effort, energy, collaboration to get us to where we're at.

25           So as you know, your Honor, we filed this case exactly

1  one year ago on October 1st, and I am very proud to present

2  what I think is an agreed plan of reorganization.  We are down

3  to one last objection for the, from the U. S. Trustee's Office.

4  We have resolved all other objections.  And the plan and the

5  confirmation order that is in front of you does reflect the

6  collaboration and the agreement of all of the parties, except

7  subject to the one objection from the U. S. Trustee's Office.

8          I was going to walk through, again, just some, some

9  opening comments and then I'll leave it to you.  If we can rely

10  on our declarations and briefs, or if you want to hear a, a

11  typical one-hour presentation on the elements of 1129.

12          THE COURT:  What I was hoping, Attorney -- I was

13  hoping we could resolve a couple of other motions that were --

14          MR. GREEN:  Yes.

15          THE COURT:  -- still on for today before we move to

16  the confirmation hearing, just to get those --

17          MR. GREEN:  Yes.

18          THE COURT:  -- out of the way.

19          MR. GREEN:  Yes, and I think the first one you're

20  probably talking about, your Honor, is Cardinal Health, which

21  is at Docket 1019.  Early, early this morning, Cardinal filed

22  an assented-to revised order which I, which should resolve

23  their objection.  That's at Docket 1058.  If Cardinal's in, in

24  the room or on the call, I'm sure they can say otherwise.

25          MS. FREEDMAN:  Good morning, your Honor.

1          THE COURT:  Good morning.

2          MS. FREEDMAN:  Terri Freedman for Cardinal.  I'm

3   trying to get my video to work.  I apologize.  There we go.

4   Terri Freedman for Cardinal Health.

5          I agree that we have resolved our motion

6   satisfactorily and the entry of the stipulation or the consent

7   order should wrap everything up.

8          Thank you.

9          THE COURT:  Okay.  Thank you.

10         I haven't, obviously, had a chance to take a look at

11  that, but, if the parties are all satisfied, we can move on to

12  the next motion.

13         MR. GREEN:  Okay.  Thank you, your Honor.

14         I think that's, as far as actual motions, we're down

15  to the plan, cash collateral, and the complaints.

16         THE COURT:  There was --

17         MR. GREEN:  We have --

18         THE COURT:  -- the Commonwealth of Massachusetts.

19         MR. GREEN:  I thought that was resolved.  Are these

20  the old motions relating to, we'll call it the, the advances

21  and the recoupment on the advances?.

22         THE COURT:  Yes.  It's Docket 810.

23         MR. GREEN:  Oh, okay.

24         I think for, for purposes of today, your Honor, that

25  is actually -- I think you can -- well, let's assume we, if we

```
 1   confirm the plan, I think that is actually dealt with in the

 2   plan as well.  I'll defer to Mr. Gordon.  I, I, I think we

 3   could withdraw those motions and let them be handled in the

 4   plan.

 5            THE COURT:  Okay.

 6            MR. GORDON:  Yeah, sure.  The, the confirmation order

 7   and, and plan include that those are deemed withdrawn upon

 8   entry of the confirmation order.

 9            THE COURT:  Okay.  Thank you.

10            Okay.  So let's -- we can move forward, then, with the

11   confirmation hearing and go ahead and do a brief presentation.

12   I will not require, unless United States Trustee tells me they

13   want to cross-examine, anyone.  We can just do this on proffer.

14   I think --

15            Attorney Meunier, your, your --

16            MR. GREEN:  Your, your Honor --

17            THE COURT:  -- issue is not --

18            MR. GREEN:  -- that is where I was going to start.

19            THE COURT:  Hold, hold on one second.

20            Attorney Meunier, you weren't -- were you planning on

21   cross-examining?

22            MR. MEUNIER:  I don't anticipate that, your Honor.

23            THE COURT:  Okay.  Either Mr. Bujak or Ms. Penney?

24            MR. MEUNIER:  But --

25            THE COURT:  Okay.  It's probably not necessary.
```

1           Okay.  Attorney Green.

2           MR. GREEN:  All right.  Thank you, your Honor.

3           And again, two of the, three of the most important

4    people are actually Ms. Penney, Mr. Bujak, and Mr. Sullivan on

5    the phone.  It has, it has truly been an effort.  This is what

6    I call an old-school bankruptcy case.  We went through all the

7    traps, all the hoops, and got to the final stage.  And they

8    really are to be commended.  Our community is elated.  This

9    case has truly been what I talk about when it comes to

10   healthcare bankruptcies.  It's really 95 percent healthcare and

11   5 percent bankruptcy because you have to get the healthcare

12   right to end up where we're at today.  And as I've said before,

13   and it continues right up until the end, we used bankruptcy the

14   way bankruptcy should be used.  We increased our revenues.  We

15   decreased our expenses.  We recruited 18 doctors in midlevel

16   during the bankruptcy case.  We increased patient satisfaction.

17   We renegotiated payor contracts.  We were able to work with the

18   Commonwealth, who not only provided substantial funding at the

19   beginning of the case, but at the end of the case came in, in

20   combination with the Federal Government, and were able to put

21   together a program that will put an additional $34.5 million

22   over three years into the coffers at that hospital as we leave.

23   And as, as sort of some of the plan supplemental documents

24   show, not only have we fixed the balance sheet, we have fixed

25   the income statement and, and through our agreements with the

1   creditors, we will once again be able to actually have

2   something called day's cash on hand, which is truly, truly a

3   testament of all of those involved.

4         We did earlier, I, I would say later last week, file

5   notice that we had received approval from both the State

6   Government and the Federal Government, that they had all issued

7   approvals on something called the HSN program, that is,

8   effectively, the hospital safety net program.  We filed that

9   paperwork.  That was, I would say, probably most important

10  element remaining on feasibility.  Now that that program is in

11  place -- and it technically will be in place starting tomorrow

12  because that's when the federal budget starts -- so we think,

13  at least in terms of everything that we could have possibly

14  done during the case, we think we did it.

15        And I, and I think everybody on the management team

16  should be congratulated.  Same with the board and our board

17  chair.  I -- I -- I am not lying to you.  I, I think I had at

18  least multiple calls every day with the senior management team.

19  Our board chair, we had calls every week with the board chair,

20  sometimes twice a week, and the various board entities, be it

21  the executive committee or the finance committee.  We met with

22  that board once a week, maybe twice a month.  It, it was just

23  an incredible level of commitment to run the bankruptcy case

24  while at the same time running a hospital.

25        So this was not a case where we had a number of

1   consultants scurrying around helping us.  This was actually

2   done by the people at the hospital.  So not only did they run

3   the hospital and make it a far better place today than it was

4   one year ago, they were actual meaningful participate,

5   participants in everything that happened.  So every decision

6   that was made participated directly and live in the mediation.

7          So again, we, we stand here today due in large part to

8   the efforts of that management team at that hospital.  And I've

9   been doing this for now almost 30 years.  And I will tell you,

10  this was the most engaged management team, board team that I've

11  ever worked with in a case like this.  And, and that is why we

12  will, we will be presenting to you today a standalone plan

13  which again, in and of itself in this day and age, is a very,

14  very unique result.  And we're very proud of that result.  And

15  I'm just, again, I'm, I'm happy more than anything else, and

16  I'm very happy to present to you.

17         As we said, we have resolved all of the objections.

18  We'll leave the U. S. Trustee to the end.

19         I did want to offer into evidence, proffer it, so I

20  don't forget to do it.  First would be the declaration of John

21  Bujak, which is at, it is Docket No. 1042.  This -- Mr. Bujak

22  is our the Chief Op, Chief Financial Officer and this is his

23  affidavit in support of our plan of reorganization.  And I

24  would offer that in evidence, hopefully without objection.

25         THE COURT:  I'll admit the statement of John Bujak at

1   Docket 1, 1042.

2          MR. GREEN:  Thank you, your Honor.

3          And then the next one up -- and you saw Mr. Karpuk

4   from Stretto -- it is at Document 1043 -- this declaration from

5   Stretto regarding the solicitation and tabulation of ballots.

6   Again, I would move to admit that into evidence, hopefully

7   without objection.

8          THE COURT:  The declaration of Brian Karpuk is also

9   admitted, Docket 1043.

10         MR. GREEN:  Thank you, your Honor.

11         We did submit a rather lengthy brief in support of

12  confirmation at 1045.  That brief really does walk you through

13  all of the elements of 1129.  And we think it was a well-

14  written brief.  We think we, it hits all the elements.  We're

15  here to certainly answer any questions.  And I would say

16  probably the biggest thing, as, as you look through that, you

17  will note that we obviously received the support of the secured

18  creditors.  We received the support of the, the Committee.  I

19  would say the one party that voted against the plan was

20  Waterstone.  Just that vote alone sort of tips the unsecureds

21  from a dollar value below the standard.  So we will, in fact,

22  be cramming down the unsecureds.  But it's interesting if you

23  actually back out -- and I know we're, we're not allowed to

24  really back it out -- but if you normalize the, the Waterstone

25  vote, I actually think we received almost unanimous support for

1   the plan out, outside of, of Waterstone.

2          So again, we're very proud of what we've done.  It is

3   not an easy spot to get to where we're at.  Our mediation was,

4   it was a mediation.  We'll say it that way.  It was, everyone

5   certainly protected their rights during this case.  And again,

6   from our point of view, your Honor, I can walk through every

7   one of these elements.  The team has prepared a very lengthy

8   talking-point memo for me, or we can, we can take your

9   questions.

10          The order itself is sitting at 1054-1 and the, and

11  we'll call it the final final version of the plan was sitting

12  at 1040.

13          THE COURT:  So Attorney Green, to, before we get to

14  1129, the Jeffrey v. Desmond factors, I would like to have you

15  put on the record a little bit more about the positions of the

16  parties.  Because there's really not a lot of facts in your

17  brief to let me know what was happening with the adversary.

18  And obviously, the positions of the parties were strongly held.

19  And as you said, it was very, there was a lot of mediation, but

20  the Court was never involved, really, with the adversary.

21  I've, I had read the complaint, but there was never an answer

22  because we, you know, we got to a point where everything was

23  able to get resolved, also.  So, I mean eventually.

24          So -- and I do understand the, you know, the plan had,

25  that the debtor's position was that the debtor had the

1 │ authority to resolve the claims of the Unsecured Creditors'

2 │ Committee.  And the Unsecured Creditors' Committee said, "Oh,

3 │ no, that's not true.  Because the cash collateral order gave us

4 │ the exclusive ability to do that."

5 │      But I guess what I, what I'd like the record to

6 │ reflect was just a little bit of what was the argument in that

7 │ adversary, what was the defense in that adversary, just so I

8 │ understand what the facts were.

9 │      MR. GREEN:  Okay.  I, I will go first and then I'm

10 │ sure Mr. Helman and Mr. Swett will, will chime in.

11 │      And again, what I call the Committee settlement is

12 │ embodied in the plan.  So you're absolutely right.  We did take

13 │ advantage of the, the Desmond case.  The, the long and the

14 │ short of it is that the Committee believes certain collateral

15 │ of the, the secureds may have not been properly perfected.

16 │ That was the, the main gist.  And that was a very contentious

17 │ item during the mediation.  That was ultimately resolved.  And

18 │ ultimately, the Committee will be receiving $4.75 million in

19 │ cash and a $5.25 million promissory note.  To the extent

20 │ there's more than that, I'm sure Mr. Gordon, who helped

21 │ document the, the mediation settlement and draft up most of the

22 │ plan, can chime in.

23 │      But I also think the Committee is, is more than

24 │ capable of sort of explaining what their theories were.  I will

25 │ tell you the, the secureds disagreed with those theories.  But

1  again, that was the art of the settlement, was getting all of

2  the parties to realize why they all were sort of advantaged by

3  the settlement.  I don't think anyone's happy, but I do think

4  the settlement is a, a win, if you will, for the unsecured

5  creditors.

6          THE COURT:  Attorney Gordon.

7          MR. GORDON:  Your Honor, I'm happy to walk through a

8  little bit of the, of the meat and potatoes of the complaint

9  and why we thought that the settlement is appropriate here,

10  again subject to Mr. Helman and Mr. Swett's positions, and us

11  not at this point taking a position on the merit of those

12  arguments, given the fact that we're settling.

13          But essentially, the arguments that the Committee set

14  forth were that the secured parties did not have a properly

15  perfected security interest in the depository accounts based on

16  the lack of deposit account control agreements.  Generally,

17  deposit account control agreements are not put in place in

18  bonds of the nature held by the secured parties, but there were

19  also arguments on the secured parties' point of view, from the

20  secured parties' point of view under the, under the UCC arguing

21  that because cash was less than 20 days old, they had 20 days

22  to actually take any action to perfect the security interest.

23  So there were strong arguments on both sides.

24          To walk through the Desmond factors, we thought the

25  probability of success in the litigation being compromised was

1   hard to ascertain.  Because even though the Committee was the

2   one bringing the complaint, they were derivative complaints on

3   the debtor's behalf.  The debtors evaluated the merits of those

4   and it was a novel argument, but we think that the probability

5   of success was, was, again, difficult to ascertain.  And I

6   don't want to opine on it, given that we're settling, but it

7   was, it was unsure, to say the least.

8           The difficulties of collections on anything, we

9   believe, is, is inapplicable here.

10          The complexity of the litigation involved would have

11  been very high.  The expense and inconvenience of delay

12  attending it would have been very high as well.  As we have

13  noted throughout the case, you know, we walked a very thin line

14  between success and failure here.  And extension of time to

15  litigate again, including the costs of litigation, may have

16  tipped our, our case into a downward spiral that we would not,

17  may not have been able to survive and it was critical that we

18  resolve these in a consensual manner.

19          So the complexity, again, it was not -- there were

20  novel arguments that the Committee put forth, there were strong

21  defenses on the secured lender's side, and we believe that any

22  type of resolution here could have taken months and months to

23  resolve and would have racked up incredibly high fees on the

24  debtors and the estates because the debtors would have been

25  paying for their own fees and the Committee's fees and,

1  possibly, the secured lender's fees, depending on the outcome

2  of that litigation.

3       Finally, the fourth <u>Desmond</u> factor is the paramount

4  interest of the creditors and a proper deference to the views.

5  We thought that it was best that we took the money that would

6  have been spent on the litigation and use it to, to fund, fund

7  recoveries to the creditors.  That's easily demonstrated by the

8  $10 million of value that's going to unsecured creditors in

9  this case.  And I think that that easily satisfies the

10 paramount interest of the creditors test here.

11      Again, as Mr. Green noted earlier, he, outside of the

12 one very large unsecured creditor who voted to reject, there

13 was large, there was nearly unanimous support amongst the

14 unsecured creditors who did vote.  And the Committee itself is

15 in support of the plan.  Again, we also believe that it

16 provided benefits in, in, in excess of the liquidating,

17 liquidation value that we put forth with our disclosure

18 statement; and therefore, we satisfy the four <u>Desmond</u> factors,

19 your Honor.

20      THE COURT:  Thank you.

21      I'm satisfied.  I don't need to hear from the

22 Unsecured Creditors' Committee or the secured creditors.  I

23 just, when looking at the brief it was just a very

24 conclusory -- this was a complex adversary proceeding.  So I

25 just wanted a little bit more, more on the record.

1        So I'm satisfied.

2        Thank you, Attorney Gordon, for supplementing.

3        So Attorney Green, if you want to just go ahead and

4   give a proffer as to the 1129 factors.  It can be very brief.

5        MR. GREEN:  Okay.  Thank you, your Honor.

6        Again, as we set forth in the brief, we do think we

7   have satisfied all of the 1129 factors.  1129(a)(1),

8   preponderance of evidence supports that.

9        Trying to figure out how much of this I want to

10  actually, you know -- your Honor, is there any section in

11  particular?  I -- I -- we really did write a long memo on this.

12  I think, obviously, the biggest ones normally come down to good

13  faith, best interest of creditors, feasibility, and acceptance

14  by at least one impaired class.  We have, we think, obviously,

15  we satisfy all of the elements of 1129.  But in particular,

16  it's been proposed in good faith.  It satisfies the best

17  interest of creditors test.

18        THE COURT:  I can accept the offer of proof as

19  unrebutted evidence.  I do find that the debtor has satisfied

20  all of Section 1129.

21        There are a couple of loose ends, I believe.  There

22  were objections that have -- there were representations made

23  that they were -- there was going to be some agreements.  I

24  think they were some lease parties that had some lingering

25  issues.  So if we could just clarify that.

1           MR. GREEN:  Yes, your Honor.  Let's -- we did have a

2    handful of initial objections that we have since resolved.  You

3    heard from Cardinal this morning.  With Microsoft -- and again,

4    if they're here, I'll let them speak -- we did have more of an

5    objection to their cure amount.  Microsoft filed a reservation

6    of rights.  They've agreed to some language we put in the order

7    for them and, and hopefully, they're there to confirm that they

8    were okay with the fixes we made.  They did file a statement to

9    that effect.

10          THE COURT:  Okay.

11          MR. GREEN:  I don't know if they're there.

12          BankFinancial was also -- BankFinancial is connected

13   up to Huntington on the leases.  BankFinancial has withdrawn

14   their objection.  I just can't find the document.  I saw the

15   amendment to the lease agreement that dealt with the actual

16   underlying issue that led to their objection, limited

17   objection, I would say.  And then the withdrawal.  Again,

18   BankFinancial or Huntington is there.  They can speak to that.

19          But as I understand it, that objection has been

20   withdrawn.

21          MR. GORDON:  They have not filed a document

22   withdrawing that objection, but they have told us, they have

23   told us that it has been withdrawn and that they are

24   substantively resolved.

25          THE COURT:  Okay.

1          MR. GREEN:  Then, the, the, the other large one was

2    Consigli.  Mr. Monaghan can certainly talk to that as well.

3    But that, Consigli's objection was handled last week.  You

4    actually entered an order on that disposing of the objection

5    and leading to the treatment that we came to an agreement with,

6    with Consigli.

7          And as far as I know, the only objection left is the

8    U. S. Trustee's.

9          THE COURT:  Okay.  Thank you.

10         And Attorney Meunier, I'll hear you on the United

11   States Trustee's objection.

12         MR. MEUNIER:  Thank you, your Honor.

13         Good morning, again.  Stephen Meunier for the United

14   States Trustee.

15         Your Honor, I want to make clear that our objection

16   should not be construed in any way as a criticism of the

17   debtors, the Committees, the secured parties, or their

18   professionals' conduct in the case.  That has been admirable.

19   I, I hope that the, the debtor agrees with my statement that

20   our relationship with the debtor throughout the case has been

21   cooperative.

22         Having said that, your Honor, this is -- the objection

23   raises issues that are important to the United States Trustee

24   Program.  If I could, I will address sort of the arguments that

25   debtors make in response to the U. S. Trustee's objection, not

1   necessarily in order, but maybe, maybe, maybe so.

2           With respect to the law-of-the-case doctrine, the

3   U. S. Trustee does not believe that it is applicable here

4   and -- but in any event, where there is no appellate decision

5   involved, the trial court, if you will, has very broad

6   discretion to reconsider issues that were previously ruled on.

7   And I can cite to Daumont-Colón at 982 F.3d 20, at page 26.

8   It's a First Circuit case from 2020.

9           Your Honor, so the U. S. Trustee's position is that

10  with respect to the releases, that they are, they are not

11  consensual and the debtor, the, the debtor has not established

12  under state law that they are, in fact, consensual.  I should

13  start with a quote from the Purdue Pharma case, which is that

14  the Bankruptcy Code does not authorize a release, an

15  injunction, that, as part of a chapter 11 plan, effectively

16  seeks to discharge claims against the nondebtor without the

17  consent of affected claimants.  And that's why because of that

18  decision the U. S. Trustee believes that the correct approach

19  is then to look to state law.  And that, the, the debtor has

20  not shown under state law that, the consent here, but the, the

21  fact of debtor's voting in favor of the plan is enough to give

22  consent, even with the language warning the voters that a vote

23  in favor of the plan is an acceptance of the, of the release.

24          In some ways, this is very much a Hobson's choice.

25  If, if a creditor wants to vote in favor of the plan, they, by

1    definition in this instance, are agreeing to the release.  I

2    think that that's, that under state law silence like that

3    cannot give consent.

4          And your Honor, with respect to the injunction under

5    the plan, the injunction is --

6          THE COURT:  Well, let me -- let me --

7          MR. MEUNIER:  -- under --

8          THE COURT:  -- stop you -- let me stop for one second.

9          The Hobson -- Hobbs -- I'm not saying it right.  The

10   choice you're suggesting is not really what you're suggesting.

11   So I agree.  In this particular case, if you vote for the plan,

12   you are opting in to the releases.  Someone who has read the

13   ballot and wanted to sue outside of the plan and wanted to opt

14   out is instructed to vote to reject the plan.  And assuming the

15   plan is confirmed, they still get to participate in

16   distribution and still sue whoever they want to sue.

17         So I don't -- I don't -- I don't -- agree that there's

18   a Hobson's choice there.

19         MR. MEUNIER:  Your Honor, that, I think that assumes

20   that we're dealing with in every case very sophisticated

21   creditors.  In many cases, we're dealing with unsophisticated

22   creditors who may not know that they have a possible claim

23   against the released parties.  They may not know what they're

24   doing.  They may just want to get the benefit of the plan, that

25   is, the payout.  They may not know that if they're, they voted

1    against the plan, that if, ultimately, the plan was confirmed,

2    that they would still get that distribution.  That's not made

3    particularly clear in this plan.

4            So our, our position is that -- that contrary to --

5    contrary to the debtors, that this is not enough to give

6    consent.  They're not even -- and, and I should say, you know,

7    and, and speaking of the cooperation and the, the efforts by

8    the debtors to facilitate a path to reorganization, they did

9    agree to change the ballot with respect to those who either

10   don't vote or who vote to reject, that those are not deemed to

11   be acceptances of the, of the plan.  And we appreciate that,

12   but we, we still have this final stumbling point.

13           THE COURT:  I think you meant to say acceptances of

14   the releases and you said "acceptances of the plan," but I

15   understand what you meant.

16           MR. MEUNIER:  Yeah.  Thank you.

17           So voters in favor of the plan have no option.

18   They -- they -- they're -- they're simply told that.  And we

19   think that for most creditors, they don't really know what

20   they're giving up and they don't know that not voting to accept

21   the plan, that voting to reject the plan may still result in a

22   recovery under the plan.

23           With respect to the injunction, your Honor, our

24   objection has to do with, to the extent it extends to parties

25   who are not actually released, in this instance any party that

1   rejected the, the plan it's, it's not proper.  And with respect

2   to parties that are released, if the Court upholds the releases

3   here, those released parties are not entitled to the protection

4   of an injunction because it's not, it's not in the Code.

5   There, the only injunction under the plan is basically under

6   Section 524(a) by, by, by route of 524(e).

7          So the injunction should only apply to the debtor.

8   That doesn't leave the released parties hanging in the wind.

9   They still have that release as an affirmative defense to any

10  lawsuit brought by any holder of the claim that does pursue

11  something, that does decide to pursue something against them.

12         With respect to the exculpation clause, your Honor,

13  our, the U. S. Trustee's position is that it should only extend

14  to estate fiduciaries and only for actions from the petition

15  date through the effective date.  So essentially, it should not

16  extend beyond court-supervised conduct of estate fiduciaries in

17  the chapter 11 case.

18         And your Honor, with respect to the quarterly fees --

19         THE COURT:  Yes.

20         MR. MEUNIER:  -- as stated in our objection and I'll

21  admit it is not, it is not well developed, but I'm not sure it

22  has to be.  The U. S. Trustee is concerned that disbursements

23  to be made under the plan may evade inclusion in the

24  calculation of quarterly fees.  So it's unclear to the, the

25  U. S. Trustee as to whether or not -- I mean, it's clear that

1  the reorganized debtors with respect to disbursements that they

2  make through the effective date post-effective date in the

3  conduct of their business will file reports, quarterly reports,

4  with the U. S. Trustee post-confirmation showing, among other

5  things, the amount of disbursements.  But we don't really know

6  whether the disbursements that will be reported by the

7  reorganized debtors capture disbursements that are ultimately

8  made by the liquidating trustee.

9       THE COURT:  Okay.  So that -- okay.  That, that's

10  something that could be clarified --

11       MR. MEUNIER:  I, I think --

12       THE COURT:  -- in any confirmation order.

13       MR. MEUNIER:  And I, I understand that the timing is

14  crucial, but this, I think, is something that we can resolve.

15       But that's U. S. Trustee's position.

16       THE COURT:  Thank you, Attorney Meunier.

17       Counsel for the debtors, whosever going to present.

18       MR. GREEN:  I, I'll go first, your Honor, at a macro

19  level.  And let's take these in two parts, the -- the -- sort

20  of the, the whole concept of the, off the releases and then

21  we'll leave the U. S. Trustee fees.

22       I, I actually think you dealt with this very issue

23  when we did the disclosure statement.  As the U. S. Trustee

24  admitted, we clearly amended the plan to provide for optins

25  rather than optouts.  We clearly went through various spots in

1  the plan and in the ballots where, as you said, we literally

2  told people, "If you do not wish to consent to the release, you

3  should not vote in favor of the plan."  So I, I, I can't

4  imagine we could be any more clear than that.  And I will also

5  say that the injunctions at least are supposed to give some

6  teeth to the releases.

7        But again, I'm going to turn the, the details of that

8  over to Mr. Goroff, who's ready to present a more detailed

9  argument.

10        THE COURT:  Thank you.

11        Attorney Goroff.

12        MR. GOROFF:  Thank you, your Honor.

13        And thank you, Ed.

14        So Mr. Meunier talks about the, the _Purdue_ case, but

15  the _Purdue_ case left open what constituted consent.  And, and

16  what it really involved were sort of stealth releases and

17  injunctions where the parties did not know what they were

18  giving up.  It couldn't be any more different here, your Honor,

19  where, as, as Mr. Meunier acknowledges, the language is very,

20  very clear that, "If you are accepting the plan, you are

21  accepting the releases and injunctions in the plan.  And if you

22  have an issue with that, you have, don't vote."  And, and for

23  those who abstain even, there, there has to be an affirmative

24  act, either by opting in or filing an, filing an opt-in form or

25  sending in a ballot before they are held responsible to, you

1  know, for, for the, the releases and, and injunctions.  So in

2  no case is there any kind of surprise.

3          And so the U. S. Trustee in their briefing cite a

4  series of cases where you can't say solely by accepting a plan

5  or merely by accepting a plan, you can't be held to accept the

6  releases and injunctions, but that's not the case here.  And

7  what we see, instead is, your Honor, an emerging consensus

8  since the Purdue decision in bankruptcy courts elsewhere in, in

9  cases similar to, to ours where it has been recognized that the

10 very kind of process that was followed here is sufficient to

11 justify releases and injunctions.  We cite ten of them,

12 actually, at our confirmation brief, pages 47, 48, paragraph

13 31.  They include the Red Lobster case, the Ebix case, the

14 BowFlex case, the GigaMonster case, the Net, In re Network

15 case, In re Robertshaw.  And, and you don't really see Mr.

16 Meunier acknowledging that emerging authority and you don't see

17 Mr. Meunier pointing to anything post-Purdue that really

18 supports their, their read.

19          And you know, he talks about that, you know, obviously

20 there are a lot of sophisticated creditors in this case, but he

21 says there may be some who weren't aware what they're giving

22 up.  I mean, I think if something says "you're going to," you

23 know, "release parties, the release will apply to you if you

24 accept," couldn't be clearer.  But to me, your Honor, that is a

25 disclosure issue.  The question was, were parties given

1   adequate notice to know what they were giving up.  And your

2   Honor already ruled very forcefully on that in paragraph 3 of

3   your disclosure statement order last month.  And that is why

4   you can quarrel whether, you know, the law of the case is the

5   right terminology, but the real question is have, has Mr.

6   Meunier and the U. S. Trustee presented to you reasons to have

7   a different view than you had before.  And, and obviously, they

8   have not.

9       And you know, there is warning language here.  There's

10  no case that has ever said that is insufficient.  And, and, and

11  you really come down to, you know, a plan is, essentially, a

12  kind of contract.  And so you, you either accept the contract

13  or you, or you don't.  If you propose a modification, then

14  you're not, not accepting.  What they're really asking for is,

15  is an ability to sort of do a smorgasbord approach to a

16  contract to say, "I'm going to accept the plan, but I'm not

17  going to accept these," you know, "provisions that go to the

18  injunction and release."  And the injunction piece -- and

19  there's a little bit of a pivot, I think, because the, the

20  U. S. Trustee has fronted these arguments before and they did

21  not succeed at disclosure, to focusing on the injunction.  But

22  without the injunction, you, you lose what makes a release

23  effective.

24      And actually, Mr. Meunier concedes that in his

25  presentation.  He says, "Well, they're not," you know, "they

1  can still raise this as an affirmative defense," you know, "if,

2  if someone pursues a released claim against them."  But that

3  shows the very problem.  That ends up having unnecessary

4  litigation.  Obviously, if you're sued and you've been

5  released, you're put to a burden you thought you were getting

6  rid of.  You're not getting quite the consideration under the

7  plan you thought.

8         And so for a lot of reasons, you know, we, we think

9  the Court was absolutely correct and in line with all of the

10  brother and sister bankruptcy courts thus far in, in ruling as

11  you did on the disclosure statement.  And we think the same

12  argument applies as to the releases and, and injunctions.

13         And similarly, the exculpation provision.  Mr. Meunier

14  talks about it should only apply to court-appointed

15  fiduciaries.  As we pointed out in paragraph 127 of our

16  confirmation brief, page 45 and 46, that is a minority

17  position.  It's only been adopted by the Fifth Circuit.  The

18  majority position -- and we cite In re PWS from the Third

19  Circuit; we cite Patterson vs. Mahwah from Eastern District of

20  Virginia and a number of other cases -- that, that is not the

21  case.

22         And so for those reasons, your Honor, I'm happy to

23  answer any questions.  But those, you know, I'm speaking to the

24  release and injunction and exculpation provisions of, of the

25  U. S. Trustee's objections.  I think my colleague will speak to

1   anything else.  But if, if your Honor has any questions.

2   Otherwise, you know, we, we believe these absolutely pass

3   muster as they have in many other cases.

4         THE COURT:  So Attorney Goroff, the exculpation, is it

5   extended past the effective date or was that misread by the

6   U. S. Trustee?

7         MR. GOROFF:  It, it, it covers post-petition conduct.

8   The U. S., the U. S. Trustee misreads it.

9         THE COURT:  Okay.  So it's not extended past the

10  effective date.  It's from the petition date --

11        MR. GOROFF:  That --

12        THE COURT:  -- through the effective date?

13        MR. GOROFF:  Correct.

14        THE COURT:  And although he didn't bring it up today,

15  in the briefs there was a discussion about consideration.  And

16  I understand the debtor's position is that the debtor can

17  provide consideration and that, that satisfies any kind of

18  contract law offer and acceptance.

19        MR. GOROFF:  That, that's correct.  Under

20  Massachusetts law, which we look to, consider, there has to be

21  consideration.  There doesn't have to be consideration from the

22  party receiving the benefit.  It can be supplied by someone

23  else.  And here, that's, that's the case.

24        THE COURT:  And then he, in his presentation, Attorney

25  Meunier just indicated that the injunction included parties

1    outside of the released party.  And I'm not sure he read that

2    accurately.  Is that true, too?

3              MR. GOROFF:  I mean, I think there are non-debtor

4    releases that, you know, that would then be enjoined as well.

5    But I'm not, I want to make sure I'm understanding your

6    question right.  And again, if one of my colleagues has a

7    different view, they should also make sure I'm not misspeaking

8    there.

9              THE COURT:  Well, the injunction should be as to the

10   released parties, period.  And that's --

11             MR. GOROFF:  Period, exactly.

12             THE COURT:  And that's it.  And that, and that's --

13             MR. GOROFF:  Yes.  I'm sorry --

14             THE COURT:  -- how I read it.

15             MR. GOROFF:  -- I wasn't clear on that.  Absolutely.

16             THE COURT:  That's how I read it.  Okay.

17             MR. GREEN:  We agree.

18             THE COURT:  Okay.

19             MR. GOROFF:  They're really part and parcel to one

20   another.  The -- the -- again, the injunction is what makes the

21   release effective, essentially.

22             THE COURT:  Thank you, Attorney Goroff.

23             And then as to the quarterly fees, there's still a

24   lingering issue.

25             MR. GORDON:  I'm happy to --

1          MR. GREEN:  Go ahead, Jake.

2          MR. GORDON:  Your Honor, the objection from the United

3   States Trustee at paragraph 39 states that, "The plan should

4   more specifically provide for post-confirmation reporting and

5   payment requirements by the debtors and the liquidating

6   trustee."  We had a conversation with the United States Trustee

7   last week and requested language about what specifically they

8   wanted included.  And unfortunately, we never received that

9   language.

10          So at, at this point, we're a little confused on what

11   exactly they're looking for.

12          THE COURT:  Okay.

13          MR. GORDON:  We've made it clear that the distribution

14   from the debtor to the liquidating trust will be counted as a

15   disbursement and applicable fees will apply.  To the extent the

16   United States Trustee has additional proposed language, we're,

17   we're all ears.  But again, we just haven't received that.

18          THE COURT:  Okay.  Just before -- I see Attorney

19   Helman wishes to be heard.  Just before I get to you, Attorney

20   Helman.

21          Could you restate the United States Trustee's position

22   on that?  As I understood Attorney Gordon just now, the

23   position of the debtor would be, right now, as of the effective

24   date when, I think it's $4 million is distributed to the

25   liquidating trust, that is part of the basis of calculating the

1    United States Trustee's fees.  But maybe the disconnect is that

2    the United States Trustee is assuming that in the future when

3    that $4 million -- well, no.  I guess it would be -- when

4    additional money comes in there's a concern that it would not

5    be as part of, calculated as part of the United States

6    Trustee's fees.

7            Can you just restate what -- what's the issue there?

8            MR. MEUNIER:  The -- so there are two distributions,

9    or two funds that are being, being paid in the debtors -- and

10   Attorney Helman can describe this much better than I -- but

11   there's the 4.75 million that, that is to be transferred in

12   funds, basically, but not today.  But I think revised papers

13   say later this week.

14           THE COURT:  Okay.  On the effective date?

15           MR. MEUNIER:  Effectively.  The funding date --

16           THE COURT:  Okay.

17           MR. MEUNIER:  -- which will be, I, I guess --

18           THE COURT:  Okay.

19           MR. MEUNIER:  -- retro -- the -- retroactive to the

20   effective date.  So -- but the remaining fund of, of the note

21   for $5.25 million, we're not clear on whether that will be

22   considered in the calculation of disbursements at the time of

23   transfer.  And if not, how will the liquidating trustee account

24   for disbursements as those are made or the reorganized debtors

25   going forward --

1              THE COURT:  Right.

2              MR. MEUNIER:  -- when they make that transfer to the

3      liquidating trustee?

4              THE COURT:  Okay.  So if someone --

5              MR. MEUNIER:  And we're hap, I'm happy to, to provide

6      some language, or the standard language that the U. S. Trustee

7      asks for in terms of the reports.  But the, the issue here is

8      whether or not the reorganized debtors and the liquidating

9      trustee should be filing these reports.  We think both should.

10     And to the extent that either of those parties believes that

11     disbursements have already been calculated and shouldn't be

12     calculated a second time, they should be free to make that

13     argument in the future.  But we just need to be protected on

14     that front.

15             THE COURT:  Okay.

16             So Attorney Gordon, what's your response to that?

17             MR. GORDON:  I believe -- so just to clarify your

18     question.  So the, the liquidate, the GUP (phonetic) note will

19     be paid solely pursuant to the excess cash sweep, which could

20     take up to, I think that the expiration date of that is 10 or

21     20 years.  Mr. Helman can correct me if I'm wrong.  But it, it

22     could take a substantial amount of time.

23             I, I do not know that we've seen proposed language

24     covering what exactly Mr. Meunier is looking for.  Is he

25     looking for each time we make the excess cash sweep for it to

#23-40817/AP 24-04022                              9-30-2024

```
 1   continue to be counted as a disbursement from the debtor?

 2          THE COURT:  Attorney Meunier, he's asking your -- your

 3   -- he's asking a question.

 4          MR. MEUNIER:  It depends on the, on the mechanics of

 5   the disbursement, I, I think.

 6          MR. GORDON:  That --

 7          MR. MEUNIER:  If it's from the reorganized debtors to

 8   the liquidating trustee --

 9          THE COURT:  Right.

10          MR. MEUNIER:  -- then --

11          MR. GORDON:  Yes.  Our position would be that those --

12   that those are not -- that, that the cases will be closed.  I

13   assume the cases will not remain open necessarily through the

14   expiration of the note; and therefore, will not count as

15   distributions over the next, you know, 10-to-20 years.

16          MR. MEUNIER:  Your Honor, we, we wouldn't expect to --

17   we wouldn't expect quarterly fees beyond the times described in

18   the statute, including --

19          THE COURT:  When the case --

20          MR. MEUNIER:  -- of course, closure.

21          THE COURT:  -- is closed --

22          MR. MEUNIER:  Yeah.

23          THE COURT:  -- there's no, there's no U. S. --

24          MR. MEUNIER:  Dismissed or converted, yes.

25          THE COURT:  Okay.
```

1        MR. MEUNIER:  No, no quarterly fees after that time.

2        THE COURT:  Okay.

3        Attorney Helman, what, what's your input on this?

4        MR. HELMAN:  Good morning, your Honor.  Andrew Helman

5   on behalf of the Committee.  Thank you for the opportunity to

6   speak.  I appreciate it.

7        So I'm going to stay focused on the U. S. Trustee

8   fees.  I think that the, the releases have been adequately

9   addressed.  The plan, in my view, makes very clear that the

10   debtor will pay quarterly fees in the disbursements that

11   they're making to the liquidating trust while the case is open.

12   And from our perspective -- and again, I'm, I don't currently

13   represent the liquidating trustee -- but our perspective as the

14   folks who are economically interested is that once that fee has

15   been paid on, the initial 4 million, for example, the fee has

16   been paid and it would effectively be akin to a double tax.

17        If your Honor is looking for authority for that

18   position, which I will candidly admit does not mean that there

19   isn't contrary authority, In re Paragon Offshore PLC -- and

20   forgive me, your Honor, for not putting this in front of you by

21   a writing before right now -- 629 B.R. 227 (Delaware 2021),

22   Judge Sontchi.  And he looked at Section 28 U.S.C. 1930(a)(6)

23   and considered this double-taxation argument.

24        And really, the differentiation would be whether the

25   liquidating trustee is effectively going to be managing

1    everything for the debtor afterwards.  We're not.  We have a

2    very limited and discrete role.  The debtor will continue on

3    into the future.  It has its own continuing business

4    operations.  We are not reorganized debtors.  We are so

5    thankful that they're going to be able to continue their

6    operations.  And we think the plan is very clear that the

7    distributions that they make to the trust, that's the point in

8    time where the fee or the, the programmatic tax effectively

9    will be paid.

10            I do also think it's worth drawing a distinction

11   between the payments that are made while the case is open

12   versus payments that are made off into the future.  For

13   example, the debtor will be making payments to the bondholder,

14   the trustee, bond trustee, for a very long time, just like you

15   will have a property owner with a real property mortgage that

16   extends past the time when a, a case is closed and U. S.

17   Trustee fees are not paid on those disbursements off into the

18   future.  In this instance, we have an initial slug of cash, to

19   put it in technical terms, we have an initial disbursement and

20   then we have a subsequent slug in about a year.  And then the

21   rest is really dependent upon the debtor's business operations.

22            It's reflected a, a significant compromise among all

23   of the parties just to, to have our moment of kumbaya in that

24   sense.  This really did reflect a significant compromise among

25   all the parties, including the debtor who made modifications to

1   the cash sweep, which is predicated upon the number of days of

2   cash on hand.  It's entirely im, it's entirely possible that it

3   takes, you know, a couple of decades for that note to be fully

4   paid down.  We certainly hope that it is less than that, but

5   there is an outside maturity date that is way off into the

6   future.  Again, our hope is that it's paid before then and that

7   the liquidating trustee will be discharged.

8          But our view is that the liquidating trustee is not

9   responsible for those fees.

10          THE COURT:  Okay.  Thank you.  So --

11          MR. HELMAN:  Thank you very much, your Honor.

12          THE COURT:  So Attorney Meunier, in looking at your

13   objection, it's not fully articulated.  It simply says there

14   needs to be post-confirmation reporting and payment

15   requirements by each of the reorganized debtors and by the

16   liquidating trustee or disbursing agent, to the extent of any

17   disbursements over and above those already accounted for by the

18   reorganized debtors.

19          So I didn't really have a lot to think about before

20   today's hearing, but it seems to me the argument from the

21   Committee and the debtors are that disbursements from the

22   debtor while the case is open is what the United States

23   Trustee's [sic] are supposed to be based on, period, the end.

24   I mean, that's their argument.  And I don't -- I -- it seems to

25   be correct, but I think you're arguing something else.

1          MR. MEUNIER:  Your Honor, so long as it's clear that

2     the only funds that the liquidating trustee is disbursing are

3     those funds that the reorganized debtor have, have accounted

4     for.  And maybe just a statement on the record to that effect

5     is that, that the liquidating trust is not going to be

6     disbursing funds that haven't already been reported by the

7     debtors as disbursements.

8          THE COURT:  Any --

9          MR. HELMAN:  I --

10          THE COURT:  -- comment?

11          MR. HELMAN:  Your Honor, I assume that that -- I

12     assume that you're looking to me on that one.

13          To the best of my knowledge, based on my understanding

14     of the documents that are presented to you for approval today

15     and the agreements that have been reached and that are set

16     forth in the plan and the liquidating trust instrument and the

17     contours of the funding source for general unsecured creditors,

18     I am not aware of any source of funding that the liquidating

19     trust would have that has not first passed through the debtor.

20     It is entirely possible that there is something that I'm

21     missing.  But I do see nodding heads for Mr. Green and Mr.

22     Gordon.  I am not able to, as I sit here today, conceive of a

23     different source of funding.

24          And in part, your Honor, just to provide a little bit

25     more for the record for you and for Mr. Meunier, because I

1   appreciate the importance of this issue programmatically for

2   the United States Trustee, it is the debtor that will be in

3   control, effectively, of certain post-confirmation claims that

4   could potentially be, be brought.  We will not be -- and I

5   shouldn't say "we" --

6           THE COURT:  Okay.

7           MR. HELMAN:  -- the liquidating trustee will not be

8   bringing those; and therefore, funds that the liquidating trust

9   receives will be derivative of recovery efforts by the debtor.

10          And so for that reason, while I cannot make a

11  representation for all time -- and that would be outside the

12  scope of what I can do -- to the best of my knowledge, I'm not

13  aware of any funds that would go to the trust outside of that

14  which the debtor has already received and would then have

15  recorded as a disbursement.

16          THE COURT:  So here's what I'd like to do.  I'd like

17  to enter generic language about the United States Trustee's

18  fees.  And as time goes on, if the United States Trustee is not

19  satisfied with either the reporting or the calculation of fees,

20  the United States Trustee will have to bring a motion.

21          So we'll have to leave it at that.

22          MR. GORDON: Your Honor?

23          THE COURT:  Yes.

24          MR. GORDON:  Paragraph 138 of confirmation order says

25  that the debtors will comply with the U. S. Trustee's quarterly

1  reporting requirements, file such report as required under the

2  Local Bankruptcy Rules through the effective date.

3          THE COURT:  Okay.

4          MR. HELMAN:  And the plan, your Honor -- pardon me for

5  interrupting -- the plan also indicates that the, the

6  reorganized debtor will be paying U. S. Trustee fees as well.

7  And I believe, in case that's helpful, your Honor, that that is

8  in, I believe it's Article --

9          MR. GORDON:  13(C).

10         MR. HELMAN:  Yes.  Thank you.

11         -- 13(C) was where I was going, Mr. Gordon.  I

12  appreciate it.

13         And it says:

14         "All fees payable pursuant to Section 1930(a) of the

15         Judicial Code, as determined by the bankruptcy court,

16         shall be paid by the reorganized, each of the

17         reorganized debtors for each quarter until the cases

18         are converted, dismissed or closed, whichever occurs

19         first."

20         I, I actually thought that the debtor had done a nice

21  job endeavoring to make clear that it would continue to pay

22  these fees, notwithstanding disbursements made to the trust.

23  And we appreciated their sensitivity on that issue.

24         THE COURT:  So the Court overrules the United States

25  Trustee's objection.  I do find the releases are consensual

1   releases that are permitted under the Code.

2           And as an aside, the releases that we're talking about

3   here are just so different from what was happening at Purdue

4   Pharma.  I mean, families who lost loved ones because of the

5   opioid crisis and whether they can consent to not suing the

6   principals is just such a completely different scenario than

7   what I'm presented with today, which is just the restructuring

8   of these healthcare facilities.

9           So I'll have more, a more thorough ruling, but I am

10  overruling the objection of the United States Trustee.

11          The only loose end that I had was the healthcare

12  ombudsman, who I have read the reports every time they've come

13  in.

14          Mr. Tomaino, thank you very much for doing that.  I

15  appreciate it.

16          But is there now some terminating language that needs

17  to be in the confirmation order?  That was just a loose end

18  that I was wondering about.

19          MR. TOMAINO:  Well, your Honor, Joseph Tomaino,

20  Patient Care Ombudsman.

21          Typically, when, once a plan is approved, we are

22  released from our obligation to, to monitor, but I'll defer to

23  my counsel.  He's  on the line.

24          MR. HAMMEL:  Your Honor, Ian Hammel, Mintz Levin, on

25  behalf of the Patient Care Ombudsman.

1          If it's helpful to the Court and the parties, we're,

2    we're happy to work quickly today with counsel for the debtor

3    to, perhaps, propose a sentence or two that can go in the

4    confirmation order.

5          THE COURT:  Thank you, Attorney Hammel.  That's

6    exactly what I was looking for, just, just to tie up that loose

7    end.

8          MR. HAMMEL:  Of course, your Honor.

9          THE COURT:  In terms of the confirmation, the plan is

10   confirmed.  Congratulations to the parties for all their hard

11   work and the Court appreciates all the work of all the

12   professionals in this case.

13         And then, the only other two things left are the cash

14   collateral motion, which I thought I could just enter a short

15   order without requiring a proposed order that just indicated

16   that the cash collateral is permitted through the effective

17   date and just leave it at that.

18         To remind counsel, when you -- I am going to require a

19   proposed order on confirmation.  And please provide a redline

20   copy, which you always have in the past, but just to remind you

21   that I need to see the redline copy of that.

22         And then I believe the last matter on is the adversary

23   proceeding.  But before I move there, is there anything else on

24   the case in chief that anyone needs to have me address?

25         (No response)

1          THE COURT:  No.

2          And Mr. Reynolds, did you call that adversary when you

3   called this case?  I can't recall.

4          THE COURTROOM DEPUTY:  I did, Judge.

5          THE COURT:  Okay.

6          So Attorney Helman, should I just continue this for a

7   month and you can file a dismissal or something like that?

8          MR. HELMAN:  Your Honor, if you could just continue

9   it, I think that would be the path of least resistance.  There

10  are releases that are baked into the plan that address the

11  adversary proceeding, and they become effective when the

12  initial tranche of funds flow.  We're going to get a stip of

13  dismissal ready to go and circulate it in the parties.  And I

14  expect very shortly after we go effective we'll get that filed

15  and we'll clean up the docket for you in that way.

16         I do see that Ms. Zuccarello went on camera and she

17  may have any additional or alternating different comments.

18         THE COURT:  Sure.

19         Attorney Zuccarello.

20         MS. ZUCCARELLO:  Thank you, your Honor.

21         I was just going to say that's acceptable to us.

22         THE COURT:  Okay.

23         Attorney -- okay.

24         So Mr. Reynolds, let's have a continued pre-trial

25  hearing date on the adversary in about 30 days.  And that could

1   be by telephone.

2          Attorney Swett.  I'm sorry.  Is there anything else?

3          MR. SWETT:  Wanted to note for the record, your Honor,

4   that that's acceptable to Siemens as well.

5          Thank you.

6          THE COURT:  Okay.

7          THE COURTROOM DEPUTY:  Judge, I'm going to suggest

8   Wednesday, November 6th, at 10:00 a.m.

9          THE COURT:  Okay.  Wednesday, November 6th, 10:00

10  a.m., is a pre-trial hearing on the adversary proceeding.

11         All the other matters are resolved in connection with

12  the confirmation hearing or as announced by the Court.

13         Congratulations, again, to everyone.

14         And hearings are adjourned.

15         Thank you.  Have a good day.

16         MR. GREEN:  Thank you, your Honor.

17         MR. HELMAN:  Thank you, your Honor.

18         MR. GREEN:  Have a good evening.

19         MR. GORDON:  Thank you very much, your Honor.

20         THE COURT:  You're welcome.

21         THE COURTROOM DEPUTY:  All rise.

22     (Proceedings concluded at 10:24:31 a.m.)

23

24

25

1                          <u>CERTIFICATE</u>

2          I, court approved transcriber, certify that the

3   foregoing is a correct transcript from the official electronic

4   sound recording of the proceedings in the above-entitled

5   matter.

6   /s/ *Janice Russell*                    February 20, 2025

7   Janice Russell, Transcriber                    Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25